# EXHIBIT 1

DocuSign Envelope ID: E38418B8-C607-4628-BEE4-5FDED50CE963

FL-300

PARTY WITHOUT ATTORNEY OR ATTORNEY: STATE BAR NO.:
NAME: Joseph Mannis 51098
FIRM NAME: HERSH MANNIS LLP
STREET ADDRESS: 9150 Wilshire Blvd., Suite 209
CITY: Beverly Hills STATE: CA ZIP CODE: 90212
TELEPHONE NO.: (310) 78601910 FAX NO.: (310) 786-1917
E-MAIL ADDRESS: Jmannis@hershmannis.com
ATTORNEY FOR *(name)*: Marilyn Wilson-Rutherford

FOR COURT USE ONLY

RECEIVED - CENTRAL FAMILY LAW CLERK'S OFFICE FEB 18 2022

CONFORMED COPY ORIGINAL FILED Superior Court of California County of Los Angeles

FEB 18 2022

Sherri R. Carter, Executive Officer/Clerk of Court

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: 111 North Hill Street
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Central

PETITIONER: Brian Wilson
RESPONDENT: Marilyn Wilson-Rutherford
OTHER PARENT/PARTY:

CASE NUMBER: D 983 605

**REQUEST FOR ORDER** ☐ **CHANGE** ☐ **TEMPORARY EMERGENCY ORDERS**

☐ Child Custody ☐ Visitation (Parenting Time) ☐ Spousal or Partner Support
☐ Child Support ☐ Domestic Violence Order ☒ Attorney's Fees and Costs
☐ Property Control ☒ Other *(specify)*: Accounting and Related Relief

## NOTICE OF HEARING

1. TO *(name(s))*: Brian Wilson
☒ Petitioner ☐ Respondent ☐ Other Parent/Party ☐ Other *(specify)*:

2. **A COURT HEARING WILL BE HELD AS FOLLOWS:**
a. Date: April 14, 2022 Time: 8:30 AM ☐ Dept.: 88 ☑ Room: 831
b. Address of court ☒ same as noted above ☐ other *(specify)*:

3. **WARNING to the person served with the *Request for Order:*** The court may make the requested orders without you if you do not file a *Responsive Declaration to Request for Order* (form FL-320), serve a copy on the other parties at least nine court days before the hearing (unless the court has ordered a shorter period of time), and appear at the hearing. *(See form FL-320-INFO for more information.)*

*(Forms FL-300-INFO and DV-400-INFO provide information about completing this form.)*

## COURT ORDER
*(FOR COURT USE ONLY)*

***It is ordered that:***

4. ☐ Time ☐ for service ☐ until the hearing is shortened. Service must be on or before *(date)*:
5. ☐ A *Responsive Declaration to Request for Order* (form FL-320) must be served on or before *(date)*:
6. ☐ The parties must attend an appointment for child custody mediation or child custody recommending counseling as follows *(specify date, time, and location)*:
7. ☐ The orders in *Temporary Emergency (Ex Parte) Orders* (form FL-305) apply to this proceeding and must be personally served with all documents filed with this *Request for Order.*
8. ☐ Other *(specify)*:

Date:

JUDICIAL OFFICER

| | |
|---|---|
| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford<br>OTHER PARENT/PARTY: | CASE NUMBER:<br>D 983 605 |

## REQUEST FOR ORDER

**Note**: Place a mark ☒ in front of the box that applies to your case or to your request. If you need more space, mark the box for "Attachment." For example, mark "Attachment 2a" to indicate that the list of children's names and birth dates continues on a paper attached to this form. Then, on a sheet of paper, list each attachment number followed by your request. At the top of the paper, write your name, case number, and "FL-300" as a title. (You may use *Attached Declaration* (form MC-031) for this purpose.)

1. ☐ RESTRAINING ORDER INFORMATION
One or more domestic violence restraining/protective orders are now in effect between *(specify)*:
☐ Petitioner ☐ Respondent ☐ Other Parent/Party *(Attach a copy of the orders if you have one.)*
The orders are from the following court or courts *(specify county and state)*:
a. ☐ Criminal: County/state *(specify)*: Case No. *(if known)*:
b. ☐ Family: County/state *(specify)*: Case No. *(if known)*:
c. ☐ Juvenile: County/state *(specify)*: Case No. *(if known)*:
d. ☐ Other: County/state *(specify)*: Case No. *(if known)*:

2. ☐ CHILD CUSTODY ☐ I request temporary emergency orders
☐ VISITATION (PARENTING TIME)
a. I request that the court make orders about the following children *(specify)*:

| Child's Name | Date of Birth | ☐ Legal Custody to *(person who decides: health, education, etc)*: | ☐ Physical Custody to *(person with whom child lives)*: |
|---|---|---|---|

☐ Attachment 2a.

b. ☐ The orders I request for ☐ child custody ☐ visitation (parenting time) are:
(1) ☐ Specified in the attached forms:
☐ Form FL-305 ☐ Form FL-311 ☐ Form FL-312 ☐ Form FL-341(C)
☐ Form FL-341(D) ☐ Form FL-341(E) ☐ Other *(specify)*:
(2) ☐ As follows *(specify)*: ☐ Attachment 2b.

c. The orders that I request are in the best interest of the children because *(specify)*: ☐ Attachment 2c.

d. ☐ This is a change from the current order for ☐ child custody ☐ visitation (parenting time).
(1) ☐ The order for legal or physical custody was filed on *(date)*: . The court ordered *(specify)*:

(2) ☐ The visitation (parenting time) order was filed on *(date)*: . The court ordered *(specify)*:

☐ Attachment 2d.

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford<br>OTHER PARENT/PARTY: | CASE NUMBER:<br>D 983 605 |
|---|---|

3. ☐ CHILD SUPPORT
(Note: An earnings assignment may be issued. See *Income Withholding for Support* (form FL-195))
a. I request that the court order child support as follows:

| Child's name and age | ☐ I request support for each child based on the child support guideline. | ☐ Monthly amount ($) requested (if not by guideline) |
|---|---|---|

☐ Attachment 3a.

b. ☐ I want to change a current court order for child support filed on *(date):*
The court ordered child support as follows *(specify):*

c. I have completed and filed with this *Request for Order* a current *Income and Expense Declaration* (form FL-150) or I filed a current *Financial Statement (Simplified)* (form FL-155) because I meet the requirements to file form FL-155.

d. The court should make or change the support orders because *(specify)*: ☐ Attachment 3d.

4. ☐ SPOUSAL OR DOMESTIC PARTNER SUPPORT
(Note: An *Earnings Assignment Order For Spousal or Partner Support* (form FL-435) may be issued.)
a. ☐ Amount requested *(monthly):* $
b. ☐ I want the court to ☐ change ☐ end the current support order filed on *(date):*
The court ordered $ per month for support.
c. ☐ This request is to modify (change) spousal or partner support after entry of a judgment.
I have completed and attached *Spousal or Partner Support Declaration Attachment* (form FL-157) or a declaration that addresses the same factors covered in form FL-157.
d. I have completed and filed a current *Income and Expense Declaration* (form FL-150) in support of my request.
e. The court should make, change, or end the support orders because *(specify):* ☐ Attachment 4e.

5. ☐ PROPERTY CONTROL ☐ I request temporary emergency orders
a. The ☐ petitioner ☐ respondent ☐ other parent/party be given exclusive temporary use, possession, and control of the following property that we ☐ own or are buying ☐ lease or rent *(specify):*

b. The ☐ petitioner ☐ respondent ☐ other parent/party be ordered to make the following payments on debts and liens coming due while the order is in effect:

| Pay to: | For: | Amount: $ | Due date: |
|---|---|---|---|
| Pay to: | For: | Amount: $ | Due date: |
| Pay to: | For: | Amount: $ | Due date: |
| Pay to: | For: | Amount: $ | Due date: |

c. ☐ This is a change from the current order for property control filed on *(date):*
d. Specify in Attachment 5d the reasons why the court should make or change the property control orders.


CEB ceb.com Essential Forms

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford<br>OTHER PARENT/PARTY: | CASE NUMBER:<br>D 983 605 |
|---|---|

6. ☒ ATTORNEY'S FEES AND COSTS
I request attorney's fees and costs, which total *(specify amount):* $ 500,000 . I filed the following to support my request:
   a. A current *Income and Expense Declaration* (form FL-150).
   b. A *Request for Attorney's Fees and Costs Attachment* (form FL-319) or a declaration that addresses the factors covered in that form.
   c. A *Supporting Declaration for Attorney's Fees and Costs Attachment* (form FL-158) or a declaration that addresses the factors covered in that form.

7. ☐ DOMESTIC VIOLENCE ORDER

- Do not use this form to ask for domestic violence restraining orders! Read form DV-505-INFO, *How Do I Ask for a Temporary Restraining Order,* for forms and information you need to ask for domestic violence restraining orders.
- Read form DV-400-INFO, *How to Change or End a Domestic Violence Restraining Order* for more information.

   a. The *Restraining Order After Hearing* (form DV-130) was filed on *(date):*
   b. I request that the court ☐ change ☐ end the personal conduct, stay-away, move-out orders, or other protective orders made in *Restraining Order After Hearing* (form DV-130). (*If you want to change the orders, complete 7c.)*
   c. ☐ I request that the court make the following changes to the restraining orders *(specify):* ☐ Attachment 7c.
   d. I want the court to change or end the orders because (*specify)*: ☐ Attachment 7d.

8. ☒ OTHER ORDERS REQUESTED *(specify):* ☐ Attachment 8.
See Attachment 8.

9. ☐ TIME FOR SERVICE / TIME UNTIL HEARING I urgently need*:*
   a. ☐ To serve the *Request for Order* no less than *(number):* court days before the hearing.
   b. ☐ The hearing date and service of the *Request for Order* to be sooner.
   c. I need the order because *(specify):* ☐ Attachment 9c.

10. ☒ FACTS TO SUPPORT the orders I request are listed below. The facts that I write in support and attach to this request cannot be longer than 10 pages, unless the court gives me permission. ☐ Attachment 10.
Declarations of Marilyn Wilson-Rutherford, Joseph Mannis, James Simon, Andrew Stein, Candace Carlo, and Bonnie Eskenazi
Memorandum of Points and Authorities

I declare under penalty of perjury under the laws of the State of California that the information provided in this form and all attachments is true and correct.

Date: 2/17/2022

Marilyn Wilson-Rutherford
(TYPE OR PRINT NAME)

DocuSigned by:
Marilyn
B40F755CBCF144A...
(SIGNATURE OF APPLICANT)

**Requests for Accommodations**
Assistive listening systems, computer-assisted real-time captioning, or sign language interpreter services are available if you ask at least five days before the proceeding. Contact the clerk's office or go to *www.courts.ca.gov/forms* for *Request for Accommodations by Persons With Disabilities and Response* (form MC-410). (Civ. Code, § 54.8.)

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

# ATTACHMENT 8 TO FL-300

8. OTHER ORDERS REQUESTED (*specify*):

1. An award to Marilyn of at least the sum of $6,704,879.64, together with 10-percent statutory interest thereon from December 15, 2021, based on the computation by Brian that the reversion sales price of the community property musical compositions under paragraphs 6 and 7 of the parties' judgment is the sum of $13,409,759.30, after payment of a 5% commission.

2. An accounting and payment of all funds due Marilyn as a result of her interest in the community property catalogue of musical compositions awarded to her under paragraphs 6 and 7 of the parties' judgment, including a minimum of $6,704,879.64 for the sale of 50% of the community property reversion rights, or such other amount as may be determined by the Court, and an additional amount for producers' royalties. The accounting shall include, but not be limited to:

A. a complete computation of Marilyn's copyright reversion rights;

B. a complete computation of Marilyn's rights to 50% of Brian's producer royalties;

C. a complete computation of Marilyn's rights to 50% of all sums generated from synchronization licenses, mechanical royalties, public performance royalties, whether payable by ASCAP, BMI, or SESAC or direct licensing, and royalties based on Brian's performance of the songs, including SoundExchange (featured artist royalties) and neighbouring rights royalties.

2. If the Court finds that the disposition of producers' royalties is not covered under the judgment, that such producers' royalties be declared an omitted asset under Family Code section 2556 and the producers' royalties received post-judgment be ordered divided equally between the parties and restitution thereof paid by Brian to Marilyn.

3. Final, full copy, with all exhibits, of the asset-acquisition agreement that Brian entered into with Universal Music Corp. d/b/a Irving Music and Primary Wave Music IP on

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

about December 15, 2021.

4. 10-percent statutory interest on any and all past-due payments due from Brian to Marilyn.

| | |
|---|---|
| PETITIONER/PLAINTIFF: Brian Wilson<br>RESPONDENT/DEFENDANT: Marilyn Wilson-Rutherford<br>OTHER PARTY: | CASE NUMBER:<br>D 983 605 |

## REQUEST FOR ATTORNEY'S FEES AND COSTS ATTACHMENT

1. I am completing this form because:
   a. I need to have enough money for attorney's fees and costs to present my case adequately;
      ☐ I am receiving free legal services from an attorney at a nonprofit legal services agency or a volunteer attorney.
   b. I have less money or limited access to funds to retain or maintain an attorney compared to the party that I am requesting pay for my attorney's fees and costs; and
   c. the party that I want the court to order to pay for my attorney's fees and costs has or is reasonably likely to have the ability to pay for attorney's fees and costs for me and himself or herself.

2. I am asking the court to order that *(check all that apply):* ☒ petitioner/plaintiff ☐ respondent/defendant ☐ other party *(specify):* pay for my attorney's fees and costs in this legal proceeding as follows:
   a. ☒ Fees: $ 250,000
   b. ☒ Costs: $ 250,000 accountant costs

3. The requested amount includes *(check all that apply):*
   a. ☐ a fee in this amount of: $ to hire an attorney in a timely manner before the proceedings in the matter go forward.
   b. ☒ attorney's fees and costs incurred from the beginning of representation until now in the amount of: $ 48,236
   c. ☒ estimated attorney's fees and costs in the amount of: $ 451,764
   d. ☐ attorney's fees and costs for limited scope representation in the amount of: $

4. Have attorney's fees and costs been ordered in this case before?
   a. ☐ No.
   b. ☐ Yes. If so, describe the order:
      (1) The ☐ petitioner/plaintiff ☐ respondent/defendant ☐ other party must pay: $ for attorney's fees and costs.
         (a) This order was made on *(date):*
         (b) From the payment sources of *(if known):*

      (c) The payments ☐ have been made ☐ have not been made ☐ have been made in part since the date of the order.
      (2) ☐ Additional information *(specify):*

5. Along with this *Request* form, you must complete, file and serve:
   a. A current *Income and Expense Declaration* (form FL-150). It is considered current if you have completed form FL-150 within the past three months and no facts have changed since the time of completion; and



CEB® ceb.com Essential Forms™

| PETITIONER/PLAINTIFF: Brian Wilson<br>RESPONDENT/DEFENDANT: Marilyn Wilson-Rutherford<br>OTHER PARTY: | CASE NUMBER:<br>D 983 605 |
|---|---|

5. b. A personal declaration in support of your request for attorney's fees and costs that explains why you need an award of attorney's fees and costs (either *Supporting Declaration for Attorney's Fees and Costs Attachment* (form FL-158) or a comparable declaration that addresses the factors covered in form FL-158).

6. The party requesting attorney's fees and costs must provide the court with sufficient information about the following factors:
   a. The attorney's hourly billing rate;
   b. The nature of the litigation, its difficulty, and skill required and employed in handing the litigation;
   c. Fees and costs incurred until now; anticipated attorney's fees and costs; and why the fees and costs are just, necessary, and reasonable;
   d. The attorney's experience in the particular type of work demanded; and
   e. If it is a limited scope fee arrangement, the scope of representation.

**Notice to Responding Party**

7. To respond to this request, you must complete, file and serve:
   a. A *Responsive Declaration* (form FL-320);
   b. A current *Income and Expense Declaration* (form FL-150). It is considered current if you have completed form FL-150 within the past three months and no facts have changes since the time of completion; and
   c. A personal declaration explaining why the court should grant or deny the request for attorney's fees and costs (either *Supporting Declaration for Attorney's Fees and Costs Attachment* (form FL-158) or a comparable declaration that addresses the factors covered in form FL-158).

8. Number of pages attached to this *Request* form: ______________

I declare under penalty of perjury under the laws of the State of California that the information contained on all pages of this form and any attachments is true and correct.

Date: 2/17/2022

Marilyn Wilson-Rutherford
(TYPE OR PRINT NAME)

DocuSigned by:
Marilyn
B40F755CBCF144A...
(SIGNATURE)

**FL-158**

| | | |
|---|---|---|
| PETITIONER/PLAINTIFF: | Brian Wilson | CASE NUMBER: D 983 605 |
| RESPONDENT/DEFENDANT: | Marilyn Rutherford-Wilson | |
| OTHER PARTY: | | |

**SUPPORTING DECLARATION FOR ATTORNEY'S FEES AND COSTS ATTACHMENT**

***To:*** ☒ ***Request for Attorney's Fees and Costs Attachment*** **(form FL-319)**
☐ ***Responsive Declaration*** **(form FL-320)**

1. I am
   a. ☐ the petitioner/plaintiff.
   b. ☒ the respondent/defendant.
   c. ☐ the other party.

2. I request that the court ☒ grant ☐ grant in part ☐ deny the request for attorney's fees and costs.

3. I am providing the following information ☒ in support of ☐ in opposition to the request for attorney's fees and costs.

   a. The ☒ petitioner/plaintiff ☐ respondent/defendant ☐ other party has the ability to pay
      (1) ☐ my attorney's fees and costs.
      (2) ☐ his or her own attorney's fees and costs.
      (3) ☒ both my and his or her own attorney's fees and costs.
      (4) ☐ other *(specify):*

   b. The attorney's fees and costs can be paid from the following sources:
      The tens of millions of dollars (before taxes) he just received from selling writer shares and reversion rights concerning his musical compositions, along with significant additional income and assets that I believe he has.

   c. The court should consider the following facts in deciding whether to grant, grant in part, or deny the request for attorney's fees and costs *(describe):*
      ☐ See Attachment 3c.
      See accompanying declarations.

   d. If appropriate, describe the reasons why a non-spouse party or domestic partner is involved in the case and whether he or she should or should not pay attorney's fees and costs:
      ☐ See Attachment 3d.

| PETITIONER/PLAINTIFF: Brian Wilson<br>RESPONDENT/DEFENDANT: Marilyn Rutherford-Wilson<br>OTHER PARTY: | CASE NUMBER:<br>D 983 605 |
|---|---|

4. Has an order already been made for payment of child support in this case?
   a. ☐ No.
   b. ☒ Yes. If so, describe the order:
      (1) The ☐ petitioner/plaintiff ☐ respondent/defendant ☐ other party must pay: $ per month for child support.
         (a) This order has been in effect since *(date):*
         (b) The payments ☐ have been made ☐ have not been made ☐ have been made in part since the date of the order.
      (2) ☒ Additional information *(specify):*
         Child support ended decades ago.

5. Has an order already been made for payment of spousal, partner, or family support in this case?
   a. ☐ No.
   b. ☒ Yes. If so, describe the order:
      (1) The ☐ petitioner/plaintiff ☐ respondent/defendant ☐ other party must pay: $ per month for ☐ spousal support ☐ partner support ☐ family support.
         (a) This order has been in effect since *(date):*
         (b) The payments ☐ have been made ☐ have not been made ☐ have been made in part since the date of the order.
      (2) ☒ Additional information *(specify):*
         Spousal support ended decades ago.

6. If you are or were married to, or in a domestic partnership with, the person you are seeking fees from, the court must consider the factors in Family Code section 4320 in determining whether it is just and reasonable under the relative circumstances to award attorney's fees and costs. Complete and attach *Spousal or Partner Support Declaration Attachment* (form FL-157) or a comparable declaration to provide the court with information about the factors described in section 4320.

7. You must complete, file, and serve a current *Income and Expense Declaration* (form FL-150). It is considered current if you have completed form FL-150 within the past three months and no facts have changed since the time of completion.

8. Number of pages attached to this *Supporting Declaration:* ____________

I declare under penalty of perjury under the laws of the State of California that the information contained on all pages of this form and any attachments is true and correct.

Date: 2/17/2022

DocuSigned by:
Marilyn
B40F755CBCF144A...

Marilyn Wilson-Rutherford ______________________ ▶ ______________________
(TYPE OR PRINT NAME) (SIGNATURE)

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

# SPOUSAL OR DOMESTIC PARTNER SUPPORT DECLARATION ATTACHMENT

☐ ***Declaration for Default or Uncontested Judgment*** **(form FL-170)**
☐ ***Request for Order*** **(form FL-300)**
☐ **Other** *(specify):*
☒ ***Supporting Declaration for Attorney's Fees and Costs Attachment*** **(form FL-158)**

1. **Spouse or domestic partner support.**
   a. I am the *(specify all that apply):*
      (1) ☐ petitioner ☒ respondent.
      (2) ☐ support payee (party asking for support) ☐ support payor (party being asked to pay support).
   b. I request that the court *(check all that apply)*
      (1) ☐ enter a judgment for spousal or domestic partner support for ☐ petitioner ☐ respondent.
      (2) ☐ modify the judgment for spousal or domestic partner support for ☐ petitioner ☐ respondent.
      (3) ☐ deny the request to modify the judgment for spousal or domestic partner support.
      (4) ☐ terminate jurisdiction to award spousal or domestic partner support to ☐ petitioner ☐ respondent.

2. ☒ **Attorney fees and costs.** I request that the court *(check one):*
   a. ☒ order my attorney fees and costs to be paid by ☒ my spouse or domestic partner ☐ a joined party *(specify):*
   b. ☐ deny the request for attorney fees and costs.

## SECTION 1: FACTS ABOUT BOTH PARTIES

3. **Length of marriage or domestic partnership** (Family Code section 4320(f))
   a. (1) Date of marriage: 12/7/1964
      (2) Date of separation: 1978
      (3) Time from date of marriage to date of separation: Around 15 years ______ months
   b. (1) Date domestic partnership was registered:
      (2) Date of separation:
      (3) Time from date of registration of the domestic partnership to date of separation: ______ years ______ months
   c. If applicable, total combined years and months for the marriage (a(3)) and the domestic partnership (b(3)) ______ years ______ months

4. **Standard of living of the marriage or domestic partnership** (Family Code section 4320(a)) ☐ See Attachment 4
   The standard of living established during the marriage or domestic partnership was *(describe, for example, information from your income tax return, type and frequency of vacations, value of home and other real estate, value of investments, type of vehicles owned, credit card use or nonuse, ability to save for retirement):*
   Brian, a world-famous musician, enabled us to live an upper-class lifestyle, with multiple homes, worldwide travel, luxury cars, and high-end shopping.

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

5. **Age and health of the parties** (Family Code section 4320(h))
   a. The age of the party asking for support is: 73
   b. The age of the party being asked to pay support is: 79
   c. The health condition of the party asking for support is *(describe):* ☐ See Attachment 5c
   No support is being sought.

   d. The health condition of the party being asked to pay support is *(describe):* ☐ See Attachment 5d
   No support is being sought.

6. **Documented history of domestic violence** (Family Code section 4320(i)) Not applicable. ☐ See Attachment 6
   The court will consider all documented evidence of any history of domestic violence between the parties or perpetrated by either party against either party's child, including but not limited to the following:
   a. A plea of nolo contendere ("no contest").
   b. Emotional distress resulting from domestic violence against the party asking for support by the party being asked to pay support.
   c. Any history of violence against the party being asked to pay support by the party asking for support.
   d. A *Restraining Order After Hearing* (form DV-130).
   e. A finding by a court as part of a case involving divorce, separation, or a child custody proceeding, or any other proceeding in family court in which the court has found that the spouse or domestic partner committed domestic violence.
   f. Other evidence of any history of violence between the parties.
   *Attach to this form copies of the documents that you want the court to consider. Label them "Attachment 6."*

7. **Documented evidence of criminal conviction** (Family Code section 4320(m))
   a. ☐ **Felony conviction of the party asking for support**
   The party being asked to pay support requests that the court find that the party asking for support is prohibited by law from receiving support (including medical, life, or other insurance benefits or payments) under Family Code section 4324.5 because:
   (1) The party asking for support was convicted of a violent sexual felony or domestic violence felony against the party being asked to pay support within five years after the conviction (and any time served in custody, on probation or on parole); and
   (2) The petition for divorce was filed within five years after the spouse's or domestic partner's conviction (and any time served in custody or on parole).

   b. ☐ **Misdemeanor conviction of the party asking for support** ☐ See Attachment 7b
   (1) There is a rebuttable presumption that the party asking for support is prohibited from receiving support from the party being asked to pay support under Family Code section 4325 because:
   (A) The party asking for support was either convicted of a domestic violence misdemeanor against the party being asked to pay support in this case or convicted of a misdemeanor against the other party that resulted in a term of probation under Penal Code section 1203.097*)*; and
   (B) The conviction was entered by the court within five years before the petition for divorce was filed (or the conviction was entered at any time during the divorce case).

   (2) Based on a preponderance of the evidence,
   (A) ☐ The party being asked to pay support asks the court to find that the presumption has not been rebutted.
   (B) ☐ The party asking for support asks the court find that the presumption has been rebutted.
   *Attach to this form a declaration and documents that you want the court to consider. Label them "Attachment 7b"*



CEB® ceb.com Essential Forms™

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

**SECTION 2: FACTS ABOUT THE PARTY ASKING FOR SUPPORT**

8. **Earning capacity** (Family Code section 4320(a)(1)

a. The marketable skills (training, job skills, and work history) of the party asking for support *(describe):* ☐ See Attachment 8a

I work as a real-estate agent. I am over the retirement age of 65.

b. The current job market for the job skills of the party asking for support is *(specify):* ☐ See Attachment 8b

No support is being requested.

c. The time and expenses required for the party asking for support to acquire the appropriate education and training to develop the skills for the job market described in (b) *(specify):* ☐ See Attachment 8c

No support is being requested.

d. The possible need for retraining or education to acquire other, more marketable skills or employment *(specify):* ☐ See Attachment 8d

At age 73, I cannot retrain or acquire other, more-marketable skills or employment. I have worked as a real-estate agent for over 20 years, and I have no other work skills.

e. Indicate the extent to which the party asking for support is able to earn enough money to maintain the standard of living established during the marriage or domestic partnership.

In my profession, I have never earned anywhere near enough to maintain our upper-class marital living standard. In any event, I am not seeking support.

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

9. **Earning capacity** (Family Code section 4320(a)(2)) ☐ See Attachment 9
   a. The party asking for support ☒ has ☐ has not had periods of unemployment because of the time needed to attend to domestic duties. *(Complete (b) if there were periods of unemployment.)*
   b. Specify the extent to which the present or future earning capacity of the party asking for support is impaired by periods of unemployment to devote time to domestic duties during the marriage or domestic partnership.
   During the marriage, I cared for our household and children and did not work.

10. **Contributions to the education and training of the party being asked to pay support** ☐ See Attachment 10
   a. The party asking for support ☐ did ☐ did not contribute to the education, training, career position, or license of the party being asked to pay support *(If the party asking for support did contribute, complete item b below.)*
   b. Specify the extent to which the party asking for support contributed to the education, training, career position, or license of the party being asked to pay support.
   I am not seeking support.

11. **Care for children** (Family Code section 4320(g)) ☐ See Attachment 11
   a. The party asking for support ☐ has ☐ has not had periods of unemployment to care for the children of the marriage or domestic partnership. *(Complete (b) if there were periods of unemployment.)*
   b. The party asking for support ☐ is ☐ is not able to be gainfully employed without unduly interfering with the interests of the children in the care of the party asking for support *(specify):*
   I am not seeking support.

12 **Needs of the party asking for support** (Family Code section 4320(d)) ☐ See Attachment 12
   Specify the needs of the party asking for support based on the standard of living established during the marriage or domestic partnership, as described in question 4.
   I am seeking attorneys' fees and costs to determine my rights related to community intellectual property that Brian created during our marriage and to potentially litigate those rights.

13. **Assets and debts** (Family Code section 4320(e)) ☐ See Attachment 13
   a. The assets, including separate property, of the party asking for support are *(specify):*
   See my accompanying income and expense declaration.

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

b. The debts, including separate property, of the party asking for support are *(specify):*
See my accompanying income and expense declaration.

14. **Tax consequences** (Family Code section 4320(j)) ☐ See Attachment 14
The immediate and specific tax consequences for the party asking for support are *(specify):*
I am not seeking support.

15. **Goal to become self-supporting** (Family Code section 4320(*l*)) ☐ See Attachment 15

**Notice:** When ordering spousal or domestic partner support in a judgment, the court may advise (warn) the party asking for support to make reasonable efforts to become self-supporting within a reasonable period of time, considering all the factors in Family Code section 4320. The court may decide that this warning (often called a "Gavron" warning) is not appropriate if the case involves a marriage or domestic partnership of long duration (about 10 years or longer). Generally, failure to become self-supporting after the court gives the warning can result in an order to reduce the amount of the support award.

a. This ☒ is ☐ is not a marriage or domestic partnership of long duration (ten years or more).

b. The party asking for support ☐ is ☒ is not self-supporting *(If not, specify below what steps, if any, the party asking for support will take to become self-supporting within a reasonable period of time):*
I am not seeking support.

c. Other *(specify below):*
See accompanying declarations.


CEB® ceb.com Essential Forms™

FL-157

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

**SECTION 3: FACTS ABOUT THE PARTY BEING ASKED TO PAY SUPPORT**

16. **Ability to pay support / earning capacity** (Family Code sections 4320(a) and (c)) ☐ See Attachment 16

a. The earned income of the party being asked to pay support is *(specify):* ☐ unknown

b. The unearned income of the party being asked to pay support is *(specify):* ☐ unknown

c. This party ☐ does ☐ does not have the ability to earn enough money to maintain the standard of living described in 4 for both spouses or domestic partners. *(If not, explain why below.)*
I am not seeking support.

d. Based on the above responses, this party ☐ is ☐ is not able to pay spousal or domestic partner support.

17. **Needs of the party being asked to pay support** (Family Code section 4320(d)) ☐ See Attachment 17
Specify the needs of the party being asked to pay support based on the standard of living established during the marriage or domestic partnership, as described in question 4.
I am seeking attorneys' fees and costs to determine my rights related to community intellectual property that Brian created during our marriage and to potentially litigate those rights.

18. **Assets and debts** (Family Code section 4320(e)) ☐ See Attachment 18

a. The assets, including separate property, of the party being asked to pay support are *(specify):*
Unknown, other than his lawyers' recent admission that he recently received tens of millions of dollars in various business deals. I am seeking an accounting for significant royalties that I do not believe have been paid to me. Brian has recently received many, many millions

b. The debts, including separate property, of the party being asked to pay support are *(specify):*
Unknown.

19. **Tax consequences** (Family Code section 4320(j)) ☐ See Attachment 19
The immediate and specific tax consequences for the party being asked to pay support *(specify):*
Unknown.

| PETITIONER: Brian Wilson<br>RESPONDENT: Marilyn Wilson-Rutherford | CASE NUMBER:<br>D 983 605 |
|---|---|

**SECTION 4: BALANCE OF HARDSHIPS AND OTHER FACTORS**

20. **Balance of hardships** (Family Code section 4320(k)) ☐ See Attachment 20
Describe below any special financial difficulties to the party if ordered to pay support compared to the hardship to the party who is asking for support. *(For example, consider the ability of a party to pay support versus the need of the other an party to receive financial support).*
I believe that paying my fees and costs would not impose any financial difficulties on Brian, as he recently received tens of millions of dollars from business deals and, even before then, lived a luxurious lifestyle. For decades, he has been receiving substantial royalties.

21. Indicate below other factors, if any, that the court should consider that are just and equitable in ordering spousal or domestic partner.(Family Code section 4320(n)) ☐ See Attachment 21
See accompanying declarations.

Number of pages attached: ________

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

## INDEX OF EXHIBITS

| EX. NO. | DESCRIPTION |
|---|---|
| A | Interlocutory Judgment, filed March 4, 1981 |
| A1 | Stipulation Modifying Judgment and Order Thereon, filed August 11, 1997 |
| B | Joseph Mannis' and Candace Carlo's letter to Eric Custer dated November 18, 2001 |
| C | Eric Custer E-mail to Joseph Mannis and Candace Carlo, dated November 29, 2021 |
| D | Joseph Mannis email to Eric Custer, dated November 30, 2021 |
| E | Eric Custer E-mail reply to Joseph Mannis, dated November 30, 2021 |
| F | Redacted chain of emails, from December 14 to 15, 2021 |
| G1 - G4 | Redacted, highlighted copies of parts of the email chain between Eric Custer and Joseph Mannis and Candace Carlo, from December 14 to 15, 2021 |
| H | HM redacted billing statements from November 29, 2021 through January 26, 2022 |
| I | John Branca Web site home page |
| J | Eric Custer Web site profile |
| K | Joseph Mannis CV |

# MEMORANDUM OF POINTS AND AUTHORITIES

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES:**


INTRODUCTION ..................................................................................................1

THE FACTS ........................................................................................................2

I. The Judgment Awarded Marilyn an Equal Community Interest in All Marital Compositions and Entitles Her to Accountings..........................7

II. Even without the Judgment and the Modification Stipulation, Marylin Has the Same Rights as Brian to Royalties from All His Marital Works ..........................................................................................8

A. Marilyn has the right to royalties from all of Brian's Marital works..........................................................................................8

B. Marilyn may move at any time for an award of any marital Work as an omitted or unadjudicated communite asset ............................11

III. Concerning All Undistributed Community Assets, Brian Has Always Owed Marilyn Broad Fiduciary Duties, including the Duty to Account.........................................................................................12

IV. The Court Should Order Brian to Account to Marilyn for All Community Royalties Over the Past Seven Years .........................................15

DECLARATION OF MARILYN WILSON-RUTHERFORD

DECLARATION OF JOSEPH MANNIS

DECLARATION OF JAMES M. SIMON

DECLARATION OF ANDREW STEIN

DECLARATION OF CANDACE CARLO

DECLARATION OF BONNIE ESKENAZI

# TABLE OF AUTHORITIES

## CASES

*Burroughs v. MGM*
(2d Cir. 1982) 683 F.2d 610 .......... 11

*Clark v. Clark*
(1961) 195 Cal.App.2d 373 .......... 15

*Feresi v. The Livery, LLC*
(2014) 232 Cal.App.4th 419 .......... 14

*Lorraine v. Lorraine*
(1935) 8 Cal.App.2d 687 .......... 10

*Marriage of Feldman*
(2007) 153 Cal.App.4th 1470 .......... 14

*Marriage of Huntley*
(2017) 10 Cal.App.5th 1053 .......... 12

*Marriage of Schleich*
(2017) 8 Cal.App.5th 267 .......... 15

*Marriage of Sorge*
(2012) 202 Cal.App.4th 626 .......... 14, 15

*Marriage of Worth*
(1987) 195 Cal.App.3d 768 .......... 9, 10, 11

*People v. Coker*
(2004) 120 Cal.App.4th 581 .......... 14

*Rader v. Thrasher*
(1962) 57 Cal.2d 244 .......... 15

*Vai v. Bank of America National Trust & Savings Ass'n*
(1961) 56 Cal.2d 329 .......... 15

**CALIFORNIA STATUTES**

**Civil Code Section:**


1542 .....5


**Corporations Code Sections:**


16403 .....12
16404 .....12
16503 .....12


**Family Code Sections:**


721 .....12, 14
721(b) .....12, 13
751 .....11
760 .....8
271 .....15
2102 .....14
2102(a) .....12, 13
2102(a)(2) .....14
2102(b) .....13, 14
2102(c) .....14
2107 .....14, 15
2107(c) .....14, 15
2550 .....12
2556 .....11, 12


**FEDERAL STATUTES**


Pub.L. No. 94-553 (Oct. 19, 1976) 90 Stat. 2575 .....11


**17 United States Code sections:**


102(a) .....9, 11
102(a)(1) .....11
102(a)(2) .....11
102(a)(8) .....11
106 .....10
201(a) .....9
201(d)(1) .....9
202 .....9, 10
302(a) .....9
304(c) .....11


**SECONDARY AUTHORITIES**


Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2021) ¶ 9:238 .....12

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**INTRODUCTION**

The Family Code imposes on each spouse fiduciary duties concerning each community asset until its actual distribution. Those duties include the obligations to provide access at all times to books regarding a transaction; to render true and full information of all things affecting any transaction; and to account and hold as trustee any benefit or profit derived from any transaction by one spouse without the other's consent. The duties also govern the operation or management of a business or a business interest in which the community may have an interest and apply to certain business, investment, or income-producing opportunities stemming from a community asset. Beach Boys founder, songwriter, and performer Petitioner Brian Wilson created some 170 musical compositions during his marriage, from 1964 to 1978, to Respondent Marilyn Wilson. Their 1981 judgment expressly awarded Marilyn an equal interest in copyrights, contract rights, and royalty rights in his name for those compositions. It also gave Marilyn the right to annual accountings and obligated Brian to collect and distribute to her, or into a trust, half of all related proceeds. The judgment awarded Marilyn shares of various companies, including Brother Publishing, charging Brian with similar duties and granting Marilyn similar rights. The judgment reserved the Court's enforcement jurisdiction. Over the ensuing decades, Brian has sporadically provided Marilyn with the required information. Now, he denies Marilyn's right to certain royalties, such as producers' fees, and has finally confirmed that he sold Brother Publishing.

Also, in 2021, Brian sold Universal the writer shares and reversion rights stemming from community intellectual property. For the former, he sent Marilyn a $11,022,937 check for her community half share but never produced the promised backup, preventing her from verifying the numbers. For the latter, he offered her $3,352,439.82, only a *quarter* of the claimed community share.

The Court should therefore order Brian to account to Marilyn for all the community entities, including Brother Publishing; for all payments owed or made to Marilyn over the past seven years; and for the sales of the writer shares and reversion rights. In addition, it should immediately order the payment of at least $6,704,879 for half of the community-property reversion rights sold by Brian. It should also order him to pay her all other amounts he owes her. And it should award interest on all past-due payments. Once Marilyn digests the information on the accounting, she will decide

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

whether to request an accounting for earlier periods.

## THE FACTS

**1981 Judgment:** Brian, a founder of the Beach Boys, married Marilyn. Their marriage lasted from December 7, 1964, to 1978. On March 4, 1981, this Court entered their dissolution judgment. (Exh. A, form 1287, p. 1.) Paragraph 1 of the judgment confirmed to Brian various items as his separate property, being musical composition and copyrights from before marriage and after separation. (*Id*., attachment, ¶¶ 1, 1(E), (F), pp. 1-7.)

Paragraph 3 declared "that the community property of the parties is equally divided" and set up a trust account for payments of royalties and profit participations. (Exh. A, attachment, pp. 7-8, ¶¶ 3, 3(A)(5).) It gave Marilyn a half interest in the account, subject to the paragraph 38 Trust Account. (*Id*. at p. 8, ¶ 3(A)(5); see *id*. at pp. 34-35, ¶ 38.)

Next, paragraph 6 ordered "that *the community is the owner* of certain *copyrights*, contract rights and/or *royalty* rights in [Brian]'s name with respect to musical compositions created during the marriage... ." (Exh. A, attachment, p. 13, ¶ 6, italics added.) It then listed the qualifying 170 musical compositions. (*Id*. at pp. 13-20, ¶ 6.) Paragraph 7 provided for the parties "to equally divide between themselves the foregoing *rights in the community musical compositions* listed hereinabove, so that from the date hereof EACH PARTY IS to hold as his or her sole and separate property, an *undivided one-half* (½) interest in said *rights in the community musical compositions* as tenants-in-common." (*Id*. at p. 20, ¶ 7, italics added.)

Paragraph 8 ordered Brian "to execute such assignments, copyright registrations, or other documents as shall be necessary to effect direct payment to [Marilyn] of one-half (½) of all receipts from such rights in the musical compositions." (Exh. A, attachment, p. 20, ¶ 8.) To the extent "direct payment" of her share could not be "effected," Brian was ordered "to collect the total receipts from community musical compositions and promptly transmit said monies to the paragraph 38... Trust Account for distribution to each party in equal shares." (*Ibid*.)

While paragraph 9 gave Brian the right "to administer and exploit all rights in said compositions"; "to print, publish, sell, use or license the use of said rights and compositions"; "to execute any license or agreement affecting said rights and compositions"; "to make all decisions with

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

respect to said rights and compositions"; and "to have the right to assign or license such rights to others" and "to sell or dispose of such rights or copyrights," it prohibited him from "act[ing] in an unreasonable manner" in the exercising of that discretion and from "maliciously or willfully tak[ing] any such action with a view of damaging [Marilyn], or her interest therein." (Exh. A, attachment, pp. 20-21, ¶ 9.) The paragraph ended: "The Court shall retain jurisdiction to determine the rights and duties of [Brian] and [Marilyn] under this paragraph." (*Id.* at p. 21.)

The judgment also awarded the parties equal community interests in Wilojarston, Inc., with similar provisions requiring Brian to execute documents to effect the direct payment to Marilyn of half of any dividends or other distributions under that entity's stock and, to the extent direct payment could not be effected, to collect payments and promptly transmit them to the paragraph 38 Trust Account for equal distribution to the parties. (Exh. A, attachment, p. 23, ¶ 13.) Brian must pay Marilyn "a royalty equal to one-half (½) of all sums he receives after the date hereof," subject to certain overhead deductions, and may sell and otherwise dispose of the stock, but he must not maliciously or willfully take any action to damage her or her interest. (*Id.* at pp. 23-24, ¶¶ 14-16.)

Similar provisions governed Brian's duties and Marilyn's rights concerning a one-fifth Brother Publishing interest, awarded to the parties equally. (Exh. A, attachment, pp. 26-29, ¶¶ 20-26.) The judgment confirmed that "*royalties* are divided at paragraph 7... ." (*Ibid.*, italics added.)

The judgment awarded the parties equal community interests in, and similar rights and duties regarding, New Executive Music, defining it as "'the publishing company,'" except Marilyn has no interest in Brian's postseparation musical compositions. (Exh. A, attachment, pp. 29-33, ¶¶ 27-33.)

Paragraph 38 ordered the termination of the Alan Priven Trust Account and the transferring of all its funds to the "'paragraph 38 Trust Account.'" (Exh. A, attachment, p. 34, ¶ 38.) The judgment confirmed the purposes of the paragraph 38 Trust Account as to (1) collect and distribute all the joint income of the parties that the judgment required to flow into the account; (2) calculate, apportion, and distribute, according to the judgment, the income so received; and (3) retain and reserve sufficient funds from that received income necessary to pay any common expenses or obligations of the parties arising from the common ownership of the assets that the judgment mentioned. (*Id.* at p. 35, ¶ 39.) While the trustee of the paragraph 38 Trust Account may charge against the funds

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

reasonable costs and fees for the trust's administration, it must "render accounts to each party at reasonably request intervals, not less than quarterly, and shall make available for inspection to each party all books and records pertaining to the" account. (*Id*. at p. 35, ¶ 40.) The judgment ordered that any direction to the trustee proceed "by joint written instructions of the parties." (*Id*. at p. 36, ¶ 41.)

The judgment also ordered Brian "to cooperate with [Marilyn] in obtaining audits of any entity from which [they] jointly receive income, pursuant to th[e] Judgment, or which they hold an ownership interest in common as provided in th[e] Judgment." (Exh. A, attachment, pp. 40-41, ¶ 59.)

The judgment permitted Marilyn to obtain those audits annually, but Brian must provide Marilyn with any audit that he triggers. (*Id*. at p. 41, ¶ 59.) While she would share in the increased value of the community interest in Brother Records' stock under a then-pending audit, Marilyn would have "no other rights in any other records or other audit conducted by Brother Records, Inc., nor in any other asset of Brother Records, Inc., or in the name or group known as 'The Beach Boys', except as otherwise provided in th[e] Judgment." (Exh. A, attachment, pp. 41-42, ¶¶ 59-60, 62.)

Finally, the judgment reserved jurisdiction "to make such other and further orders as may be necessary to carry out [its] provisions... ." (Exh. A, form 1287, item 3(c).)

**1997 Stipulation Modifying Judgment:** On August 11, 1997, the Court entered the parties' Stipulation Modifying Judgment and Order Thereon and Order on Order to Show Cause, fully signed as of April 28, 1997. (Exh. B.) Noting that Marilyn sought to restrain Brian and his agents from withholding her share of marital royalties and to obtain orders to pay money for an accounting, the stipulation ordered Brian to pay her $300,000, which would "not be a[] charge against or off set against any funds due [her] pursuant to the Judgment and th[e] Stipulation... for the period commencing February 1, 1997, and thereafter." (*Id*. at pp. 1-2, recitals a-b, ¶ 2.) The $300,000 payment "satisfie[d] in full [Marilyn]'s claims that the deductions set forth on the accounting mentioned in paragraph 3 []below are incorrect and/or improper" as well as Brian's claims that Marilyn owed him for her share of fees, costs, and expenses related to marital royalties. (*Id*. at p. 2, ¶ 2(b).) The $300,000 payment would "not be charged in any future periods against [Marilyn]'s share of marital royalties." (*Id*. at pp. 2-3, ¶ 2.)

Under paragraph 3, as of February 1, 1997, "all receipts of marital royalties of community

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

sums as set forth in the Judgment and received prior to February 1, 1997," would be "divided pursuant to the Judgment" as amended by the stipulation, "without deduction or offset (except as specifically authorized by paragraph 5 []below." (Exh. B, p. 3.) Brian waived and released all claims for offset or deduction under Brenner & Glassberg' accountings through December 31, 1996. (*Ibid.*)

Also, Brian released Marilyn "from all claims for offset or reimbursement whatsoever that [he] may have arising out of or connected with any action, formal demand in writing or litigation which ha[d] been received or commenced prior to the date of signing th[e] Stipulation or which [was] presently known by [him] or his representatives." (Exh. B, p. 3, ¶ 4.) He made similar releases concerning "any monies claimed due [himself] pursuant to the Judgment or otherwise arising out of or connected with any known claims, demands, causes of action," etc., through the stipulation's signature date. (*Id.* at p. 3, ¶ 3.) The parties made mutual releases, including under Civil Code section 1542, except as the stipulation provided otherwise. (*Id.* at p. 5, ¶ 8.) The releases, for example, do not preclude Marilyn "from sharing in any marital receipts pursuant to audit by Brian Wilson or otherwise if the proceeds are received by Brian Wilson after February 1, 1997." (*Id.* at p. 5, ¶ 9.)

The stipulation confirmed that, except as it "specifically modified" the judgment, the latter would "remain in full force and effect," with the family-law department of the Los Angeles Superior Court retaining jurisdiction over any dispute regarding the stipulation. (Exh. B, p. 6, ¶¶ 10-11.)

**2021 Disputes over Accountings, Royalties, and the Disposition of Community Assets:** On November 18, 2021, Joseph Mannis and Candace Carlo—Marilyn's lawyers—wrote Eric Custer—Brian's counsel—to request information and accountings. (Exh. C.) Since Marilyn could not recall the rights held by Brother Publishing, Brother Records, New Executive Music, and Wilojarston, Inc., her lawyers asked Custer to "advise as to the status of th[o]se entities and whether payment was made to Marilyn." (*Id.* at p. 1.) They also asked for information concerning Brian's potential sales of various community assets. (*Id.* at p. 2.)

In addition, Marilyn's counsel requested an accounting of "what is due her under the Judgment" for the past five years, from January 1, 2016, through October 2021, so they could compare against her receipts before deciding whether to examine earlier periods. (Exh. C, p. 2.) They wanted the accounting to include backup documentation from all payment streams, including a

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

description of distribution rights and distributions resulting from the musical compositions listed in the judgment's paragraph 6, or by the four above entities; a list of all payments, including their sources, made to Marilyn; and any advances to Brian from BMI, plus proof that Marilyn's share did not repay advances that she did not share. (*Ibid.*)

Mannis and Carlo also requested an accounting concerning eight groups of community assets: (1) BMI (advances to Brian and documents reflecting that Marilyn's share had not been used to repay money for advances she did not share); (2) neighboring-rights royalties; (3) SoundExchange royalties; (4) royalties (writer's share) from synchronization and other licensing; (5) mechanical royalties (writer's share); (6) any other sources of income from the community projects; (7) producers' royalties or fees from February 1, 1997, onward from the community musical compositions; and (8) reversion rights and reversion plans for community songs. (Exh. C, pp. 2-4.)

While Custer argued that the judgment, paragraph 6, did not include producers' royalties, Mannis and Carlo, disagreeing, replied that, if Custer were correct, those royalties would constitute undivided community assets, which the Court would have to award equally to the parties under Family Code section 2556. (Exh. C, p. 3.)

Custer claimed that, for over a decade, Brian had accounted in the same format, though historically he had omitted underlying UMPG and BMI statements since (1) they included confidential information about noncommunity songs and (2) under modern, per-track accounting, they are voluminous and hard to decipher. (Exh. D, p. 2.) Custer said, however, that, under current circumstances, he was willing to let Marilyn access certain of those statements. Offering backup, he asserted that Brian's advances from BMI did not impact Marilyn, who had been paid her ongoing share of BMI royalties as accrued on statements irrespective of Brian's recoupment status. (*Ibid.*)

But Custer claimed that neighboring rights and SoundExchange were "not interests/monies derived from 'musical compositions' (in which Marilyn shares), but rather derive[d] from performances on 'sound recordings'." (Exh. D, p. 2.) He asserted that, under the judgment, "Marilyn does not share in monies Brian receives in respect of Beach Boys recordings (i.e., producer royalties are not monies derived from musical compositions)," pointing to the judgment, paragraph 4(D), which awarded Brian as his separate property "'all of the community's right, title and interest in

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

Brother Records, Inc.' (the source of the Beach Boys sound recording income in which Brian shares, including any producer royalties, which the parties clearly understood based on other provisions of the Judgment)." (*Ibid.*)

Likewise, Custer claimed that paragraph 4(E) awarded "Brian ... as his separate property 'any interest in the musical group 'The Beach Boys[,]'..." contrasting that language with "certain minor Beach Boys related music publishing entities (Brother Publishing and Wilojarston...), where the Judgment provided Marilyn would be entitled to an ongoing 50% interest." (Exh. D, p. 2.) Custer cited paragraphs 59, 60, and 62 as "underscor[ing] that the parties clearly understood Brother Records, Inc. was the source of sound recording royalties, which was awarded to Brian alone," and showing that "Marilyn has no interest in sound recording royalties." (*Id.* at p. 3.)

As for reversion rights and reversion plans for community songs, Custer claimed that Brian had recovered them in 2021, allowing him to "claim from UMPG going forward the other 50% of US earnings that UMPG was retaining the past 60 years, which Brian did not own previously." (Exh. D, p. 3.) "Inasmuch as these additional rights were not owned by Brian during the marriage ... and were only acquired by Brian under federal copyright law by virtue of his surviving to the effective dates over the past few years..., Marilyn has no interest in and is not entitled to a share of any purchase price for such interests." (*Id.* at pp. 3-4.)

Mannis later wrote Custer to inquire whether the recent sale of Brother Records had included Brother Publishing—which the judgment had awarded the parties equally—or any of its assets. (Exh. E, p. 1.) Carlo believed that various publishing rights may also have sold, and so Mannis requested a copy of the sales agreement so Marilyn could determine whether the sale affected her rights. He offered to sign the Court's form protective agreement, attaching a copy. (*Ibid.*) Ultimately, as 2021 ended, Brian sold Universal community writer shares and cut Marilyn an $11,022,937 check for her half, but he never provided backup so she could verify the numbers. (Exh. F.) And he offered her $3,352,439.82 as a *quarter* of the community reversion rights that he sold to Universal. (*Ibid.*)

## I. The Judgment Awarded Marilyn an Equal Community Interest in All Marital Compositions and Entitles Her to Accountings.

The judgment grants Marilyn the same rights as Brian to all proceeds from the community

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

musical compositions, including from royalties. It also gives her the same right to information.

The judgment divides the community property equally, ordering "that the community is the owner of certain *copyrights*, contract rights and/or *royalty* rights in [Brian]'s name with respect to musical compositions created during the marriage," and listed 170 of those compositions. (Exh. A, attachment, p. 7, ¶ 3, pp. 13-20, ¶ 6, italics added.) It then provides for the parties "to equally divide between themselves the foregoing *rights in the community musical compositions* listed hereinabove," so that each party holds as his "sole and separate property, an undivided one-half (½) interest in said *rights in the community musical compositions* as tenants-in-common." (*Id*. at p. 20, ¶ 7, italics added.)

Also, the judgment obligates Brian to execute any documents necessary to secure Marilyn's right to "receipts from [her] rights in the musical compositions." (Exh. A, attachment, p. 20, ¶ 8.) Even if Brian alienates or exploits the compositions, he must protect Marilyn's interests. (*Id*. at pp. 20-21, ¶ 9.) Similar rights and duties govern her interests in Wilojarston, Inc.; Brother Publishing; and New Executive Music. (*Id*. at pp. 23-24, ¶¶ 13-16, pp. 26-29, ¶¶ 20-26, pp. 29-33, ¶¶ 27-33.) The judgment grants her access to the paragraph 38 Trust Account's books and records and entitles her annual audits and quarterly accountings, requiring his cooperation. (*Id*. at p. 35, ¶¶ 39-40, pp. 40-41, ¶ 59.) By reserving jurisdiction to enforce Marilyn's rights, the judgment entitles her to accountings. (Exh. A, form 1287, item 3(c), attachment, p. 21, ¶ 9, p. 23, ¶ 16, p. 28, ¶ 23, p. 31, ¶ 30.)

## II. Even without the Judgment and the Modification Stipulation, Marylin Has the Same Rights as Brian to Royalties from All His Marital Works.

Even if the judgment had not awarded Marilyn an equal community interest in Brian's marital works, the law would have granted her that interest, and she could now seek an award of the interest as an omitted or unadjudicated asset. She thus has the right to an accounting.

### A. Marilyn has the right to royalties from all of Brian's marital works.

"Except as otherwise provided by statute, all property, real or personal, wherever situated, acquired by a married person during the marriage while domiciled in this state is community property." (Fam. Code, § 760.) (Except where context suggests otherwise, all section citations run to the Family Code.) Here, the marriage lasted from December 7, 1964, to 1978.

"A royalty is generally defined to mean compensation given to the copyright owner for

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

permission to use the copyrighted work." (*In re Marriage of* ("*IRMO*") *Worth* (1987) 195 Cal.App.3d 768, 772, fn. 3.) It therefore captures compensation for all forms of a copyright's exploitation.

In *Worth*, the spouses agreed to divide equally the royalties from books that the husband had written during the marriage. (*Worth*, *supra*, 195 Cal.App.3d at p. 771.) Later, he sued the producers of the board game Trivial Pursuit in federal court, alleging they had infringed his copyright by plagiarizing his books to create certain questions. Based on their divorce agreement, a California superior court declared the wife's entitlement to half of any proceeds derived from that suit. (*Ibid.*)

Affirming, the Court of Appeal recognized that, in agreeing to the wife's entitlement to half of the royalties on books he had written during the marriage, the husband had "at least tacitly conceded the community property nature of the books themselves." (*Worth*, *supra*, 195 Cal.App.3d at p. 774.) *Worth* held that, "[i]f the artistic work is community property, then it must follow that the copyright itself obtains the same status." (*Ibid.*) Under copyright legislation, "a copyright is automatically acquired upon expression of the work" under 17 United States Code sections 102(a) and 302(a). (*Ibid.*) "Since the copyrights derived from the literary efforts, time and skill of [the] husband during the marriage, *such copyrights and related tangible benefits* must be considered community property." (*Ibid.*, italics added.)

Because 17 United States Code section 201(d)(1) expressly provided for the transfer of a copyright by contract, by will, "'or by operation of law,'" even though the copyright vested initially in the authoring spouse under section 201(a), it "automatically transferred to both spouses by operation of the California law of community property." (*Worth*, *supra*, 195 Cal.App.3d at p. 774.) While a copyright constitutes an "intangible interest separate and distinct from the tangible creative work," it remains personalty subject to community-property law. (*Id.* at pp. 774-775, citing 17 U.S.C. § 202.) "The fact that a copyright is intangible will not affect its community character or the community nature of any tangible benefits directly associated with the copyright." (*Id.* at p. 775.) *Worth* thus confirmed the wife's entitlement to *royalties* stemming from the books. (*Id.* at p. 775-776, italics added.)

Undeterred, the husband contended that the trial court could not divide any proceeds from the federal suit since the divorce decree, which provided for the royalties' equal division, "reserved

jurisdiction only to resolve 'issues that may subsequently arise regarding the distinction between a re-edition or complete reworking of [a] book....'" (*Worth*, *supra*, 195 Cal.App.3d at p. 775.)

Rejecting the argument as "specious," *Worth* noted that "[t]he preprinted interlocutory judgment form contain[ed] a provision"—identical to the one Brian and Marilyn used (exh. A, p. 1, item 3(c))—"expressly reserving jurisdiction 'to make such other and further orders as may be necessary to carry out the provisions of this judgment.'" (*Worth*, *supra*, 195 Cal.App.3d at pp. 775-776.) The appellate court understood the order "was obviously intended to carry out the provisions of paragraph 8 of the interlocutory decree providing for equal division of royalties." (*Id*. at p. 776.)

Still, the husband asserted that the decree "purported to divide only the royalties from the books and not the copyrights... ." (*Worth*, *supra*, 195 Cal.App.3d at p. 776.) He reasoned that, since, under 17 United States Code section 202, a transfer of the literary property does not convey any of the statutory rights attached to the work, "his agreement to share the royalties did not effect a transfer to [the] wife of an interest in the copyrights, without which she ha[d] no colorable claim to share in any proceeds arising from infringement of the statutory right to the exclusive use of the books to prepare derivative works" under 17 United States Code section 106. (*Ibid*.)

Seeing through the ruse, the Court of Appeal observed that the argument failed to consider the community nature of the copyrights. (*Worth*, *supra*, 195 Cal.App.3d at p. 776.) While the decree "divided only the future book royalties and not the intangible copyrights, nonetheless, as property interests acquired during the marriage which *remained undistributed* under the terms of the interlocutory judgment, [the] husband and [the] wife would hold title to such undivided interests in the copyrights as tenants in common." (*Ibid*., italics added.) "As a common owner of the copyright, [the] wife would be entitled to share in *all* of the proceeds therefrom, including any settlement or award of damages resulting from the copyright infringement." (*Ibid*.)

In sum, because the decree did not dispose of the copyrights, the parties "remain[ed] as co-owners of an undivided interest in the copyrights" and were "entitled to share equally in any of the proceeds directly or indirectly related to the pending federal lawsuit for copyright infringement." (*Worth*, *supra*, 195 Cal.App.3d at p. 778; see *Lorraine v. Lorraine* (1935) 8 Cal.App.2d 687, 701-702 [patents husband applied for during marriage and assigned to his corporation were community

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

property; trial court properly set aside judgment to award wife equal share, including increase].)

The same statute *Worth* interpreted applies to music royalties. 17 United States Code section 102(a) grants copyright protection to works of authorship in eight categories, including "literary works" (subdivision (a)(1)); "musical works, including any accompanying words" (subdivision (a)(2)); and "sound recordings" (subdivision (a)(8)).

Here, the Wilsons' judgment (a judgment entered after a trial approving the fairness of all the terms, etc.) *expressly* awarded Marilyn her share of copyrights, contract rights, and royalty rights concerning marital musical compositions as well as "rights in the community musical compositions" themselves. (Exh. A, attachment, p. 7, ¶ 3, pp. 13-20, ¶¶ 6-7; see Mannis decl.) Again, besides referencing "the common ownership of assets enumerated in this Judgment," the judgment expressly ordered "that *the community is the owner* of certain copyrights, contract rights and/or royalty rights in [Brian]'s name with respect to musical compositions created during the marriage… ." (*Id.* at p. 13, ¶ 6, p. 35, ¶ 39(C), italics added.) Those provisions respect Family Code section 751, which provides that "[t]he respective interests of each spouse in community property during continuance of the marriage relation are *present*, *existing*, and equal interests." (Italics added.)

Since the judgment held the community is the owner of the 170 copyrights, the community must also own the reversion rights in those copyrights, although exercised through Brian. (Pub.L. No. 94-553 (Oct. 19, 1976) 90 Stat. 2575; 17 U.S.C. 304(c)(3); *Burroughs v. MGM* (2d Cir. 1982) 683 F.2d 610, 617 [17 U.S.C. 304(c), "under certain conditions, allows a living author…to terminate a copyright grant fifty-six years after the copyright was originally secured"].)

**B. Marilyn may move at any time for an award of any marital work as an omitted or unadjudicated community asset.**

Even if the judgment had neglected to award Marilyn her share of a musical composition, she could move any time for an award of it as an omitted or unadjudicated community asset.

Family Code section 2556 requires a court to award and generally equally divide any omitted or unadjudicated community asset: "In a proceeding for dissolution of marriage, ... the court has continuing jurisdiction to award community estate assets ... to the parties that have not been previously adjudicated by a judgment in the proceeding." A party thus may "file a postjudgment

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

motion ... in the proceeding ... to obtain adjudication of any community estate asset ... omitted or not adjudicated by the judgment," and "the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability." (*Ibid*.)

That section provides courts with "continuing jurisdiction to divide omitted or unadjudicated community property." (*IRMO Huntley* (2017) 10 Cal.App.5th 1053, 1056.) *Huntley* held a default judgment's "silence as to any division of property require[d] reversal and remand for further proceedings under sections 2550 and 2556." (*Ibid*.) Even when a judgment partially adjudicates community property, a spouse retains the right, with *no* time limit, to adjudicate any assets about which it remains silent. (*Id*. at pp. 1059-1060.) That power extends, of course, to the community reversion rights. "[T]here is no statute of limitations imposed by ... section 2556 on a former spouse who seeks adjudication of omitted or unadjudicated community property." (*Id*. at p. 1060.)

**III. Concerning All Undistributed Community Assets, Brian Has Always Owed Marilyn Broad Fiduciary Duties, including the Duty to Account.**

Independent of the judgment, the Family Code imposes continuing fiduciary duties on Brian concerning the property that the judgment awarded Marilyn but that he controls.

"By statute, the int[er]spousal confidential relationship and Fam.C. § 721(b) fiduciary obligations *continue postseparation* . . . [¶] . . . for so long as one spouse has control over an undistributed asset or liability. . . ." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2021) ¶ 9:238.)

Section 2102, subdivision (a), provides that, "[f]rom the date of separation to the *date of the distribution* of the community or quasi-community asset or liability in question, each party is subject to the standards provided in Section 721, as to all activities that affect the assets and liabilities of the other party... ." (Italics added.)[1]

Section 721, subdivision (b), in turn, states that, subject to certain exceptions that do not apply here, "in transactions between themselves, spouses are subject to the general rules governing

---

[1] Marilyn uses "community" as a synecdoche for "community" and "quasi-community."

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

fiduciary relationships that control the actions of persons occupying confidential relations with each other," adding that "[t]his confidential relationship imposes a duty of the highest good faith and fair dealing on each spouse, and neither shall take any unfair advantage of the other."

Subdivision (b) continues: "This confidential relationship is a fiduciary relationship subject to the same rights and duties of nonmarital business partners, as provided in Sections 16403, 16404, and 16503 of the Corporations Code, including, but not limited to," three sets of duties: (1) providing each spouse access at all times to any books kept regarding a transaction for inspection and copying; (2) rendering upon request true and full information of all things affecting any transaction that concerns the community property; and (3) "accounting to the spouse, and holding as a trustee, any benefit or profit derived from any transaction by one spouse without the consent of the other spouse that concerns the community property."

Separately, section 2102, subdivision (a), lists a nonexclusive set of "activities" for which one spouse owes the other a fiduciary duty concerning each community asset until its distribution, including (1) the accurate and complete disclosure of all assets and liabilities in which the party has or may have an interest or obligation and all current earnings, accumulations, and expenses, including an immediate, full, and accurate update or augmentation to the extent there have been material changes; (2) the accurate and complete written disclosure of any investment opportunity, business opportunity, or other income-producing opportunity that presents itself after the date of separation but that results from any investment, significant business activity outside the ordinary course of business, or other income-producing opportunity of either spouse from the date of marriage to the date of separation, with written disclosure made in sufficient time for the other spouse to make an informed decision whether to participate and for the court to resolve any related dispute; and (3) the operation or management of a business interest in which the community may have an interest.

Thus, regardless of Brian's right to control or sell a community asset, including a business interest, he owes fiduciary duties to account to Marilyn and to inform her of related opportunities.

Section 2102, subdivision (b), fortifies those duties, confirming that they last until an asset's actual distribution: "From the date that a valid, enforceable, and binding resolution of the disposition of the asset or liability in question is reached, until the asset or liability *has actually been distributed*,

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

each party is subject to the standards provided in Section 721 as to all activities that affect the assets or liabilities of the other party." (Italics added.) Only when "a particular asset or liability *has been distributed*" will "the duties and standards set forth in Section 721 ... end as to that asset or liability." (*Ibid*., italics added.)

One decision interpreted the phrase "valid, enforceable, and binding resolution of all issues relating to child ... support" within section 2102, subdivision (c), as meaning "a final judicial child support determination, whether obtained pursuant to agreement of the parties or after litigation of the matter before the court." (*IRMO Sorge* (2012) 202 Cal.App.4th 626, 655, 657.)

The identical language in section 2102, subdivision (b)'s phrase "From the date that a valid, enforceable, and binding resolution of the disposition of the asset or liability in question is reached" therefore must mean a final disposition of an asset, such as through a judgment. (See *People v. Coker* (2004) 120 Cal.App.4th 581, 588 ["To understand the intended meaning of a statutory phrase, we may consider use of the same or similar language in other statutes, because similar words or phrases in statutes in pari materia [that is, dealing with the same subject matter] ordinarily will be given the same interpretation... ."].)

Under subdivisions (a) and (b), then, Brian's fiduciary duties to Marilyn persisted after the entry of judgment in 1981 and will continue for each community asset until the actual distribution of her share to her. Those fiduciary duties impose exacting standards on him. (See *Feresi v. The Livery, LLC* (2014) 232 Cal.App.4th 419, 425.)

The law penalizes the violation of an interspousal fiduciary duty. For example, a spouse may incur severe sanctions for violating the duty under section 2102, subdivision (a)(2), to disclose business opportunities resulting from any marital investment, significant business activity outside the ordinary course of business, or other income-producing opportunity of either spouse. (See *IRMO Feldman* (2007) 153 Cal.App.4th 1470, 1492–1493.)

If a party fails to comply with any provision of the Family Code, division 6, part 1, chapter 9—which includes section 2102—"the court shall, in addition to any other remedy provided by law, impose money sanctions against the noncomplying party." (§ 2107, subd. (c).) Section 2107 specifies that "[s]anctions shall be in an amount sufficient to deter repetition of the conduct or comparable

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

conduct, and shall include reasonable attorney's fees, costs incurred, or both, unless the court finds that the noncomplying party acted with substantial justification or that other circumstances make the imposition of the sanction unjust." (§ 2107, subd. (c).) "'Shall' is mandatory... ." (§ 12.)

A spouse is "subject to sanctions under section 2107 for breaching his dissolution disclosure obligations related to both his separate and community interests... ." (*IRMO Schleich* (2017) 8 Cal.App.5th 267, 280.) "Together, sections 271 and 2107 'give the trial court authority to order sanctions and the payment of attorney fees for breach of a party's fiduciary duty of disclosure and for conduct which frustrates the policy of promoting settlement.'" (*Sorge*, *supra*, 202 Cal.App.4th at p. 652.)

While Brian may argue that the 1981 judgment preceded the modern statutory fiduciary-duty scheme within the Family Code, even decades earlier the law would have assigned him similar duties. The Supreme Court explained in 1961, in *Vai v. Bank of America National Trust & Savings Association*, that "the fact of the husband's management and control of the community property places him in the position of trustee for his wife as to her community interest, which trust continues even after separation." (*Clark v. Clark* (1961) 195 Cal.App.2d 373, 380, citing *Vai v. Bank of America National Trust & Savings Ass'n* (1961) 56 Cal.2d 329, 337-338.)

Even when trust no longer bonds husband and wife and their confidential relationship thus terminates, the control by one over the property of the other will maintain their fiduciary relationship. (*Rader v. Thrasher* (1962) 57 Cal.2d 244, 249; *Vai*, *supra*, 56 Cal.2d at p. 338.)

## IV. The Court Should Order Brian to Account to Marilyn for All Community Royalties Over the Past Seven Years.

Given Marilyn's right to community royalties and Brian's duties to Marilyn, the Court should order Brian to account to Marilyn for all the community entities, including Brother Publishing, and for all payments owed or made to Marilyn over the past seven years, as well as the writer-share and reversion sales. Once she digests the accounting, she will decide whether to seek a further accounting. Meanwhile, the Court should order Brian to pay her what he owes, plus interest.

Dated: February 17, 2022

Respectfully submitted,
HERSH MANNIS LLP

By: ______________________
Andrew Stein, Attorneys for Respondent

# DECLARATION

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**DECLARATION OF MARILYN WILSON-RUTHERFORD**

I, MARILYN WILSON-RUTHERFORD, declare:

1. I am the respondent. I married Petitioner Brian Wilson, a founder of the pop group the Beach Boys, on December 7, 1964. At the time, I went by the name Marilyn Wilson. We separated in 1978. On March 4, 1981, this Court entered our interlocutory judgment of dissolution of marriage, which incorporated our marital settlement agreement. A copy of the judgment is attached to this request for order ("motion") as **exhibit A**.

2. The judgment ordered "that the community is the owner of certain copyrights, contract rights and/or royalty rights in [Brian]'s name with respect to musical compositions created during the marriage," and listed 170 of those musical compositions. It then provided for us "to equally divide between [our]selves the foregoing rights in the community musical compositions listed hereinabove, so that from the date hereof EACH PARTY IS to hold as his or her sole and separate property, an undivided one-half (½) interest in said rights in the community musical compositions as tenants-in-common."

3. The judgment obligates Brian to execute any documents necessary to secure my right to "receipts from [my] rights in the musical compositions." Even if Brian alienates or exploits the compositions, he must protect my interests. Similar rights and duties govern my interests in various business entities, such as Wilojarston, Inc.; Brother Publishing; and New Executive Music. The judgment entitles me to access the books and records of a certain trust account and to annual audits and quarterly accountings, requiring Brian's cooperation.

4. On August 11, 1997, the Court entered our Stipulation Modifying Judgment and Order Thereon and Order on Order to Show Cause, fully signed as of April 28, 1997. A copy of that stipulation is attached to this motion as **exhibit A1**. I am unaware of anything in the stipulation that might reduce my rights to information, including through audits and accountings.

5. Since the 1981 entry of the judgment, I have received sporadic information about the finances related to the community musical compositions in which I have interests. I also cannot recall the rights held by the various community entities, such as Wilojarston, Inc.; Brother Publishing; and New Executive Music. I have heard that Brian sold Brother Records and worry that

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

he may have also sold Brother Publishing. I have also learned of various business deals that Brian has recently made concerning community musical compositions. Based on the limited information I have received, I lack confidence that I have been paid my share of the proceeds related to community assets, including the marital musical compositions.

6. Around late December 2021, I received a $11,022,937 check from Brian attached to a portion of Eric Custer's e-mail from the chain ending around December 15, 2021. That chain appears under exhibit F. I have been unable to verify the correctness of the amount.

7. I respectfully request an accounting as well as an award of all proceeds owed to me.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 2/16/2022 day of February, 2022, at Woodland Hills, California.

DocuSigned by:
Marilyn Wilson
B40F755CBCF144A...

Marilyn Wilson-Rutherford

# DECLARATION

0.0

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**DECLARATION OF JOSEPH MANNIS**

I, JOSEPH MANNIS, declare:

1. I am a partner of Hersh Mannis LLP, Respondent Marilyn Wilson-Rutherford's attorneys of record. I was involved with the drafting of the parties' marital settlement agreement. I was present (co-counsel for Marilyn) at the trial, which led to the 1981 judgment. A copy of that judgment is attached to this request for order ("motion") as **exhibit A**. Brian was represented by the prominent firm of Fulop, Rolston, Burns & McKittrick and Marilyn by Law Offices of Simon Taub (lead counsel) and me as co-counsel. After the trial (presided over by recently retired Superior Court judge Joseph Wapner, before People's Court), the judgment was entered based on evidence presented at the trial.

2. On November 18, 2021, Candace Carlo (Marilyn's entertainment lawyer) and I wrote Eric Custer—Petitioner Brian Wilson's counsel—to request information and accountings related to Marilyn's interests in musical compositions and business entities that the judgment had awarded her. A copy of that letter is attached to this motion as **exhibit B**. We asked Mr. Custer to advise about the status of Brother Publishing, Brother Records, New Executive Music, and Wilojarston, Inc., and whether they had paid Marilyn distributions. We also asked for information concerning Brian's potential sales of various community assets.

3. In addition, we requested an accounting of what is due Marilyn under the judgment for the past five years, from January 1, 2016, through October 2021, so we could compare that information against her receipts before deciding whether to examine earlier periods. We asked for an accounting that included backup documentation from all payment streams, including a description of distribution rights and distributions resulting from the musical compositions listed in the judgment's paragraph 6, or by the four above entities; a list of all payments, including their sources, made to Marilyn; and any advances to Brian from BMI, plus proof that Marilyn's share did not repay advances that she did not share.

4. We also requested an accounting concerning eight groups of community assets: (1) BMI (advances to Brian and documents reflecting that Marilyn's share had not been used to repay money for advances she did not share); (2) neighboring-rights royalties; (3) SoundExchange

royalties; (4) royalties (writer's share) from synchronization and other licensing; (5) mechanical royalties (writer's share); (6) any other sources of income from the community projects; (7) producers' royalties or fees from February 1, 1997, onward from the community musical compositions; and (8) reversion rights and reversion plans for community songs.

5. Over the phone, Mr. Custer had argued to us that the judgment, paragraph 6, did not include producers' royalties, but, in our letter, we disagreed, replying that, if he were correct, those royalties would constitute undivided community assets, which the Court would have to award equally to the parties under Family Code section 2556.

6. I received a reply by e-mail from Mr. Custer dated November 29, 2021, a copy of which is attached to this motion as **exhibit C**. He claimed that, for over a decade, Brian had accounted in the same format, though historically he had omitted underlying UMPG and BMI statements since (1) they included confidential information about noncommunity songs and (2) under modern, per-track accounting, they are voluminous and hard to decipher. Mr. Custer said, however, that, under current circumstances, he was willing to let Marilyn access certain of those statements. Offering backup, he asserted that Brian's advances from BMI did not impact Marilyn, who had been paid her ongoing share of BMI royalties as accrued on statements irrespective of Brian's recoupment status.

7. At the same time, Mr. Custer claimed that neighboring rights and SoundExchange were "not interests/monies derived from 'musical compositions' (in which Marilyn shares), but rather derive[d] from performances on 'sound recordings'." He asserted that, under the judgment, "Marilyn does not share in monies Brian receives in respect of Beach Boys recordings (i.e., producer royalties are not monies derived from musical compositions)," pointing to the judgment, paragraph 4(D), which awarded Brian as his separate property "'all of the community's right, title and interest in Brother Records, Inc.' (the source of the Beach Boys sound recording income in which Brian shares, including any producer royalties, which the parties clearly understood based on other provisions of the Judgment)."

8. Likewise, Mr. Custer claimed that paragraph 4(E) awarded "Brian ... as his separate property 'any interest in the musical group 'The Beach Boys[,]'..." contrasting that language with "certain minor Beach Boys related music publishing entities (Brother Publishing and Wilojarston...),

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

where the Judgment provided Marilyn would be entitled to an ongoing 50% interest." He cited paragraphs 59, 60, and 62 as "underscor[ing] that the parties clearly understood Brother Records, Inc. was the source of sound recording royalties, which was awarded to Brian alone," and showing that "Marilyn has no interest in sound recording royalties."

9. As for reversion rights and reversion plans for community songs, Mr. Custer claimed that Brian had recovered them in 2021, allowing him to "claim from UMPG going forward the other 50% of US earnings that UMPG was retaining the past 60 years, which Brian did not own previously." He added: "Inasmuch as these additional rights were not owned by Brian during the marriage ... and were only acquired by Brian under federal copyright law by virtue of his surviving to the effective dates over the past few years..., Marilyn has no interest in and is not entitled to a share of any purchase price for such interests."

10. On November 30, 2021, I e-mailed Mr. Custer to inquire whether the recent sale of Brother Records had included Brother Publishing—which the judgment had awarded the parties equally—or any of its assets. I noted that Ms. Carlo believed that various publishing rights may also have sold, and so I requested a copy of the sales agreement so Marilyn could determine whether the sale affected her rights. I offered to sign the Court's form protective agreement, attaching a copy. A copy of that e-mail, including its attachment, is attached to this motion as **exhibit D**.

11. That day, Mr. Custer replied to my e-mail. A copy of his reply is attached to this motion as **exhibit E**. He confirmed that, while the Beach Boys had sold to a company called Iconic a 51-percent interest in all the group's assets, the sale excluded individual assets of its members, such as Brian's writers' royalties and owned publishing. He asserted that, generally, the sale covered things that did not involve Marilyn. But he confirmed that the sale did include "certain minor publishing assets that involve Marilyn, to wit the sale by Brother Publishing and Wilojarston of the musical composition copyrights owned by those entities." He attached catalog lists for Brother Publishing and Wilojarston. (I have omitted them from exhibit E.)

12. Mr. Custer explained that, prospectively, Iconic had assumed the obligation to account and pay writers' royalties, including those due Brian on those of the compositions that he wrote or co-wrote, but he claimed that the sale would not impact the writers' royalties that Brian

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

received concerning the Brother Publishing and Wilojarston compositions he had written. Still, Mr. Custer represented, Brian would continue to account to Marilyn for her share of those songwriter royalties.

13. In addition, Mr. Custer explained the valuation process for the sale of those Brother Publishing and Wilojarston musical-composition interests. He added that, while the Iconic sale had closed some time ago, those entities had not distributed to the shareholders the purchase-price proceeds attributable to those publishing assets. Mr. Custer said that the next statement to Marilyn covering her share of that money would show her receiving about $70,000.

14. As the new year approached, Mr. Custer and I continued to communicate. Understanding that Universal—the entity seeking to purchase the disputed rights—was ceasing work for the year in mid-December, I expressed the concern that Marilyn was being placed in a time crunch with insufficient information. On December 14, 2021, after we had spoken, Mr. Custer e-mailed me, apologizing for the rush given the consequential issues and offering to work around them and take up other elements in 2022. The next day, he e-mailed me again, in the same chain, to announce that he had "the final figures calculated from the underlying source statements," which he said we could "review []ourselves to tie out the math… ." The "[e]nd result," he continued, "is that net to Marilyn on the writer share sale is: **$11,022,937**." He laid out his calculation, which simply multiplied the $33,324,023.50 gross price for the writer-share sale against Marilyn's claimed "pro rata share of 34.819%" and then subtracted a five-percent commission.

15. I do not know whether the 5 percent was actually paid and, if so, whether Manatt, Phelps & Phillips (Mr. Custer) charged Marilyn for their work on this matter. Nor do I know why Marilyn would be responsible for Mr. Custer's or his firm's fees or charges. Next, Mr. Custer addressed the reversion-rights sale. This time, however, he offered Marilyn *half* of her 34.819-percent prorated share—17.41 percent—of the $19,255,829 net sales price after the five-percent commission. The offer, which amounted to $3,352,439.82, thus would have given Marilyn a *quarter*, rather than a half, of the money stemming from the underlying community assets. Again, Mr. Custer had contended that the reversion rights did not exist during the marriage and did not materialize until Congress changed the law to recognize those rights. In any event, because Brian would be

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

proceeding with the sale that week, Mr. Custer concluded, "to the extent we cannot resolve the reversions on the above basis, then we understand everyone will reserve their arguments to make as to same, including from our side that Marilyn is not entitled to any of that."

16. That day, I responded to Mr. Custer's e-mail. I asked that Universal make out its $11,022,937 check to Marilyn and send it to us, but I reserved Marilyn's rights, noting that she was considering his offer of an additional $3,352,439.82. Closing, I requested that he send us the finalized Universal agreement. A redacted copy of the chain of e-mails, from December 14 to 15, 2021, mentioned in this paragraph and the preceding two is attached to this motion as **exhibit F**.

17. Later on December 15, 2021, Mr. Custer e-mailed me draft 8 of the Universal agreement but without any of its exhibits. In a series of e-mails that day, Ms. Carlo and I asked him to send the exhibits, and he said he would "hunt" for them, but I still have not received a single exhibit (or the final, executed agreement). Because Mr. Custer asked me to treat the agreement as confidential, I have not attached a copy. I will, however, lodge a copy conditionally under seal and notify Brian of his right to bring a motion to seal. Redacted, highlighted copies of parts of the e-mail chains that I have just mentioned are attached to this motion as **exhibits G1, G2, G3, and G4**.

18. We did not receive Universal's $11,022,937 check. Instead, Marilyn received a check from Brian attached to a portion of Mr. Custer's e-mail from the chain ending December 15. (See Marilyn decl., ¶ 6.) No one sent us any backup, an accounting, any exhibits, or anything else that we could use to verify the correctness of that sum. In his November 30 reply e-mail (exh. E), Mr. Custer had offered to provide further detail and documentation on the valuation, the share of the purchase price attributable to the assets, and the resulting portion distributed to Brian by Brother and Wilojarston. In that context, he offered to review the proposed protective order that I had sent him but claimed that the transaction primarily covered assets irrelevant to Marilyn and involving the interests of third parties. And Mr. Custer's December 15 e-mail promised us "the underlying source statements" so we could review his math. (Exh. F.) He made similar promises in parts of exhibits G1 to G4.

19. To date Marilyn and I have never been provided any of the following:

1. The actual sales agreement between Brian and Universal.

2. Any schedule showing what was sold in that transaction.

3. Any breakdown as to how Marilyn's approximate 34% share of the gross sales proceeds (not including reversion monies) was estimated or determined.

4. Any documents reflecting what was actually paid to Brian and any documents supporting the claim that 68% of the 100% paid by Universal the "community's" gross share.

5. Any correspondence or other documents between Brian and Universal, particularly as the only partial documentation (again no schedules, etc.) we received was an unsigned draft "8." Hence, what was negotiated is hidden in past drafts.

20. At this point, I remain in the dark about the specifics of the proceeds owed to Marilyn. We therefore ask the Court to order Brian to account to Marilyn, including all documents concerning the writer-share sale and the reversion-rights sale.

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**REQUEST FOR $250,000 IN ATTORNEYS' FEES AND $250,000 IN ACCOUNTING COSTS**

21. Given Brian's posture on Marilyn's entitlement to payments and his refusal to provide documentation, I expect Marilyn will incur substantial attorneys' fees and costs litigating those issues. For example, I expect Brian will move to transfer at least a portion of this case to federal court. I do not practice in federal court and have retained Greenberg Glukser on Marilyn's behalf to aid Hersh Mannis on the federal issues in this family-law matter and for any federal-court litigation necessitated by federal-court issues. (Please see the accompanying declaration of my partner James Simon for more detail on the need for fees.) I therefore respectfully ask the Court to order Brian to pay attorneys' fees of $250,000 and accounting costs of $250,000.

22. I have practiced law since 1972. From 1972 to approximately 1976, my practice consisted of civil litigation with an emphasis on construction litigation. Beginning in 1976 through the mid to late 1980s, my practice was substantially family law. From the mid to late 1980s to the present, my practice has been almost exclusively family law. My regular hourly billable rate is $925.

23. A copy of my curriculum vitae, which is accurate, is attached to this motion as **exhibit K**.

24. On several occasions, I have qualified as an expert witness in the Los Angeles

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

Superior Court system in family law matters. I regularly serve as a family law mediator in the Los Angeles Superior Court, Central District. My firm has been AV rated by Martindale-Hubbell virtually since its inception in 1990. Prior to 1990, my previous firms were also AV rated for many years. I have handled dozens of cases involving significant assets, some with a value of over $200 million. I regularly review and analyze tax returns and financial statements.

25. Based on my 50-years' experience as a lawyer, a majority of which have been exclusively devoted to the practice of family law, I believe that the attorneys' fees and costs that Marilyn has incurred thus far in this postjudgment matter relating to her intellectual-property rights have been reasonably necessary to maintain and defend the issues and matters related to her.

26. Since Marilyn retained our office for that matter in March 2021, I have served as the partner primarily responsible for her representation. As a result, I am fully familiar with all that has transpired in the case since then. I have managed this case and reviewed all the bills. A redacted copy of our billing statements from November 29, 2021, to January 26, 2022, is attached to this motion as **exhibit H**. Those bills total approximately $48,236.

27. I will now address factors mentioned in *In re Marriage of Keech* (1999) 75 Cal.App.4th 860 and California Rules of Court, rule 5.427(b)(2):

A. Nature of the litigation: The parties dispute Marilyn's right to payments stemming from, and information and documents related to, songs and business entities that their stipulated judgment awarded her shares of as community property. I expect, based on my experience in other family-law litigation involving music royalties and related businesses, the resulting production to prove voluminous, to require many hours of attorney and accountant time to digest and evaluate, and to prompt us to make follow-up requests for information and documents. In addition, Brian is offering to pay Marilyn only a *quarter* of the proceeds flowing from reversion rights related to community songs. Marilyn will not accept anything less than *half* of those proceeds. In offering her a quarter, Brian argues that the law entitles her to *nothing* because the reversion rights allegedly did not exist during the marriage. I regard that position as hardline: the judgment awarded Marilyn her community rights in the same intellectual property in which it awarded Brian community rights, and I believe the law treats their rights as coextensive. Family Code section 751, for example, provides:

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

"The respective interests of each spouse in community property during continuance of the marriage relation are present, existing, and equal interests." So I expect we will have to litigate that question. Brian offered Marilyn $3,352,439.82 as a quarter share of the reversion proceeds. If in litigation he pressed his position that she had the right to $0, we would be litigating over a spread of $6,704,879.64. Indeed, if he maintained that she had *no* right to *any* of the proceeds, I am not sure how he could argue anything other than that she should receive *nothing*. I therefore expect that Marilyn will incur significant attorneys' fees and accounting costs on the issues of both Marilyn's right to information and documents, her entitlement to money, and interest thereon.

B. Its difficulty and the amount involved: Mr. Custer and Brian's other counsel, John Branca, have communicated with me about the above issues. In January 2022, I viewed the homepage of Mr. Branca's Web site (www.johnbranca.com). It began: "Marty Bandier, CEO/Chairman of Sony/ATV Music Publishing, called entertainment attorney John Branca 'the #1 publishing lawyer in the country.' Michael Jackson hailed Branca, his longtime business and legal advisor, as 'the greatest lawyer of our time.' And client Carlos Santana called him simply 'the Shaman.' Branca has been advancing the careers of recording artists and music companies, among others, for more than four decades. [¶] Branca is a partner and head of the music department at the prominent entertainment law firm Ziffren Brittenham LLP where his clients have included more than 30 members of the Rock and Roll Hall of Fame… ." The exposition of Mr. Branca's credentials and awards went on at length. A copy of the homepage is attached to this motion as **exhibit I**.

Also, in January 2022, I viewed Mr. Custer's profile at the Web site of his law firm, Manatt, at https://www.manatt.com/eric-custer#profile. After listing him as a partner, the profile stated: "Eric Custer's practice focuses on all aspects of the music industry, including the negotiation of a wide variety of music related contracts and advising clients as to intellectual property rights in the context of the music business. [¶] Eric has provided these services for bands, recording artists, producers, songwriters, record companies, music publishing companies, film production companies, performing rights societies, music industry trade organizations, concert promoters, managers/talent agencies, brands/ad agencies, APP developers and various Internet and new media companies." A copy of that profile is attached to this motion as **exhibit J**.

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

Based on Mr. Custer's profile and Mr. Branca's Web site, my previous personal experience with Mr. Branca, as well as my interactions with them over the phone and by e-mail, I believe both to be highly intelligent, extremely capable, aggressive advocates for Brian.

In addition, I represented Marilyn against Brian in their original divorce and various later disputes over her rights to royalties and the like. Based on my experience in those cases, as well as the positions Mr. Custer has advocated in the present dispute, I believe Brian and his legal team will aggressively litigate against Marilyn, increasing her need for attorneys' fees and accounting costs.

C. The skill required and the skill employed in handling the litigation: My experience with past royalty disputes—including between Marilyn and Brian—tells me that this type of litigation requires great skill and attention to detail, from lawyers as well as accountants. I have, for instance, been involved with a number of audits of musicians, and I have yet to see one fail to turn up a material underpayment to the party requesting the audit. The process, even if it covers a period of only a year or two, typically involves poring over thousands of pages of spreadsheets and tracing each payment. Here, we are dealing with some 170 compositions—far above the average number in the disputes I have worked on—many of which I regard as classic songs (for example, Help Me Ronda; California Girls; Wouldn't It be Nice; God Only Knows; Good Vibrations; Sail on Sailor; Sloop John B; I Just wasn't Made for These Times; and Caroline No). For decades, I have been hearing those songs on the radio or in commercials or movies. I expect any accounting to result in a proliferation of paperwork. But I expect that litigating the reversion rights alone would generate significant fees in research, preparation, discovery, drafting of pleadings, and attending hearings, plus in further settlement discussions. I would also rely extensively on Ms. Carlo, whose accompanying declaration describes her credentials and experience. She billed Marilyn $695 an hour in 2021 and $725 an hour in 2022.

D. The attention given and the time consumed: So far, my firm has billed Marilyn for 79.6 hours and $48,236 (including costs) from November 29, 2021, to January 26, 2022, on this dispute and Ms. Carlo has billed her $13,747.50.

E. Attorneys' learning, age, and experience in the particular type of work demanded: I have described my 50-years' experience as a lawyer. Ms. Carlo's declaration provides the same

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

information for her. I am also using my partner James Simon—a distinguished lawyer of 38 years with extensive experience in high-asset cases—and the services of additional lawyers of our firm. (See their accompanying declarations.)

F. The intricacies and importance of the litigation: Again, I regard this type of litigation as intricate, covering complex accounting and legal principles, and important, as it could affect other cases involving music artists who seek to shut out their ex-spouses from information and valuable rights under novel legal theories and with aggressive, highly skilled lawyers.

G. The labor and the necessity for skilled legal training and ability in trying the cause: In my experience, this type of litigation requires skilled, able lawyers, as an artist's aggressive, experienced attorneys could quickly overwhelm counsel with less experience and ability.

H. Why the requested fees and costs are just, necessary, and reasonable: The requested $250,000 in attorneys' fees and $250,000 in accounting costs represent the *minimum* that Marilyn will need to vindicate her rights, which Brian vigorously disputes. I believe he is taking extreme positions by refusing to account and arguing that, despite the parties' coextensive rights to community intellectual property, only he has the right to reversions.

28. Finally, I will address the parties' relative needs and abilities to pay. Brian's lawyers have admitted that the disputed deals alone have paid him $39,890,714 after he paid Marilyn $11,022,937. (See exh. F [$31,657,822 from the writer share after commission, less $11,022,937 paid Marilyn=$20,634,885; Brian also claims 100% of $19,255,829 from reversions, after commissions].) I understand that, over the past couple of years, Brian has made further deals selling more of his catalog. Marilyn's income and expense declaration shows her with far less income and far less in asset values.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 16 day of February, 2022, at Beverly Hills, California.

JOSEPH MANNIS

DECLARATION

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**DECLARATION OF JAMES M. SIMON**

I, James M. Simon, declare:

1. I am an attorney at law duly licensed to practice before all the courts in the State of California. I am a partner of the law firm of Hersh Mannis LLP ("HM"), counsel of record for Respondent Marilyn Wilson-Rutherford. I have personal knowledge of the facts set forth below and, if called as a witness, I could and would competently testify thereto.

2. At HM, we practice exclusively in family law. I received my undergraduate degree from UCLA and my JD from Loyola law School in 1983, where I graduated Cum Laude and received the Am Jur award in Family Law and the LACBA Family Law scholarship award. I have been practicing law for 38 years and family law has been my primary area of practice. I have represented the out-spouse in multi-million-dollar disputes over the character and division of property.

3. I have been helping Joseph Mannis, the lead partner on this case, in the present dispute over Marilyn's entitlement to an accounting and royalties and have participated in many meetings and phone conferences with him. I will continue to work on this case as a supervisor and a litigator. My regular hourly billing rate is $775.

4. One of the thorniest disputes concerns whether Marilyn has reversion rights regarding songs that Brian created during the marriage. At some point, Brian had granted companies the right to exploit those songs, but the Copyright Act's creation of reversion rights allowed him to terminate those grants and reclaim ownership of the underlying intellectual property. Brian admits to having later sold some of those reversion rights. For those sales, Brian admits to having received, net of commissions, $19,255,829. He asserts that, of that amount, $13,409,759 related to songs he created during the marriage. Since we are now litigating and Marilyn is claiming half of at least the $13,409,759 based on Brian's computation of the reversion sales price of the community property musical compositions, the parties stand apart by some $6,704,879.

5. So far, HM has expended about $48,236 (not including certain work in progress) exploring and negotiating Marilyn's rights in intellectual property that Brian created during their marriage and in preparing this request for order. Based on my participation in this case, review of the file, and my understanding of the rights at stake, I believe that Marilyn will need at least $250,000

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

in attorneys' fees. Based on my extensive work with accounting firms in family law matters, I further believe that Marilyn will need at least $250,000 in accounting costs to conduct appropriate discovery, to digest the financial information obtained from discovery, to prepare schedules and other evidence based on the information obtained to provide the Court a cogent presentation of the sums due Marilyn from accountings, and otherwise to litigate those issues in this court. With Marilyn standing as the out-spouse in the complex world of music-business royalties, I believe those fee amounts reflect the *minimum*.

6. If, moreover, Brian succeeds in removing part of this case to federal court, then I believe Marilyn's fees and costs would run significantly higher, as Ms. Eskenazi explains in her accompanying declaration.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on this 17th day of February, 2022, at Beverly Hills, California.

James M. Simon

# DECLARATION

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**DECLARATION OF ANDREW STEIN**

I, ANDREW STEIN, declare:

1. I work as a lawyer for Hersh Mannis LLP, Respondent Marilyn Wilson-Rutherford's attorneys of record. In 1996, I graduated Claremont McKenna College cum laude, with honors in my government major, having made the Dean's List twice and earned the Distinguished Scholar honor twice. In the summer of 1998, I clerked in Washington, D.C., at the Center for Individual Rights, which handled high-profile cases before the United States Supreme Court and Courts of Appeals; served as a Charles G. Koch Summer Fellow; and received a University of Southern California Public Interest Law Foundation Fellowship. In 1999, I graduated USC Law School, which awarded me a partial scholarship and the Edward and Eleanor Shattuck Award. I also participated in the Hale Moot Court honors program there.

2. I became a member of the State Bar of California in December 1999. I began my career in civil practice, working under the supervision of two Certified Appellate Specialists. I then spent four years as an associate at Trope and Trope, a prominent family-law firm, followed by a year at Brot & Gross (another family-law firm) and nine years at Trope & DeCarolis, LLP, a firm that specializes in family law. Late in 2015, I rejoined Trope and Trope. That firm began to wind down around June 2016. In August 2016, I started working at Hersh Mannis.

3. For about twenty years, I have focused on family law while also working on occasional civil cases. My practice has centered around researching and briefing issues, complex as well as small, on a broad range of topics. I have worked on a number of high-profile cases involving litigants with high net worths, and I have handled appeals, from briefing to oral argument, on various issues, ranging from a civil trial to the anti-SLAPP statute to arbitration to family law.

///

///

///

///

///

///

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

4. In the present case, I researched and drafted this request for order, and I expect to work in a similar role through its completion.

I declare under penalty of perjury under the laws of the State California that the foregoing is true and correct.

Executed this 16th day of February 2022, at ~~Sherman Oaks~~ Beverly Hills, California.

ANDREW STEIN

# DECLARATION

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

# DECLARATION OF CANDACE CARLO

I, CANDACE CARLO, declare:

1. I am a partner at Kleinberg Lange Cuddy & Carlo LLP, a law firm specializing in entertainment law. Before joining my current firm, I served as the Chair of Greenberg Glusker's Entertainment Department. For the past 18 years, I have represented A-List talent and entertainment companies in private practice. Before that time, I was in the theatrical motion picture legal department at major motion-picture studios where my duties included intellectual property/copyright analyses, motion picture production, and multi-picture financing deals. My private practice clients include prominent composers, musicians, actors, directors and producers, several of whom are Academy Award and Golden Globe winners. I have extensive experience in matters involving music related to film, television and videogames, including issues of copyright and termination/reversion of copyright interests. Billboard magazine has named me one of the top music lawyers in the business. My practice also includes extensive work in the film and television arena. Representative clients of my firm include Hans Zimmer (Academy Award for musical score of The Lion King), Brenda Chapman (Academy Award as director of Brave), Gene Simmons / KISS, Toby Keith, Mick Jagger and Keith Richards, George R.R. Martin (Game of Thrones) and J.K. Rowling (Harry Potter).

2. Marilyn Wilson-Rutherford ("Marilyn") retained my services to advise her concerning certain entitlements she was awarded under the Interlocutory Judgment of Dissolution of Marriage (filed March 4, 1981) (the "Judgment"). These entitlements include, among other things, a 50% undivided interest as tenant-in-common in and to all "copyrights, contract rights and/or royalty rights held in Petitioner's [Brian Wilson's] name" for the 170 musical compositions listed in paragraph 6 of the Judgment (the "Songs").

3. There are several revenue streams that typically flow from the exploitation of musical compositions. These include revenues generated from the utilization of copyrights, contract rights and royalty rights – as recited in the Judgment. Copyrights provide revenues from synchronization fees paid whenever a song is licensed for use in audiovisual works

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

such as film, television, YouTube etc. Usually, the songwriter receives 50% and the performer shares the other 50% with the record label. Contract rights would encompass all sums paid to the producer of the applicable songs. In this case, the producer was Brian Wilson ("Brian"). The category of royalties captures a wide range of revenues. A mechanical royalty is paid from the sale of a song on a physical record or digital download or other means of delivery to the public, e.g., digital, ringtones and streaming. The mechanical royalty is set by the U.S. Copyright Royalty Board and is currently 9.1 cents/use, usually split between the songwriter and copyright owner / record label. Other royalties include public performance royalties paid to the songwriter by a performing rights organization such as ASCAP, BMI or SESAC (or less frequently through *direct licensing by* the copyright owner) whenever a song is performed publicly. Some examples of public performance are terrestrial broadcast radio, performance in a live performance venue and online streaming services. These royalties can be significant. Other royalties are SoundExchange royalties paid to the featured artist on a recording and neighbouring rights paid outside the United States to performers of songs. The only method that can ensure that Marilyn has received her share of the revenue streams to which she is entitled under the Judgment is to obtain an accounting from Brian with respect to these categories of exploitation. Only then can she examine the records and determine whether sums are owing.

4. There are two copyrights in musical compositions. The song has a separate copyright and the physical sound recording has its own copyright. The Judgment states that Marilyn is to receive a 50% undivided interest in all "copyrights, contract rights and/or royalty rights held in Petitioner's [Brian Wilson's] name" for each of the Songs. There is nothing on the face of the Judgment that excludes the sound recordings or which would limit Marilyn's participation in all the revenue streams generated by the Songs.

///

///

///

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 16th day of February, 2022, at Los Angeles, California.

Candace Carlo

CANDACE CARLO

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

# DECLARATION

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

**DECLARATION OF BONNIE ESKENAZI**

I, BONNIE ESKENAZI, declare:

1. I am a partner at Greenberg Glusker LLP. Hersh Mannis LLP has retained me in this case on behalf of Respondent Marilyn Wilson-Rutherford.

2. I have specialized in entertainment law since 1986. My clients have included, among others, Marvel Entertainment, Jeffrey Katzenberg, the Estate of JRR Tolkien, Paramount Pictures, DreamWorks, MGM, STX Entertainment, EndemolShine North America, Bron Studios, Marlon Brando, Hans Zimmer, HarperCollins Publishing, Renée Fleming, Joshua Bell, Itzhak Perlman, Ziggy Marley, Playboy Enterprises, Harvey Entertainment (as both a litigator and outside general counsel), DIC Entertainment, Lagardere Entertainment, Elle Macpherson, Geffen Records, Horror Inc. (owners of the rights to Friday the 13th), Bagdasarian Productions (owners of the Chipmunks), and Stephen Slesinger Inc. (owners of rights in Winnie the Pooh). I also serve as outside general counsel for the Bob Marley Estate. I have served on Greenberg Glusker's management committee for the past fifteen years. I teach a course in Entertainment Law at Stanford Law School and am an annual guest lecturer at Harvard Law School in its Entertainment Law class.

3. In my entertainment practice over the past 35 years, I have handled matters of all kinds, including without limitation profit participations (including both audits and litigated disputes for film, television and music), copyrights, trademarks, defamation, privacy rights and rights of publicity, life rights for potential biographical films and television, breach of contract, breach of fiduciary duty, various torts (such as fraud, interference with contract, interference with prospective business advantage), licensing and merchandising. In particular, as outside general counsel for the Bob Marley Estate, I handle or oversee every aspect of the rights (transactional and litigation) held by the heirs to the late Bob Marley and their entities all over the world, including without limitation all music publishing, sound recordings, royalties, copyrights, trademarks, name, image and likeness rights.

4. Among my many cases involving copyright issues, I have been involved in litigating some of the most significant copyright termination (sometimes referred to as reversion rights) cases, including <u>Oriolo v. Harvey Entertainment</u> (copyright termination rights in the character *Casper The*

HERSH MANNIS LLP
9150 WILSHIRE BOULEVARD, SUITE 209
BEVERLY HILLS, CA 90212-3429
PHONE: (310) 786-1910 FAX: (310) 786-1917

*Friendly Ghost*)(unreported, settled out of court), Classic Media v. Mewborn, 532 F. 3d 978 (9th Cir. 2008)(copyright termination rights in the character *Lassie*), Milne ex rel. Coyne v. Stephen Slesinger, Inc., 430 F.3d 1036 (9th Cir. 2005) (copyright termination rights concerning the character *Winnie the Pooh*), and Horror Inc. v. Miller, 15 F.4th 232 (2nd Cir. 2021)(copyright termination rights in the script for the original *Friday the 13th* film).

5. Under the Copyright Act of 1976, section 304(c), which became effective January 1, 1978, an author of intellectual property gained the right to terminate and recapture any copyright that was subsisting in either its first or renewal term as of January 1, 1978, that was the subject of a grant executed prior to January 1, 1978. Through that termination mechanism, the author would regain or recapture his or her copyright ("Reversion Rights").

6. In January 2022, I spoke by phone with Eric Custer, one of the lawyers for Petitioner Brian Wilson, about Brian's claims concerning the Reversion Rights affecting songs that he had written during his marriage to Marilyn. In short, Mr. Custer maintained that Marilyn had no rights, whether based on community-property law or on the parties' 1979 judgment, in any of Brian's Reversion Rights. Marilyn is claiming a right to 50 percent of the Reversion Rights for all intellectual property that Brian created during the marriage. Based on my conversation with Mr. Custer, it is my opinion that he may attempt to remove the Reversion Rights issue to federal court.

7. My hourly rate is $1,000 per hour. As of February 7, 2022, my firm has billed $10,075.00 to this matter. Should Brian seek to remove the Reversion Rights issue to federal court, I believe, based on my experience, that Marilyn would have to expend at least $100,000 in attorneys' fees to litigate just the removal issue. In addition, I anticipate the cost of litigating just the issue of the Reversion Rights in federal court to be in the range of $500,000, if not more, depending on the way Manatt litigates. I have litigated innumerable cases in federal court over my 35 years of practice, including without limitation music royalty cases and Reversion Rights cases (as indicated above).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on this 16th day of February, 2022, at Los Angeles, California.

Bonnie Eskenazi

BONNIE ESKENAZI

# EXHIBIT A

ATTORNEY OR PARTY WITHOUT ATTORNEY (NAME AND ADDRESS): TELEPHONE NO.:
STEVEN ..., A LAW CORPORATION 274-6047 and
9454 Wilshire Boulevard, Suite 805 272-8549
Beverly Hills, California 90212

ATTORNEY FOR (NAME): Respondent

FOR COURT USE ONLY

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS: Los Angeles, California 90012
CITY AND ZIP CODE:
BRANCH NAME: CENTRAL

MARRIAGE OF
PETITIONER: BRIAN WILSON
RESPONDENT: MARILYN WILSON

INTERLOCUTORY JUDGMENT OF DISSOLUTION OF MARRIAGE

CASE NUMBER: D 983 605

1. This proceeding came on for ☐ default or uncontested ☐ contested hearing as follows
   a. Date: October 8, 1980 ☐ Dept.: ☐ Div.: ☐ Room:
   b. Judge (name): JOSEPH WAPNER, Judge Retired ☐ Temporary judge
   c. ☐ Petitioner present in court ☒ Attorney present in court (name): FULOP, ROLSTON, BURNS & McKITTRI By ALLAN S. MORTON
   d. ☒ Respondent present in court ☒ Attorney present in court (name): SIMON TAUB and NEAL RAYMOND HER...
   e. ☐ Claimant present in court ☐ Attorney present in court (name):

ORIGINAL FILED
MAR 4 - 1981
COUNTY CLERK

2. The court acquired jurisdiction of the respondent on (date): January 22, 1979
   a. ☒ Respondent was served with process.
   b. ☐ Respondent appeared.

Glenn L. Cove...

3. THE COURT ORDERS
   a. An interlocutory judgment be entered and the parties are entitled to have their marriage dissolved.
   b. After six months from the date the court acquired jurisdiction of the respondent a final judgment of dissolution may be entered upon proper application of either party or on the court's own motion, unless a dismissal signed by both parties is filed. The final judgment shall include such other and further relief as may be necessary to a complete disposition of this proceeding, but entry of the final judgment shall not deprive this court of its jurisdiction over any matter expressly reserved to it in this or the final judgment until a final disposition is made of each such matter.
   c. Jurisdiction is reserved to make such other and further orders as may be necessary to carry out the provisions of this judgment.
4. ☒ THE COURT FURTHER ORDERS
   a. ☐ Wife's former name be restored (specify):
   b. ☒ Other: The Marital Settlement Agreement and it's addendums are approved as to their due execution, and the fairness of it's terms, and are marked Exhibit 1 and admitted into evidence.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

XXXXX . . . . . . . . . . . . . . . . . . . . . . . .

XXXXXXXXXXXXXXXXXXXXXXX

5. Total number of pages attached: ☒ Signature follows last attachment

THIS INTERLOCUTORY JUDGMENT DOES NOT CONSTITUTE A FINAL DISSOLUTION OF MARRIAGE AND THE PARTIES ARE STILL MARRIED. ONE OF THE PARTIES MUST SUBMIT A REQUEST FOR FINAL JUDGMENT ON THE FORM PRESCRIBED BY RULE 1288. NEITHER PARTY MAY REMARRY UNTIL A FINAL JUDGMENT OF DISSOLUTION IS ENTERED.

1. The separate property of the petitioner is confirmed to him, and is as follows:

A. Green Tree Avenue residence, Pacific Palisades, California, legally described as:

"THAT PORTION OF LOT 14 OF TRACT 12678, AS PER MAP RECORDED IN BOOK 262 PAGES 35 AND 36 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE SOUTH-WESTERLY LINE OF SAID LOT, LYING SOUTH 55° 05' 44" EAST 119.27 FEET FROM THE MOST WESTERLY CORNER OF SAID LOT; THENCE NORTH 55° 05' 43" WEST 119.27 FEET TO SAID WESTERLY CORNER; THENCE NORTH 34° 54' 17" EAST, ALONG THE NORTHWESTERLY LINE OF SAID LOT, 85.00 FEET MORE OR LESS, TO A POINT LYING SOUTHWESTERLY THEREON 10.00 FEET FROM THE MOST NORTHERLY CORNER OF SAID LOT; THENCE SOUTH 55° 05' 43" EAST, (PARALLEL WITH THE NORTHEASTERLY LINE OF SAID LOT, 97.00 FEET); THENCE SOUTH 44° 54' 17" WEST 37.70 FEET; THENCE SOUTH 3° 51' 23" WEST 55.88 FEET, MORE OR LESS TO A POINT OF BEGINNING."

Together with miscellaneous furniture and furnishings.

////

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS,
LIFORNIA 90212
74-6847 AND

B. 1979 Cadillac Coupe de Ville, California license number 151 YSS.

C. Checking and savings accounts in Petitioner's name.

D. Brother Records Money Purchase and Profit Sharing Plan post-separation contributions, plus accretions.

E. Musical compositions copyrighted prior to marriage, including any contract rights and royalty rights therein and thereto,, which compositions are as follows:

| COMPOSITION | COPYRIGHT NUMBER: |
|---|---|
| 1) County Fair | 743258 |
| 2) Ten Little Indians | 741336 |
| 3) Chug-A-Lug | 743257 |
| 4) 409 | 719499 |
| 5) Heads You Win Tails I Lose | 743259 |
| 6) Cuckoo Clock | 743260 |
| 7) The Shift | 743261 |
| 8) Farmer's Daughter | 762819 |
| 9) Stoked | 821068 |
| 10) Lonely Sea | 710498 |
| 11) Shut Down | 761662 |
| 12) Noble Surfer | 762818 |
| 13) Lana | 780397 |
| 14) Finders Keepers | 762817 |
| 15) Catch A Wave | 781050 |
| 16) South Bay Surfer | 821067 |

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
LIFORNIA 90212
4-6847 AND

| COMPOS. .ION | COPYRIGHT NUMBER: |
|---|---|
| 17) Little Deuce Coupe | 783375 |
| 18) In My Room | 821070 |
| 19) Hawaii | 821069 |
| 20) Surfer's Rule | 799093 |
| 21) Boogie Woodie | 830959 |
| 22) Ballad Of Old Betsy | 799091 |
| 23) Be True To Your School | 797106 |
| 24) Car Crazy Cutie | 82055 |
| 25) Cherry, Cherry Coupe | 821065 |
| 26) Spirit Of America | 799092 |
| 27) Surfin' Down The Swanee | 765859 |
| 28) No Go Showboat | 799090 |
| 29) Custom Machine | 812285 |
| 30) Fun, Fun, Fun | 807824 |
| 31) Pom Pom Play Girl | 818198 |
| 32) This Car Of Mine | 818199 |
| 33) In The Parking Lot | 818196 |
| 34) "Cassius" Love VS "Sonny" Wilson | 818194 |
| 35) Shut Down Part II | 818192 |
| 36) The Warmth Of The Sun | 818197 |
| 37) Don't Worry Baby | 818195 |
| 38) I Get Around | 821071 |
| 39) All Summer Long | 829779 |
| 40) Little Honda | 824989 |
| 41) We'll Run Away | 844935 |
| 42) Wendy | 829775 |
| 43) Do You Remember | 829777 |

SIMON TAUB
AW CORPORATION
WILSHIRE BLVD.
SUITE 803
EVERLY HILLS,
LIFORNIA 90212
74-6847 AND

| COMPOSITION | | COPYRIGHT NUMBER: |
|---|---|---|
| 44) | Girls On The Beach | 824990 |
| 45) | Drive-In | 829776 |
| 46) | Don't Back Down | 829778 |
| 47) | Little Saint Nick | 802512 |
| 48) | The Man With All The Toys | 848591 |
| 49) | Santa's Beard | 848593 |
| 50) | Merry Chirstmas, Baby | 848594 |
| 51) | Christmas Day | 848592 |
| 52) | When I Grow Up | 839789 |
| 53) | She Knows Me Too Well | 835976 |
| 54) | Sidewalk Surfin' | 849643 |
| 55) | Run Around Lover | 780398 |
| 56) | The Revolution | 733213 |
| 57) | Thinkin' Bout You Baby | 802388 |
| 58) | New Girl In School | |
| 59) | She's My Summer Girl | |
| 60) | Surf City | |
| 61) | The Surfer Moon | |
| 62) | The One You Can't Have | |
| 63) | Our Favorite Recording Sessions | 66-590 |
| 64) | Ba Ba Black Sheep | 62-989 |
| 65) | The Big Beat | 62-992 |
| 66) | Recreation | 62-992 |
| 67) | Land Ahoy | 62-992 |
| 68) | The Humpty Dumpty | 62-992 |
| 69) | Rockin' Roadster | 62-992 |
| 70) | The Rocking Surfer | |

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
IFORNIA 90212
'4-6847 AND
??-????

| COMPOSITION | COPYRIGHT NUMBER: |
|---|---|
| 71) Surfer Girl | |
| 72) Surfin' Safari | |
| 73) Surfin' U.S.A. | |
| 74) You Can't Have | |
| 75) Heads You Win Tails I Lose | |
| 76) Hide Go Seek | |
| 77) Honky Tonk | |
| 78) Keep An Eye On Summer | |
| 79) Marie | |
| 80) Moon Dawg | |
| 81) My Only Alibi | |
| 82) Number 1 | |
| 83) Our Car Club | |
| 84) Our Summer Dream | |
| 85) Ride The Wild Surf | |
| 86) South Bay Surfer | |
| 87) Stoked | |
| 88) Surfin' | |
| 89) Surf Jam | |
| 90) The Baker | |
| 91) The Beggin' Of The End | |
| 92) When Summer Comes | |
| 93) Drag City | |

/ / /

/ / /

/ / /

/ / /

F. Musical Composition opyrighted after separation, including any contract rights and royalty rights therein and thereto, which compositions are as follows:

| COMPOSITION | COPYRIGHT DATE |
| --- | --- |
| 1) Oh Darlin' | 4/80 |
| 2) Some Of Your Love | 4/80 |
| 3) Goin' On | 4/80 |
| 4) Sunshine | 4/80 |
| 5) When Girls Get Together | |

G. New Executive Music rights and interest in musical compositions copyrighted after separation.

H. Beach Bum Music, a sole partnership.

2. The following are the sole and separate debts and obligations of the petitioner:

A. Encumbrances on real property described in paragraph 1.A. above.

B. All debts and obligations incurred by petitioner from and after the date of separation.

3. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that th community property of the parties is equally divided as follows:

A. To the respondent as her sole and separate property, the following:

1) TWO HUNDRED SIXTY THOUSAND SIX HUNDRED EIGHTEEN and 30/100 ($260,618.30) DOLLARS from proceeds of sale of 1448 Laurel Way, Beverly Hills, California, now on deposit in ALAN PRIVEN Trust Account, less sums

SIMON TAUB
AW CORPORATION
A WILSHIRE BLVD.
SUITE 808
EVERLY HILLS,
LIFORNIA 90212
74-6847 AND

previously withdrawn.

2) One-half (1/2) of household furniture, furnishings and appliances formerly located in former family residence, Bellagio Road, Los Angeles, Calfornia, which has heretofore been divided in kind.

3) 1978 AMC Cherokee, bearing California license number WENDY 22.

4) 1970 Mercedes 280 SE, bearing California license number CARNIE.

5) ALAN PRIVEN Trust Account. After distribution of proceeds of sale of 1448 Laurel Way, Beverly Hills, California real property, [as provided in paragraph 3.A.1 and paragraph 4.A.] respondent is to have one-half (1/2) interest in said account, subject to the provisions of that certain Trust Account referred to herein as the "paragraph 38 Trust Account" which is more particularly described in paragraph 38 of this Judgment.

6) All of the issued and outstanding capital stock in Spring Thing Productions, Inc.

7) My Sisters' Songs, a partnership.

4. As an equal division of the community property there is awarded to the petitioner as his sole and separate property, the following:

A. SIXTY THOUSAND SIX HUNDRED EIGHTEEN and 30/100 ($60,618.30) DOLLARS from the proceeds of the sale of Laurel Way now on deposit in ALAN PRIVEN Trust Account, less sums previously withdrawn.

B. One-half (1/2) of household furniture, furnishings, and appliances formerly located in the former family residence, Bellagio Road, Los Angeles, California, which have heretofore been divided in kind.

C. ALAN PRIVEN Trust Account. After distribution of proceeds of sale of 1448 Laurel Way, Beverly Hills, California, real property [as provided in paragraph 3.A.1) and paragraph 4.A.] petitioner is to have one-half (1/2) interest in said account, subject to theprovisions of paragraph 38 Trust Account.

D. Forty (40) shares of the issued and outstanding capital stock of Brother Records, Inc. and all of the community's right, title and interest in Brother Records, Inc..

E. Any interest in the musical group "The Beach Boys", including but not limited to, goodwill, trademark, trade name or any other rights pertaining thereto.

5. IT IS FURTHER ORDERED that the petitioner and respondent shall hold the following property as tenants-in-common and each of the parties shall hold as his or her own separate property an undivided one-half (1/2) interest in the following property, subject to the special agreements between the parties, set forth with respect to each item of property:

A. Real Estate and Proceeds therefrom:

1) Promissory note secured by mortgage

SIMON TAUB
LAW CORPORATION
14 WILSHIRE BLVD.
SUITE 808
BEVERLY HILLS,
CALIFORNIA 90212
174-6847 AND
779-8849

rece;¬ed as part of sale price f Kona, Hawaii, 3 acres. All payments on said mortgage are to be received into and disbursed to the parties equally through the paragraph 38 Trust Account.

2. Kauai, Kawaii 4 acre and 8 acre parcels.

Either or both of said parcels of real property shall be sold at the request of either party upon thirty (30) days written notice. If the parties are within the said thirty (30) day period unable to agree on the price and terms of sale, the dispute shall be resolved by submission to THE HONORABLE JOSEPH WAPNER, retired judge of the Los Angeles Superior Court sitting as Judge Pro Tem, or any other retired judge of the Superior Court to sit as judge pro tem in the event THE HONORABLE JOSEPH WAPNER is unwilling, or unavailable to serve.

In the event the parties cannot agree as to a retired judge to handle the matter as a judge pro tem, then the parties agree to submit the matter to the presiding judge, Los Angeles Superior Court, to whom the parties hereby confer jurisdiction, and his selection of a retired judge shall be binding upon the parties.

Each party shall have a right of first refusal to purchase the parcel at the price and upon the terms set forth in a bona-fide offer to purchase, which the parties, or if the parties cannot agree, the judge pro tem, determines to accept. Said

written notice from one party to the other within five (5) days from the date of written notice to the party of the price and terms upon which the parcel is intended to be sold per the parties' agreement or judge pro tem's decision. Either party may give written notice to the other within said five (5) day period that he or she wishes to purchase the parcel at the identical price and terms upon which the parcel is intended to be sold. In the event both parties have exercised a right of first refusal under this paragraph, with respect to a parcel, each party shall, within five (5) days after they have so exercised the right of first refusal, deliver written sealed bids to a neutral third (3rd) party to purchase the parcel at a price and upon terms better than those upon which the parcel is intended to be sold. The neutral third (3rd) party shall be THE HONORABLE JOSEPH WAPNER, retired Judge of the Superior Court, who shall hear the matter and whose decision shall be binding; and in the event THE HONORABLE JOSEPH WAPNER is unwilling, or unavailable to serve, then the parties agree to submit the matter to the presiding Judge, Los Angeles Superior Court, to whom the parties hereby confer jurisdiction, and his selection of a retired Judge shall be binding upon the parties. Said determination shall be final and not subject to review. The winner shall purchase the parcel at

ON .UB
CORPORATION
LSHIRE BLVD.
ITE 808
ILY HILLS.
RNIA 90212
1847 AND

the pr e and upon the terms sub: :ted by the winner to the neutral third party. In the event only one of the parties hereto exercises the right of first refusal with respect to a parcel, that party shall purchase the parcel upon the terms and conditions stated in the exercise of the right of first refusal. Time is of the essence of this paragraph.

Proceeds from the sale of the parcels shall be received into and disbursed equally to the parties from the paragraph 38 Trust Account.

B. Jewelry.

1) Emerald ring, one-half (1/2) interest. Said emerald ring is to be sold as soon as possible at auction or by consignment, and the proceeds are to be received into and disbursed equally to the parties from the paragraph 38 Trust Account.

C. Secured Notes.

1) Victor Drai note and deed of trust.

2) Harry Gaddy note and deed of trust.

3) Laurel Way note and deed of trust.

The proceeds from said secured notes are to be received into and disbursed equally to the parties through the paragraph 38 Trust Account

D. Accounts Receivable and Unsecred Notes.

1) Stan Love receivable.

/ / /

/ / /

2) Ruston Pamplin re ivable.

Any sums collected on said items shall be received into and disbursed equally to the parties through the paragraph 38. Trust Account.

E. Limited Partnership Investments.

1) Lisal Properties.

2) Anaclara Properties.

3) Modal Investments.

4) Spaulding Land Co..

5) South Kona Land Co..

6) Bruner Oil and Gas.

7) Saple Properties.

Written notice shall be given to the general partner of each of said limited partnerships of the tenancy-in-common of the parties with respect to their interest therein; all contributions shall be made and all disbursements shall be received by each of the parties as their respective interests appear.

6. IT IS FURTHER ORDERED that the community is the owner of certain copyrights, contract rights and/or royalty rights in the petitioner's name with respect to musical compositions created during the marriage, and are listed as follows:

| COMPOSITION | COPYRIGHT NUMBER |
|---|---|
| 1) Good To My Baby | 868747 |
| 2) Don't Hurt My Little Sister | 868748 |
| 3) Help Me Ronda | 86745 |
| 4) Dance, Dance, Dance | 851361 |
| 5) Please Let Me Wonder | 868749 |
| 6) Kiss Me, Baby | 868744 |

ION TAUB
CORPORATION
ILSHIRE BLVD.
UITE 808
RLY HILLS.
ORNIA 90212
-8847 AND

| COMPOSITION | COPYRIGHT NUMBER |
|---|---|
| 7) In The Back Of My Mind | 868746 |
| 8) The Girl From New York City | 890209 |
| 9) Amusement Parks, U.S.A. | 890210 |
| 10) Salt Lake City | 890210 |
| 11) Girl Don't Tell Me | 890214 |
| 12) California Girls | 890216 |
| 13) Let Him Run Wild | 890207 |
| 14) You're So Good To Me | 890215 |
| 15) Summer Means New Love | 890212 |
| 16) I'm Bugged At My Ol' Man | 890213 |
| 17) And Your Dreams Come True | 890211 |
| 18) Wouldn't It Be Nice | 948191 |
| 19) You Still Believe In Me | 948190 |
| 20) That's Not Me | 948192 |
| 21) Don't Talk | 948188 |
| 22) I'm Waiting For The Day | 948187 |
| 23) Let's Go Away For Awhile | 940917 |
| 24) God Only Knows | 948189 |
| 25) I Know There's An Answer | 948186 |
| 26) Here Today | 948193 |
| 27) The Little Girl I Once Knew | 917675 |
| 28) Good Vibrations | 964030 |
| 29) Heroes & Villians | 2476 |
| 30) Vegetables | 11303 |
| 31) Fall Breaks & Back To Winter | 14298 |
| 32) She's Goin' Bald | 11304 |
| 33) Little Pad | 11305 |

SIMON TAUB
LAW CORPORATION
WILSHIRE BLVD.
SUITE 808
BEVERLY HILLS,
CALIFORNIA 90212
74-6847 AND

| COMPOSITION | | COPYRIGHT NUMBER |
|---|---|---|
| 34) | With Me Tonight | 11300 |
| 35) | Wind Chimes | 11299 |
| 36) | Gettin' Hungry | 11302 |
| 37) | Wonderful | 11301 |
| 38) | Whistle In | 11306 |
| 39) | Well, You're Welcome | 6584 |
| 40) | Wild Honey | 21396 |
| 41) | Aren't You Glad | 31113 |
| 42) | Country Air | 31115 |
| 43) | A Thing Or Two | 31116 |
| 44) | Darlin' | 31117 |
| 45) | I'd Love Just Once To See You | 31118 |
| 46) | Here Comes The Night | 31119 |
| 47) | Let The Wind Blow | 31120 |
| 48) | Mama Says | 31122 |
| 49) | Friends | 44473 |
| 50) | Meant For You | 50139 |
| 51) | Wake The World | 54327 |
| 52) | Be Here In The Morning | 54328 |
| 53) | When A Man Needs A Woman | 50137 |
| 54) | Passing By | 50140 |
| 55) | Anna Lee The Healer | 48760 |
| 56) | Busy Doin' Nothin' | 50142 |
| 57) | Diamond Head | 50138 |
| 58) | Transcendental Meditation | 50141 |
| 59) | Do It Again | 60045 |
| 60) | Time To Get Alone | 84488 |

SIMON TAUB
LAW CORPORATION
.14 WILSHIRE BLVD.
SUITE 805
BEVERLY HILLS,
CALIFORNIA 90213
274-6847 AND
272-8549

| COMPOSITION | | COPYRIGHT NUMBER |
|---|---|---|
| 61) | Our Prayer | 90886 |
| 62) | I Went To Sleep | 90885 |
| 63) | Cabinessence | 90887 |
| 64) | A Child Of Winter | Eu 571234 |
| 65) | A Day In The Life Of A Tree | Eu 276534 |
| 66) | A Little Bit Of Your Sweet Lovin | 141081 |
| 67) | Add Some Music To Your Day | |
| 68) | Airplane | |
| 69) | All I Want To Do | |
| 70) | At My Window | |
| 71) | Back Home | Eu 532668 |
| 72) | Bells Of Paris | |
| 73) | Better Get Back In Bed | |
| 74) | California Feeling | Eu 544177 |
| 75) | Cool, Cool Water | Eu 199845 |
| 76) | Dierdre | Eu 199850 |
| 77) | Ding Dang | Eu 748375 |
| 78) | Funky Pretty | |
| 79) | Good Time | |
| 80) | Had To Phone Ya | Eu 582682 |
| 81) | He Come Down | Eu 330289 |
| 82) | Hey Little Tomboy | Eu 719044 |
| 83) | Honkin' Down The Highway | Eu 740237 |
| 84) | I Just Got My Pay | Eu 175248 |
| 85) | I'll Bet He's Nice | Eu 719045 |
| 86) | I'm The Pied Piper | Eu 419892 |
| 87) | It's OK | Eu 682684 |

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
LIFORNIA 90212
74-6847 AND

| COMPOSITION | | COPYRIGHT NUMBER |
|---|---|---|
| 88) | It's Over Now | Eu 740235 |
| 89) | Let's Put Our Hearts Together | Eu 744188 |
| 90) | Loop De Loop Flip Flying In An Aeroplane | Eu 113122 |
| 91) | Love Is A Woman | Eu 744189 |
| 92) | Lucy Jones | Eu 544178 |
| 93) | Magic Transistor Radio | |
| 94) | Marcella | Eu 330291 |
| 95) | Matchpoint Of Our Love | |
| 96) | Mona | Eu 744191 |
| 97) | Mt. Vernon And Fairway | |
| 98) | My Diane | |
| 99) | Our Sweet Love | Eu 175249 |
| 100) | Our Team | |
| 101) | Pitter Patter | |
| 102) | Radio King Dom | Eu 419892 |
| 103) | Sail On Sailor | Eu 725937 |
| 104) | She's Got Rhythm | |
| 105) | Still I Dream Of It | Eu 744185 |
| 106) | Surfs Up | Eu 269505 |
| 107) | Sweet Mountain | Eu 305675 |
| 108) | Sweet Sunday Kinda Love | |
| 109) | That Same Song | Eu 582683 |
| 110) | That Special Feeling | Eu 744187 |
| 111) | They're Marching Along | Eu 744190 |
| 112) | This Whole World | Eu 175253 |
| 113) | Till I Die | Eu 269506 |
| 114) | TM Song | Eu 681449 |

SIMON TAUB
LAW CORPORATION
434 WILSHIRE BLVD.
SUITE 808
BEVERLY HILLS,
CALIFORNIA 90212
274-6847 AND
272-8840

| | COMPOSITION | COPYRIGHT NUMBER |
|---|---|---|
| 115) | When Girls Get Together | Eu 164146 |
| 116) | Wontcha Come Out Tonight | |
| 117) | You Need A Mess Of Help To Stand Alone | Eu 330290 |
| 118) | You're Riding High On The Music | Eu 544176 |
| 119) | Breakaway | |
| 120) | Cruise To Harlem | |
| 121) | Do Ya | |
| 122) | I Do | |
| 123) | If It Can't Be You | |
| 124) | Its Like Heaven | |
| 125) | Marilyn | |
| 126) | Pamela Jean | |
| 127) | Part Of Me | |
| 128) | Rock And Roll Bash | |
| 129) | Sacramento | |
| 130) | Sloop John B | |
| 131) | The One You Can't Have | |
| 132) | What'll I Wear | |
| 133) | You Brought It All On | |
| 134) | Your Summer Dream | |
| 135) | Bobby Left Me | |
| 136) | Funny Boy | |
| 137) | Guess I'm Dumb | |
| 138) | He's A Doll | |
| 139) | No Big Thing | |
| 140) | Everybody Wants To Live | |
| 141) | Games Two Can Play | |

MON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
IFORNIA 90212
4-6847 AND

| COMPOSITION | | COPYRIGHT NUMBER |
|---|---|---|
| 142) | Help | |
| 143) | Take A Load Off Your Feet, Pete | |
| 144) | Life Is For The Living | |
| 145) | Lines | |
| 146) | Roller Skating Child | |
| 147) | Let Us Go On This Way | |
| 148) | Solar System | |
| 149) | The Night Was So Young | |
| 150) | Johnny Carson | |
| 151) | Bull Session With The "Big Daddy" | |
| 152) | I Just Wasn't Made For These Times | 948194 |
| 153) | Pet Sounds | 926080 |
| 154) | Caroline No | 926696 |
| 155) | With Me Tonight | 11300 |
| 156) | Good Timin' | |
| 157) | How She Boogaloed It | 31121 |
| 158) | I Want To Pick You Up | |
| 159) | Sherry, She Needs Me | |
| 160) | Surfin' Wild | |
| 161) | "Times" Things Are Changing | |
| 162) | Winter Symphony | |
| 163) | Carl's Big Chance | 243 |
| 164) | Italia | 19024 |
| 165) | Little Bird | 44474 |
| 166) | Be Still | 50143 |
| 167) | We're Together Again | 66655 |
| 168) | Go Away Boy | |

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 803
VERLY HILLS,
LIFORNIA 90212
74-6847 AND
273-8549

COMPOSITION COPYRIGHT NUMBER

169) We'll Run Away

170) Baseball's On

7. THE PARTIES ARE ORDERED to equally divide between themselves the foregoing rights in the community musical compositions listed hereinabove, so that from the date hereof EACH PARTY IS to hold as his or her sole and separate property, an undivided one-half (1/2) interest in said rights in the community musical compositions as tenants-in-common.

8. PETITIONER IS ORDERED to execute such assignments, copyright registrations, or other documents as shall be necessary to effect direct payment to respondent of one-half (1/2) of all receipts from such rights in the musical compositions. To the extent that direct payment of respondent's share cannot be effected, PETITIONER IS ORDERED to collect the total receipts from community musical compositions and promptly transmit said monies to the paragraph 38. Trust Account for distribution to each party in equal shares.

9. Petitioner shall have the sole, absolute and exclusive right, without any limitation and in his sole unfettered discretion, to administer and exploit all rights in said compositions or any of them throughout the universe; to print, publish, sell, use or license the use of said rights and compositions, or any of them, throughout the universe; to execute any license or agreement affecting said rights and compositions, or any of them, including, but not limited to licenses for mechanical reproductio public performance, synchronization uses, subpublication, merchan dising and advertising, to make all decisions with respect to sai

IMON TAUB
LW CORPORATION
I WILSHIRE BLVD.
SUITE 808
EVERLY HILLS.
LIFORNIA 90212
74-6847 AND
??-????

rights and com sitions, and to have the ight to assign or license such rights to others, to sell or dispose of such rights or copyrights. All costs, fees and expenses attendant or attributable to any or all of the foregoing shall be paid equally by the parties. Petitioner shall not act in an unreasonable manner in the exercise of his sole discretion as hereinabove set forth and shall not maliciously or willfully take any such action with a view of damaging respondent, or her interest therein. The Court shall retain jurisdiction to determine the rights and duties of petitioner and respondent under this paragraph.

10. Petitioner shall have the sole right, at common expense, to prosecute, defend, settle and compromise all claims, disputes and actions respecting the foregoing rights and compositions, and to do and perform all things necessary concerning the rights and compositions, and the copyright therein, and any extensions and renewals thereof, and to prevent and restrain the infringement of the copyrights or other rights with respect to the compositions. Costs, fees and expenses attendant or attributable to the foregoing shall be paid by the parties equally. Petitioner shall act reasonably and in good faith.

11. Subject to the provisions of paragraph 12, RESPONDENT IS ORDERED not to sell, transfer, hypothecate or assign (hereinafter in these paragraphs 11 and 12 collectively referred to as "assignment"), her rights with respect to and in connection with the compositions, or any of them, unless she (a) complies with paragraphs 12; (b) requires that such assignment shall be and remain subject to the terms and conditions of any other agreements heretofore or hereafter entered into with third persons regarding

the compositi s; and (c) further requi s in each assignment that each party thereto shall, in writing, assume the respondent's obligations under these paragraphs 7-12, inclusive, with respect to such compositions. Notwithstanding any such assignment, RESPONDENT IS ORDERED to remain liable for all obligations under these paragraphs 7-12, inclusive.

12. RESPONDENT IS ORDERED not to make an assignment of her interest in any of the foregoing rights or compositions, or any of them, without first offering to the petitioner the right to acquire the assignment at the same price and upon the same terms as may be offered by any responsible and unrelated third party. RESPONDENT IS ORDERED to give to petitioner written notic of any such bona fide offer which respondent desires to accept (which notice shall set forth the name of the prospective purchaser, the price, and all other terms of such offer), and IT IS ORDERED THAT PETITIONER shall have thirty (30) days after receipt of such notice in which to notify respondent, in writing, whether or not he desires to acquire such interest in the rights or compositions, or any of them, at the price and pursuant to the terms set forth in said notice. In the event that no such notice is given by petitioner within said ten (10) day period, responden shall have the right to accept said bona fide offer, but only as set forth in respondent's notice to the petitioner; provided however, that if respondent does not accept said bona fide offer within thirty (30) days after expiration of said ten (10) day period, the procedure set forth in this paragraph shall again be followed by respondent before she may make an assignment of her interest in the rights, with respect to the

community mus' al compositions, or any them.

13. IT IS FURTHER ORDERED that the parties shall equally divide between themselves the community stock in Wilojarston, Inc. so that from commencing October 8, 1980 each party shall hold as his or her own separate property an undivided one-half (1/2) interest therein as tenants-in-common. PETITIONER IS ORDERED to execute such documents as shall be necessary to effect direct payment by Wilojarston, Inc. to respondent of one-half (1/2) of any dividends or other distributions that may become due on account of the ownership of said stock. To the extent that direct payment to respondent cannot be effected, PETITIONER IS ORDERED to collect the total of said sums from Wilojarston, Inc. and promptly transmit same to the paragraph 38. Trust Account for distribution to each party in equal shares. This paragraph is subject to paragraph 15

14. In consideration of past services rendered by respondent in connection with the community's interest in Wilojarston, PETITIONER IS ORDERED to pay to respondent as of the date hereof, a royalty equal to one-half (1/2) of all sums he receives after the date hereof from Wilojarston, other than as provided. in paragraph 13. This paragraph is subject to the provisions of paragraph 15.

15. The parties acknowledge that the sums to be received from Wilojarston, Inc. will be net of administrative and overhead expenses, which will have theretofore been deducted. IT IS ORDERED that a charge of not more than twenty (20%) percent of the first THREE THOUSAND THREE HUNDRED TWENTY ($3,320.00) DOLLARS, fifteen (15%) percent of the second FOUR THOUSAND NINE HUNDRED EIGHTY ($4,980.00) DOLLARS, and ten (10%) percent of any amount i

ION TAUB
CORPORATION
ILSHIRE BLVD.
UITE 803
ERLY HILLS,
ORNIA 90212

excess thereof of the revenue of Wiloja ton is a reasonable charge for administration and overhead expenses, and that charges therefor at said rate or lower shall not be objected to by either of the parties, unless objected to by both. If charges in excess of said amounts are made by Wilojarston for administration or over head, such shall be borne solely by petitioner's portion of receip

16. IT IS ORDERED that the petitioner shall have the exclusive right, without any limitation, in his sole, absolute, and unfettered discretion, to administer and manage the common interest of the parties in said stock as if petitioner were the general partner of a limited partnership and respondent was the limited partner. Respondent does hereby irrevocably appoint petitioner as her attorney in fact, coupled with an interest, to (a) sell, assign, transfer, hypothecate, exchange, convert, manage operate, control, and in any and every way and manner to deal with said stock; (b) to commence and defend at the joint, equal expense of the parties, such litigation with respect to the parties' common interest in said stock as he may deem advisable; and (c) to vote and give proxies to vote said stock. PETITIONER IS ORDERED to not act in an unreasonable manner in the exercise of his sole discretion as hereinabove set forth AND IS ORDERED to not maliciously or willfully take any such action with a view of damaging respondent or her interest therein. The Court shall retain jurisdiction to determine the rights and duties of petitioner and respondent under this paragraph.

17. RESPONDENT IS ORDERED not to sell, transfer, hypothecate, or assign (hereinafter in these paragraphs 17 and 18 collectively referred to as "assignment"), her right in said stock

unless (a) sh complies with paragraph 17; (b) requires that such assignment is and remains subject to the terms and conditions of this paragraph 17 and to the terms and conditions of any other agreements heretofore or hereafter entered into with third persons regarding the said stock; and (c) further requires in any su assignment that each party thereto shall, in writing, assume the respondent's obligations under these paragraphs 13-19, inclusive. Notwithstanding any such assignment, RESPONDENT IS ORDERED to rem liable for all her obligations under these paragraphs 13-19 inclus

18. RESPONDENT IS ORDERED not to make an assignment of her interest in said stock without first offering to petitioner the right to acquire the assignment at the same price and upon th same terms as may be offered by any responsible and unrelated third party. RESPONDENT IS ORDERED to give petitioner written notice of any such bona fide offer which respondent desires to accept (which notice shall set forth the name of the prospective purchaser, the price, and all other terms of such offer), and IT IS ORDERED that petitioner shall have ten (10) days after receipt of such notice, to notify respondent, in writing, whether or not he desires to acquire such assignment at the price and pursuant to the terms set forth in said notice. In the event tha no such notice is given by petitioner within said ten (10) day period, respondent shall have the right to accept said bona fide offer, but only as set forth in respondent's notice to petitioner provided, however, that if respondent does not accept said bona fide offer within thirty (30) days after expiration of said ten (10) day period, the procedure set forth in this paragraph shall again be followed by respondent before she may make an assignment

of her interest in said stock.

19. The preceding paragraphs 7-18, inclusive, are based on the premise that for Federal and State income tax purposes the payments made hereunder to respondent will not be taxabl to petitioner and will be taxable to respondent. If said payments are taxable to petitioner, then RESPONDENT IS ORDERED to reimburse petitioner annually for the resulting increase in his Federal and State income tax liability. Petitioner may offset any such amount due from respondent by deduction of such amount from sums payable by him to her under other provisions of this Judgment.

20. IT IS FURTHER ORDERED that the parties shall equal divide between themselves the community's one-fifth (1/5) intere in Brother Publishing, so that from October 8, 1980 each party shall hold as his or her own separate property an undivided one-half (1/2) interest therein as tenants-in-common.

21. THE PETITIONER IS ORDERED to execute such documents as shall be necessary to effect direct payment by Brother Publishing to respondent of one-half (1/2) of any distributions that may become due on account of the ownership of said partnership interest, or of any other sums other than royalties (royalties are divided at paragarph 7), which may be received fro Brother Publishing. To the extent that direct payment to respondent cannot be effected, PETITIONER IS ORDERED to collect the total of said sums from Brother Publishing and promptly transmit same to the paragraph 38. Trust Account for distribution to each party in equal shares. This paragraph is subject to paragraph 22.

////

ON TAUB
CORPORATION
ILSHIRE BLVD.
UITE 808
RLY HILLS.
ORNIA 90212
-6847 AND

22. [T]he parties acknowledge t[ha]t the sums to be receive[d] from Brother Publishing will be net of administrative and overhea[d] expenses, which will have theretofore been deducted. IT IS ORDERED that a charge of not more than twenty (20%) percent of th[e] first (1st) THIRTY THOUSAND SIX HUNDRED EIGHTY ($30,680.00) DOLLAR, fifteen (15%) percent of the second FORTY-SIX THOUSAND TWENTY ($46,020.00) DOLLARS, and ten (10%) percent of any amount in excess thereof, of the revenue of Brother Publishing is a reasonable charge for administration and overhead expenses and that charges therefor at said rate, or lower, shall not be objected to by either of the parties, unless objected to by both. If charges in excess of said amounts are made by Brother Publishing for administration or overhead, such shall be borne solely by petitioner's portion of receipts.

23. IT IS ORDERED THAT PETITIONER have the exclusive right, without any limitation, in his sole, absolute and unfetter[ed] discretion, to administer and manage the common interest of the parties in said partnership, as if petitioner were the general partner of a limited partnership and respondent was the limited partner. RESPONDENT IS ORDERED to appoint petitioner as her attorney in fact, coupled with an interest, to (a) sell, assign, transfer, hypothecate, exchange, convert, manage, operate, contro[l] and in any and every way and manner to deal with said partnership interest; (b) to commence and defend, at the joint, equal expense of the parties, such litigation with respect to the parties' common interest in said partnership as he may deem advisable; and (c) to vote said partnership interest. PETITIONER IS ORDERED not to act in an unreasonable manner in the exercise of his sole

[S]IMON TAUB
[LA]W CORPORATION
WILSHIRE BLVD.
SUITE 800
[BE]VERLY HILLS,
[CAL]IFORNIA 90213
[..]4-6847 AND

discretion as hereinabove set forth, and IS ORDERED not to maliciously or willfully take any such action with a view of damaging respondent or her interest therein. The Court shall reserve jurisdiction to determine the rights and duties of petitioner and respondent under this paragraph.

24. THE RESPONDENT IS ORDERED not to sell, transfer, hypothecate, or assign (hereinafter in these paragraphs 24 and 25 collectively referred to as "assignment"), her right in said partnership unless (a) she complies with paragraph 25; (b) requir that such assignment is and remains subject to the terms and conditions of this paragraph 24, and to the terms and conditions of any other agreements heretofore or hereafter entered into with third persons regarding the said partnership interest; and (c) further requires in any such assignment that each party thereto shall, in writing, assume the respondent's obligations under thes paragraphs 20-25 inclusive. Notwithstanding any such assignment, RESPONDENT IS ORDERED to remain liable for all her obligations un these paragraphs 20-25 inclusive.

25. RESPONDENT IS ORDERED not to make an assignment of her interest in said partnership without first offering to petitioner the right to acquire the assignment at the same price and upon the same terms as may be offered by any responsible and unrelated third party. RESPONDENT IS ORDERED to give petitioner written notice of any such bona fide offer which she desires to accept (which notice shall set forth the name of the prospective purchaser, the price, and all other terms of such offer), and IT IS ORDERED that petitioner shall have ten (10) days after receipt of such notice in which to notify respondent, in writing,

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
IFORNIA 90212
4-6847 AND
172-8549

whether or nc he desires to acquire su . assignment at the price and pursuant to the terms set forth in said notice. In the event that no such notice is given by petitioner within said ten (10) day period, IT IS ORDERED that respondent shall have the right to accept said bona fide offer, but only as set forth in respondent' notice to petitioner; provided, however, that if respondent does not accept said bona fide offer within thirty (30) days after expiration of said ten (10) day period, the procedure set forth i: this paragraph shall again be followed by respondent before she may make an assignment of her interest.

26. The provisions of paragraphs 20 through 26 are base on the premise that for Federal and State income tax purposes the payments made hereunder to respondent will not be taxable to petitioner and will be taxable to respondent. If said payments are taxable to petitioner, then RESPONDENT IS ORDERED to reimburs petitioner annually for the resulting increase in his Federal and State income tax liability. IT IS ORDERED that petitioner may offset any such amount due from respondent by deduction of such amount from sums payable by him to her under other provisions of this Judgment.

27. IT IS ORDERED that the parties shall equally divide between themselves the community's interest in New Executive Musi (hereinafter "the publishing company"), so that from October 8, 1980 each party holds, as his or her own separate property an undivided one-half (1/2) interest therein as tenants-in-common. Said common interest does not include any right or interest of th publishing company in petitioner's musical compositions copy-righted after separation.

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 805
IVERLY HILLS,
LIFORNIA 90212
'4-6847 AND

28. ⌝ IS ORDERED that petitic r shall execute such documents as shall be necessary to effect direct payment by the publishing company to respondent of one-half (1/2) of any distributions by the publishing company on account of said common interest. To the extent that direct payment to respondent cannot be effected, PETITIONER IS ORDERED to collect the total of said sums from the publishing company and promptly transmit the same to the paragraph 38 Trust Account. This paragraph is subject to paragraph 29.

29. The parties acknowledge that the sums to be received from the publishing company will be net of administrative and overhead expenses, which will have theretofore been deducted. IT IS ORDERED that a charge of not more than twenty (20%) percent of the first SIX THOUSAND ($6,000.00) DOLLARS, fifteen (15%) percent of the second NINE THOUSAND ($9,000.00) DOLLARS, and ten (10%) percent of any amount in excess thereof, of the revenue of the publishing company is a reasonable charge for administration and overhead expenses and that charges therefor at said rate or lower, shall not be objected to by either of the parties, unless objected to by both. If charges in excess of said amounts are made by the publishing company for administration or overhead, IT IS ORDERED that such be borne solely by petitioner's portion of receipts.

30. IT IS ORDERED that petitioner have the exclusive right, without any limitation, in his sole, absolute and unfettered discretion, to administer and manage the common interest of the parties in said publishing company, as if

/ / /

petitioner w e the general partner of limited partnership, anc respondent was the limited partner. RESPONDENT IS ORDERED to appoint petitioner as her attorney in fact, coupled with an interest, to (a) sell, assign, transfer, hypothecate, exchange, convert, manage, operate, control, and in any and every way and manner to deal with said publishing company, and (b) to commence and defend, at the joint, equal expense of the parties, such litigation with respect to the parties' common interest in said publishing company as he may deem advisable. PETITIONER IS ORDERED not to act in an unreasonable manner in the exercise of his sole discretion as hereinabove set forth and shall not maliciously or willfully take any such action with a view of damaging respondent or her interest therein. The Court shall retain jurisdiction to determine the rights and duties of petitioner and respondent under this paragraph.

31. RESPONDENT IS ORDERED not to sell, transfer, hypothecate, or assign (hereinafter in these paragraphs 32 and 33 collectively referred to as "assignment"), her right in said publishing company unless (a) she complies with paragraph 32; (b) requires that such assignment is and remains subject to the terms and conditions of any other agreements heretofore or hereafter entered into with third persons regarding the said publishing company; and (c) further requires in any such assignment that eac party thereto shall, in writing, assume the respondent's obligations under these paragraphs 27 through 33. Notwithstanding any such assignment, IT IS ORDERED that respondent remain liable for all of her obligations under these paragraphs 27 through 33.

////

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 805
VERLY HILLS,
LIFORNIA 90212
74-6847 AND

32. RESPONDENT IS ORDERED not to make an assignment of her interest in said publishing company without first offering to petitioner the right to acquire the assignment at the same price and upon the same terms as may be offered by any responsible and unrelated third party. RESPONDENT IS ORDERED to give to petitione written notice of any such bona fide offer, which she desires to accept (which notice shall set forth the name of the prospective purchaser, the price, and all other terms of such offer), and IT IS ORDERED that petitioner have ten (10) days after receipt of su notice in which to notify respondent, in writing, whether or not he desires to acquire such assignment, at the price and pursuant to the terms set forth in said notice. In the event that no such notice is given by petitioner within said ten (10) day period, IT IS ORDERED that respondent shall have the right to accept said bona fide offer, but only as set forth in respondent's notice to petitioner; provided, however, that if respondent does not accept said bona fide offer within thirty (30) days after expiration of said ten (10) day period, the procedure set forth in this paragraph shall again be followed by respondent before she may make a assignment of her interest.

33. The provisions of paragraphs 27 through 33 have bee agreed on the premise that for Federal and State income tax purposes the payments made hereunder to respondent will not be taxable to petitioner and will be taxable to respondent. If said payments are taxable to petitioner RESPONDENT IS ORDERED to reimburse petitioner annually for the resulting increase in his Federal and State income tax liability. IT IS ORDERED that petitioner may offset any such amount due from respondent by

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS,
LIFORNIA 90212
'4-6847 AND
?72-8549

deduction of such amount from sums payable by him to her under other provisions of this Judgment.

34. IT IS FURTHER ORDERED and the Court finds that Brother Records has a Money Purchase and Profit Sharing Plan, and that the total cash balance in said account as of June 30, 1980 is the sum of ONE HUNDRED SIXTY-EIGHT THOUSAND NINE HUNDRED THIRTY-NINE and 15/100 ($168,939.15) DOLLARS. Respondent's one-half (1/2) share of the community portion of said account is the sum of SEVENTY THOUSAND EIGHT HUNDRED SEVENTY-FIVE and 67/100 ($70,875.67) DOLLARS as of June 30, 1980. Petitioner's one-half (1/2) share of the community portion of said account, plus his separate interest in said account is the sum of NINETY-EIGHT THOUSAND SIX HUNDRED FORTY-THREE and 48/100 ($98,643.48) DOLLARS as of June 30, 1980. The community is indebted to said account in the principal sum of FORTY-NINE THOUSAND TWO HUNDRED ($49,200.00) DOLLARS, plus accrued interest.

35. IT IS ORDERED that a subaccount in the name of respondent shall be established with the Administrator of said Plan. Respondent shall be credited with the sum of SEVENTY THOUSAND EIGHT HUNDRED SEVENTY-FIVE and 67/100 ($70,875.67) DOLLARS, plus interest accrued thereon to date from July 1, 1980, and shall be charged with one-half (1/2) of the outstanding loan, including any interest or charges relating thereto. EACH OF THE PARTIES ARE ORDERED to hold harmless and indemnify the other on account of their respective one-half (1/2) of said loan, interest, and charges.

36. IT IS ORDERED that the respective account of petitioner and respondent shall be distributed in accordance with

MON TAUB
CORPORATION
WILSHIRE BLVD.
SUITE 805
ERLY HILLS,
FORNIA 90212
1-6847 AND
79-8540

the terms of the applicable trust agreements of the Plan, and in accordance with all applicable statutes and regulations, and not otherwise unless such distribution is without prejudice whatsoever to the account of the other party. THE PARTIES ARE ORDERED to indemnify and hold harmless the other party in the event that any such distribution does result in the alteration of the status of the other party's account.

37. IT IS FURTHER ORDERED and the Court finds that the balance in the New Executive Music Keogh Plan, as of June 30, 198( was THIRTY-SEVEN THOUSAND FIVE HUNDRED EIGHTY-ONE ($37,581.00) DOLLARS. IT IS ORDERED that the proceeds of said account shall be distributed equally to the parties in accordance with the terms of the applicable trust agreement of the Plan, and in accordance with all applicable statutes and regulations, and not otherwise. In the event of any distribution contrary to this provision, the party effecting such distribution IS ORDERED to indemnify the other party on account of any resulting tax, including any penalty or interest.

38. IT IS FURTHER ORDERED that the ALAN PRIVEN Trust Account shall be terminated and all sums therein transferred to a new Trust Account, which shall be a Trust Account for the benefit of petitioner and respondent, known as the "paragraph 38 Trust Account" the Trustee of which shall be TRAUBNER & FLYNN, Certified Public Accountants. The Trustee of said new Trust Account may be changed from time to time at the option of either party. In the event of the dismissal, resignation, disqualification or disability of said Trustee, if the parties cannot agree on a successor Trustee, a successor Trustee shall be appointed by the presiding Judge of the

IMON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
IFORNIA 90212
4-6947 AND

Los Angeles ( nty Superior Court upon ve (5) days written notice of ex parte application by either party.

39. IT IS ORDERED that the purpose of the new Trust Account shall be as follows:

A. To collect and distribute all joint income of the parties agreed to be received into said account under this Judgment.

B. To calculate, apportion, and distribute in accordance with this Judgment, the income so received.

C. To retain and reserve sufficient funds from such income received as shall, in the discretion and judgment of the Trustee, be necessary to pay any common expenses or obligations of the parties arising from the common ownership of assets enumerated in this Judgment, including, but not limited to, the parcels of real property described in paragraphs 5.A.1), 2) and 3).

40. IT IS ORDERED that the Trustee is hereby authorize to charge against the funds under its control its reasonable cost and fees for the administration of said trust. The Trustee shal render accounts to each party at reasonably frequent intervals, not less than quarterly, and shall make available for inspection to each party all books and records pertaining to the paragraph 38 Trust Account. All funds under the contro of the Trustee that are not deemed by the Trustee to be necessar for the purpose described in paragraph 39.C. shall be disbursed petitioner and respondent, and all funds held by the Trustee tha

MON TAUB
N CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
IFORNIA 90212

are not disbu ed shall, pursuant to pa graph 39.C., be to the extent practicable deposited in an interest bearing Trust Account The Trustee shall prepare any and all necessary tax returns from the paragraph 38 Trust Account on behalf of the Trust Account.

41. IT IS ORDERED that any direction to said Trustee shall be by joint written instructions of the parties. The Trust shall not be required to honor the direction of one of the partie only.

42. IT IS FURTHER ORDERED that all property divided her under is subject to all existing encumbrances and liens thereon. IT IS FURTHER ORDERED that the transferee of such property is to pay his or her share of any encumbrance or lien.

43. IT IS FURTHER ORDERED, based upon petitioner's and respondent's representation that they have not incurred any unpai obligations, claims, debts or liabilities for which the other par may be liable, and that petitioner and respondent are to indemnif and hold the other party harmless from any and all obligations, claims, debts or liabilities incurred by him or her not listed in Exhibit 1, or in this Judgment, and for which the other party may be liable. IT IS FURTHER ORDERED that petitioner and respondent shall not incur any further claims, debts, obligations or liabili ties, except those for which he or she shall be solely responsibl and EACH OF THE PARTIES ARE ORDERED to defend, indemnify and holc the other party harmless from any and all obligations, claims, debts or liabilities incurred by him or her, other than as otherwise set forth in Exhibit 1 or in this Judgment.

44. IT IS FURTHER ORDERED that neither party shall clai a new tax basis for any asset on account of the division set fort

INON TAUB
W CORPORATION
WILSHIRE BLVD.
SUITE 800
VERLY HILLS.
LIFORNIA 90212

in this Judgm...t; and EACH OF THE PARTI... ARE ORDERED to report all transactions for income tax purposes on the basis that this Judgment effects an equal division of community property. If either party claims such new basis for any asset and the other party is later assessed for additional Federal or State income taxes, on the ground that disposition of assets under the provisions of this Judgment was a taxable event, the party seeking the new basis IS ORDERED to indemnify the other party in the amount of all such additional taxes, including interest and penalties thereon, arising from such assessment, without regard to any other tax benefit, present or future, inuring to the party herein indemnified.

45. IT IS FURTHER ORDERED that the petitioner shall pay to respondent, as and for her support and maintenance, the sum of TWO THOUSAND FIVE HUNDRED ($2,500.00) DOLLARS per month, commencing November 1, 1980 and continuing on the first (1st) day of each month thereafter for a period of one (1) year only. Provided further that such payment shall terminate automatically upon and as of the date of either respondent's death or remarriage, except as to accrued unpaid amounts, and shall be non-modifiable during said year only.

46. IT IS FURTHER ORDERED that at the conclusion of said year the Court shall retain jurisdiction for a period of ten (10) years from October 8, 1980 to modify its' order of support upon a showing of change of circumstances. Notwithstanding the foregoing any duty of support by petitioner of respondent or by respondent of petitioner shall terminate automatically, except as to any accrued amounts, on the earliest occurrence of any of the

MON TAUB
CORPORATION
WILSHIRE BLVD.
SUITE 808
VERLY HILLS.
IFORNIA 90212
4-6847 AND

following eve s:

A. That ten (10) years shall have elapsed from October 8, 1980;

B. The death of either party;

C. The remarriage by the payee spouse.

This provision for the duration and termination of support shall not be subject to modification by order of Court, however, within said period of time it shall be modifiable as to amount, upon a showing of change of circumstances.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED as follows:

47. If petitioner and respondent agree a Federal and State joint income tax return may be filed by them (whenever allowed by law). In the event that a joint return is filed, EACH PARTY IS ORDERED to cooperate fully in providing all information necessary to complete the return and execute the return prior to the filing date for filing of the return.

48. The tax liability of each party for the total tax due on joint returns IS ORDERED allocated on the basis of the proportion of the total of the separate income tax that each party would have paid had he or she filed a separate return for such year bears to the amount of the joint tax liability.

49. IT IS ORDERED that any refunds or deficiencies arising out of joint returns filed pursuant to paragraph 47 shall be allocated between the parties by recomputing each party's separate return liability and then reapplying the formula specified in paragraph 48. PETITIONER AND RESPONDENT ARE ORDERED to execute all documents and papers necessary to contest any deficiency or to prosecute any claim for refund.

MON TAUB
N CORPORATION
WILSHIRE BLVD.
SUITE 805
VERLY HILLS.
IFORNIA 90212
4-6847-AND
272-6549

50. The provisions of paragraphs 47, 48, 49 and 50 are specifically intended to apply to calendar year 1979 tax returns, as well as all future years. Petitioner and respondent have agreed to file a joint return for 1979.

51. IT IS FURTHER ORDERED that subject to further order of any Court of competent jurisdiction respondent shall have the custody and control of the minor children of the parties, CARNIE WILSON, born April 29, 1968, a female age twelve (12), and WENDY WILSON, born October 16, 1969, a female age eleven (11). Petitioner shall have the right to reasonable visitation at times and places agreed upon by the parties. Neither petitioner nor respondent shall remove the children from the State of California for periods in excess of thirty (30) days in any calendar year, without the prior written consent of the other, or an order of a Court of competent jurisdiction on motion, after notice to the other party authorizing such removal.

52. THE PETITIONER IS ORDERED to pay directly to the respondent for the support, maintenance and education of each of the minor children the sum of ONE THOUSAND ($1,000.00) DOLLARS each month for each minor child, a total of TWO THOUSAND ($2,000.00) DOLLARS, commencing on November 1, 1980 and continuing on the first (1st) day of each month thereafter, until such child shall die, reaches the age of majority, is married, or is otherwise emancipated, whichever of these events shall first occur.

53. IT IS FURTHER ORDERED that as additional child support PETITIONER IS ORDERED to pay one-half (1/2) of the school tuition, and one-half (1/2) of the cost of summer camp for each of the minor children, and RESPONDENT IS ORDERED to pay one-half (1/2

SIMON TAUB
LAW CORPORATION
WILSHIRE BLVD.
SUITE 808
BEVERLY HILLS,
CALIFORNIA 90212
74-6847 AND

of such costs PETITIONER IS FURTHER O. ERED to maintain a policy of medical and dental insurance, substantially similar to the policy presently in force covering the minor children of the parties. PETITIONER AND RESPONDENT ARE ORDERED to each be responsible for one-half (1/2) of any medical and/or dental care of the said children in excess of said insurance coverage.

54. IT IS FURTHER ORDERED that the obligation of the petitioner for the support of the children shall terminate upon his death.

55. IT IS FURTHER ORDERED that commencing with the calendar year 1980 the petitioner's payments for the support of the minor children shall entitle him to list CARNIE WILSON as a dependant on his Federal and State income tax returns.

56. Commencing as of the calendar year 1980 the respondent's payments for support of the minor children shall entitle her to list WENDY WILSON as a dependant on her Federal and State income tax returns.

57. IT IS FURTHER ORDERED that petitioner and respondent shall each bear their own attorney's fees and costs.

58. IT IS FURTHER ORDERED that petitioner and respondent shall each concurrently herewith, or at any time hereafter on the demand of the other, execute all other documents or instruments, AND ARE ORDERED to do or cause to be done all other acts and things as may be necessary to carry out the intent and purpose of this Judgment.

59. THE PETITIONER IS FURTHER ORDERED to cooperate with the respondent in obtaining audits of any entity from which petitioner and respondent jointly receive income, pursuant to thi

SIMON TAUB
LAW CORPORATION
4 WILSHIRE BLVD.
SUITE 808
BEVERLY HILLS,
CALIFORNIA 90212
274-6847 AND

Judgment, or which they hold an owner ip interest in common a. provided in this Judgment. IT IS ORDERED that any audit requested by respondent shall be at her sole expense. PETITIONER IS ORDERED to provide respondent with copies of any audit which he causes to be performed. Notwithstanding this provision RESPONDENT IS ORDERED not to cause any such entity or income source to be audite more than once a year. IT IS FURTHER ORDERED that in connection with the audit of Warner Brothers Records that has been and is being conducted by Brother Records, Inc., with regard to record royalties for the period January 1, 1976 through December 31, 1978, the value of the community's interest in the stock of Brothe Records, Inc. will be revalued at the time Brother Records liquidates its' claim against Warner Brothers Records, so that said value of Brother Records, Inc. will be deemed to increase in the sum of twenty (20%) percent of any amount in excess of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS received by Brother, net of audit costs, including legal fees and accounting expenses.

60. IT IS ORDERED that said increase in the value of the stock of Brother Records, Inc., if any, shall be divided equally, one-half (1/2) to petitioner and one-half (1/2) to respondent by offset in distribution from the 38 Trust Account.

61. IT IS FURTHER ORDERED that the provisions of paragraph 60 are based upon the premise that for Federal and State income tax purposes the payments made pursuant to the above paragraph to the respondent by petitioner, will not be taxable to petitioner. If said payments are taxable to petitioner THE RESPONDENT IS ORDERED to reimburse petitioner for the resulting increase in his Federal and State income tax liability.

IMON TAUB
AW CORPORATION
WILSHIRE BLVD.
SUITE 803
EVERLY HILLS,
LIFORNIA 90212
74-6847 AND

Petitioner may offset any such payment due from respondent by deduction of such amount from sums payable by him to her under other provisions of Exhibit 1 or the terms of this Judgment.

62. IT IS FURTHER ORDERED that the respondent shall have no other rights in any other records or other audit conducted by Brother Records, Inc., nor in any other asset of Brother Records, Inc., or in the name or group known as "The Beach Boys", except as otherwise provided in this Judgment.

APPROVED AS TO FORM AND CONTENT:

FULOP, ROLSTON, BURNS & McKITTRICK

By: Allan S. Morton
Allan S. Morton
Attorneys for Petitioner

DATED: February 25, 1981

Joseph A. Wapner
JOSEPH A. WAPNER, Judge Pro Tem

# EXHIBIT A1

BARBAKOW & LERNER
MARC LERNER
State Bar Number 57601
11661 San Vicente Boulevard, Suite 1010
Los Angeles, California 90049
Telephone: (310) 571-3255
Facsimile: (310) 820-1594

- and -

MANNIS & PHILLIPS, L.L.P.
JOSEPH MANNIS
State Bar Number 51098
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Telephone: (310) 277-7117
Facsimile: (310) 286-9182 and (310) 277-0971

Attorneys for Respondent
MARILYN WILSON

ORIGINAL FILED
AUG 11 1997
LOS ANGELES
SUPERIOR COURT
Pleadings

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| In re the Marriage of<br><br>PETITIONER: BRIAN WILSON<br><br>and<br><br>RESPONDENT: MARILYN WILSON | Case No. D 983 605<br><br>STIPULATION MODIFYING JUDGMENT AND ORDER THEREON AND ORDER ON ORDER TO SHOW CAUSE<br><br>OSC<br>Date: April 1, 1997<br>Time: 8:30 a.m.<br>Dept: 27<br><br>Trial<br>Date: July 16, 17 & 18, 1997<br>Time: 1:30 p.m.<br>Dept: 27 |

This Stipulation and Order is made in reference to the following facts:

a. An Interlocutory Judgment of Dissolution of Marriage between the parties was filed and entered on or about March 4, 1981 ("Judgment").

b. Respondent filed an order to show cause for various orders regarding restraining Petitioner and his agents from withholding Respondent's share of marital royalties, for the payment of certain sums of money, accounting, attorneys' fees, *et al.* on or about November 19, 1996.

c. Respondent also filed an order to show cause for attorney's fees and advancement of royalties which is presently set for hearing on April 1, 1997.

d. Melinda Wilson is the duly-appointed conservator of the person and estate of Brian Wilson and has the authority to execute this settlement on behalf of Brian Wilson.

IT IS HEREBY STIPULATED as follows:

1. All of Respondent's Pending Orders to Show Cause shall go "off calendar", with prejudice (except as to Respondent's rights as set forth in paragraph 8 hereinbelow).

2. Petitioner shall pay to Respondent the sum of three hundred thousand dollars ($300,000) payable as follows:

a. One hundred fifty thousand dollars ($150,000) forthwith;

b. The sum of one hundred fifty thousand dollars ($150,000) on or before October 1, 1997; and

The aforesaid payment of $300,000 shall not be an charge against or off set against any funds due the Respondent pursuant to the Judgment and this Stipulation Modifying Judgment and Order Thereon and Order on Order to Show Cause for the period commencing February 1, 1997, and thereafter. Such $300,000 payment satisfies in full Respondent's claims that the deductions set forth on the accountings mentioned in paragraph 3 hereinbelow are incorrect and/or improper as well as claims of Petitioner that the deductions set forth on the accountings mentioned in paragraph 3 hereinbelow are correct and proper and that Respondent is liable for additional and further contributions from her share of marital royalties as a result of fees, costs and expenses necessarily incurred by Petitioner in connection with various actions taken by Petitioner in defense and/or prosecution of claims relating to marital royalties as noted in paragraph 4, below. It is the intent of the parties that

LAW OFFICES OF Manatt & Phillips, L.L.P. 2029 Century Park East, Suite 1200 Los Angeles, California 90067 Phone:(310)277-7117 Fax:(310)286-9182 and (310)277-0971

said payment herein referenced ($300,000.00) shall not be charged in any future periods against Respondent's share of marital royalties.

3. Petitioner waives all claims for recoupment of any monies claimed due Petitioner pursuant to the Judgment or otherwise arising out of or connected with any known claims, demands, causes of action, causes, expenses, debts, *et al.* or the like through the date of signature on this Stipulation Modifying Judgment and Order Thereon and Order on Order to Show Cause. Without limiting the generality of the foregoing, Petitioner waives and releases all claims for offset or deduction which he has pursuant to the accountings provided by Brenner & Glassberg through December 31, 1996 (which reflects a net unrecouped legal expense of $347,110.60 and as augmented by Brenner & Glassberg's letter of February 7, 1997, indicating a marital share of royalties in the sum of $9,715.23 were due for the month of January 1997).

It is the intent of this paragraph 3 that, as of February 1, 1997, all receipts of marital royalties of community sums as set forth in the Judgment and received prior to February 1, 1997 will be divided pursuant to the Judgment (any and all previous modifications thereof) as it may be amended by this Stipulation Modifying Judgment and Order on Order to Show Cause without deduction or offset (except as specifically authorized by paragraph 5 hereinbelow).

4. Petitioner further releases Respondent from all claims for offset or reimbursement whatsoever that Petitioner may have arising out of or connected with any action, formal demand in writing or litigation which has been received or commenced prior to the date of signing this Stipulation or which is presently known by Petitioner or his representatives.

5. In the event that a claim is made by Petitioner pursuant to the Judgment that Respondent must share in any expense regarding the community (marital royalties) of the parties, then Petitioner must deposit an amount from the share of the royalties equal to 100% of Respondent's gross payment of the disputed expense in a blocked account. By way of example only, if Petitioner believes that Respondent should be charged with $5,000 of

LAW OFFICES OF
Manatt & Phillips, L.L.P.
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Phone:(310)277-7117 Fax:(310)286-9182 and (310)277-0971

expenses pursuant to the Judgment, he shall withhold $10,000 ($5,000 from his share and $5,000 from Respondent's share) and deposit same into a blocked account requiring joint signatures of the parties or their representatives or court order for the withdrawal of any sums contained therein.

6. a. Subject to and pursuant to the terms of paragraph 6.b. below, Respondent shall be paid sixteen percent (16%) of any net proceeds which may be incurred by Petitioner on and/or after February 1, 1997 arising out of and in connection with the *Billet* litigation.

b. The participation by Respondent in sixteen (16%) of net proceeds shall be computed by subtracting from any recovery by Petitioner in the *Billet* litigation that amount reflecting attorneys' and experts' fees and costs incurred by Respondent on and/or after February 1, 1997, deducting that total sum from the totality of the amounts, if any, recovered by Petitioner in said litigation and multiplying that difference by sixteen percent (16%). The product so computed will be the amount, if any, in which Respondent shall participate from the net proceeds of the *Billet* litigation as herein defined.

c. Respondent will have no responsibility to pay from her funds any portion of the *Billet* litigation fees and costs. Her responsibility shall be limited to her share of funds as set forth in this paragraph 6, if any, received from the Billet litigation.

d. In the event there is an affirmative recovery by Petitioner in the *Billet* litigation which, pursuant to the computation set forth in paragraph 6.b. above, results in a recovery due to Respondent, such sum shall be payable to Respondent forthwith upon receipt by Petitioner of payment from or on behalf of *Billet*, but in no event later than thirty (30) days from receipt of said payment by Petitioner.

e. It is specifically agreed that any such payment to Respondent as hereinabove referenced shall specifically be exclusive of any and all sums due to Mike Love, if at all, from the proceeds of the *Billet* recovery as specifically set forth in the Stipulated Judgment In re Love v. Wilson.

LAW OFFICES OF
Manns & Phillips, L.L.P.
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Phone:(310)277-7117 Fax:(310)286-9182 and (310)277-0971

7. Both parties hereby approve Arnold Glassberg as the trustee of the community funds pursuant to paragraph 38 of the Judgment. Mr. Glassberg's signature hereunder acknowledges the fact that he serves as a trustee of both parties in the preparation of the accountings for and the actual division of the community (marital) royalties and proceeds. Mr. Glassberg's signature hereinbelow also acts as his agreement to be bound by the provisions of paragraphs 3 and 5 hereof. Both parties presently consent to Mr. Glassberg serving a the paragraph 38 trustee under the Judgment without prejudice to his being replaced in the future pursuant to the Judgment. Respondent shall pay Arnold Glassberg six hundred fifty dollars ($650) per month as her share of the total expenses of the trusteeship commencing February 1, 1997 and continuing during the period of time while Mr. Glassberg is the Paragraph 38 trustee. The balance of any fee owed to Mr. Glassberg above $650 per month shall be the sole responsibility of Petitioner.

8. Except as otherwise provided herein, each of the parties releases the other and their respective heirs, assigns, successors in interest, conservators, accountants, attorneys and trustees from any and all claims, demands, causes of action, actions, expenses, debts and liabilities arising out of issues set forth in Respondent's order to show cause filed November 19, 1996, provided, however, that such release shall not include Respondent's right to any accounting pursuant to the Judgment or that additional sums are owed as a result of accounting or audit such release includes all known and unknown claims in connection with this release, including those claims under *California Civil Code* section 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exit in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

9. The releases herein shall not preclude Respondent from sharing in any marital receipts pursuant to audit by Brian Wilson or otherwise if the proceeds are received by Brian Wilson after February 1, 1997.

LAW OFFICES OF
Manis & Phillips, L.L.P.
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Phone:(310)277-7117 Fax:(310)286-9182 and (310)277-0971

10. Except as specifically modified herein, the terms of the Judgment of March 4, 1989, shall remain in full force and effect.

11. The Family Law Department of the Los Angeles Superior Court shall retain jurisdiction over any dispute regarding the provisions of this Stipulation and Order.

12. This Stipulation and Order shall be binding on the respective parties heirs, assigns, successors in interest, conservators and trustees.

13. Brian Wilson's conservator, Melinda Wilson, shall forthwith apply in the conservatorship proceedings for approval of this Settlement Agreement. Without the Probate Court's approval, this Agreement shall be of no force or effect. If approval is not obtained by May 31, 1997, Marilyn Wilson, at her sole discretion, may withdraw from the Settlement Agreement without liability whatsoever and proceed with her action against Brian Wilson. If Marilyn Wilson so withdraws this Settlement Agreement shall be of no further force or effect.

**APPROVED AS TO FORM AND CONTENT:**

DATED: April 25, 1997 — BRIAN WILSON, Petitioner

DATED: April 28, 1997 — MARILYN WILSON, Respondent

DATED: April 25, 1997 — ARNOLD GLASSBERG, Trustee

DATED: April 25, 1997 — MELINDA WILSON, Conservator of Brian Wilson

**APPROVED AS TO FORM:**

DATED: April 25, 1997

TROPE AND TROPE

By: ______________________
Mark Vincent Kaplan

Attorneys for Petitioner
BRIAN WILSON

LAW OFFICES OF
Mannis & Phillips, L.L.P.
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Phone:(310)277-7117 Fax:(310)286-9182 and (310)277-0971

DATED: April 28, 1997

MANNIS & PHILLIPS, L.L.P.

By: ______________________
Joseph Mannis
- and -

DATED: April 28, 1997

BARBAKOW & LERNER

By: ______________________
Marc Lerner

Attorneys for Respondent
MARILYN WILSON

FOR GOOD CAUSE APPEARING, IT IS SO ORDERED.

DATED: 8-11, 1997

KENNETH A. BLACK
______________________
Honorable Kenneth A. Black, Judge of the Los Angeles Superior Court

LAW OFFICES OF
Mannis & Phillips, L.L.P.
2029 Century Park East, Suite 1200
Los Angeles, California 90067
Phone:(310)277-7117 Fax:(310)286-9182 and (310)277-0971

# EXHIBIT B

HERSH MANNIS LLP

ATTORNEYS AT LAW

9150 WILSHIRE BOULEVARD
SUITE 209
BEVERLY HILLS, CALIFORNIA 90212-3429
TELEPHONE (310) 786-1910
FACSIMILE (310) 786-1917

JOSEPH MANNIS
NEAL RAYMOND HERSH*♦‡
JAMES M. SIMON
ADAM PHILIP LIPSIC*
MARC ANDRÉ BERTET*
ANDREW M. STEIN
TERESA Y. LIN
SARAH M. LUETTO
SARAH A. THOMPSON
SUZANNE J. GOULET

OF COUNSEL
CHRISTIAN E. MARKEY III

NEW YORK
655 Third Avenue, 11th Floor
NEW YORK, NY 10017

*CERTIFIED SPECIALIST FAMILY LAW
THE STATE BAR OF CALIFORNIA
BOARD OF LEGAL SPECIALIZATION

♦FELLOW, AMERICAN ACADEMY OF
MATRIMONIAL LAWYERS

‡FELLOW, INTERNATIONAL ACADEMY
OF MATRIMONIAL LAWYERS

November 18, 2021

***VIA E-MAIL***

Eric John Custer
Manatt Phelps Phillips LLP
11355 W. Olympic Blvd.
Los Angeles, CA 90064-1614
**ecuster@manatt.com**

Re: Marilyn Wilson Rutherford

Dear Eric:

As I am sure you know, Joseph Mannis has been contacted by John Branca regarding a sale of some of Marilyn's "royalty" rights in the intellectual property awarded to her under the Judgment of April 4, 1981. Copies of the pertinent pages of the Judgment discussed below are attached for your reference. The undersigned have each on behalf of Marilyn spoken to Mr. Branca.

The Judgment at Paragraph 6 states:

> 6. IT IS FURTHER ORDERED that the community is the owner of certain copyrights, contract rights and/or royalty rights in the petitioner's name with respect to musical compositions created during the marriage, and are listed as follows: [170 musical compositions are listed].

Paragraph 12 then provides that Marilyn may not sell her interest without giving Brian Wilson a right of what effectively is a "right of first refusal."

Further paragraphs of the Judgment deal with a variety of publishing and other companies including Brother Publishing, Brother Records, New Executive Music, Wilojarston, Inc., and provide for equal division of the interest in and any distributions resulting from such entities. At present, Marilyn does not have any recollection as to the rights held by such entities. Please advise as to the status of these entities and whether payment was made to Marilyn.

Given the proposed sale and dearth of information provided to Marilyn, Marilyn requests the following:

A. A release of Brian's right of first refusal should she sell her shares of the rights and royalties directly to Universal (whom Mr. Branca advised is the buyer) or to other entities.

B. Brian's position as to whether Marilyn could opt out of any sale of music rights and keep her share of rights and royalties.

C. The approximate amount Brian believes Marilyn will receive from any sale of her share with supporting documentation and the multiplication factor.

D. The approximate breakdown of total potential sales proceeds between Marilyn and Brian and the computation thereof.

E. Marilyn has not received anything close to an actual accounting of what is due her under the Judgment. We request an accounting for the last five (5) years (January 1, 2016 through October 2021) to compare against receipts before we decide whether to look at earlier periods. The accounting must include back-up documentation from all payment streams including a description of distribution rights and distributions made resulting from the musical compositions listed in Paragraph 6 of the Judgment and by the aforesaid entities referenced in the Judgment, and a list of all payments, and the source thereof, made to Marilyn. This accounting shall further include any advances to Brian from BMI and proof that Marilyn's share was not used to repay any advances in which she did not share.

1. BMI – Any advances to Brian to be disclosed and documents produced reflecting that Marilyn's share has not been used (if there were advances) to repay money for advances she did not share in;

2. Neighbouring rights royalties (e.g., Brazil);

3. SoundExchange royalties;

4. Royalties (writer's share) from synchronization and other licensing;

5. Mechanical royalties (writer's share); and

6. Any other sources of income from the community projects.

F. In separate telephone calls earlier in the year, you indicated to each of the undersigned that you do not agree that the broad language set forth at Paragraph 6 of the Judgment covers producer's royalties for the community property musical compositions. We disagreed. Request is hereby made that Brian provide an accounting and payment to Marilyn of one-half of all producers' fees earned from February 1, 1997 to date resulting from the community property musical compositions. We reserve all claims for previous time periods.

In the event your claim is correct that Paragraph 6 does not include producer's royalties, then they would be an undivided community asset. As such, Family Code section 2556 requires a court to award and generally equally divide any omitted or unadjudicated community royalties, as follows:

> In a proceeding for dissolution of marriage, for nullity of marriage, or for legal separation of the parties, the court has continuing jurisdiction to award community estate assets or community estate liabilities to the parties that have not been previously adjudicated by a judgment in the proceeding. A party may file a post judgment motion or order to show cause in the proceeding in order to obtain adjudication of any community estate asset or liability omitted or not adjudicated by the judgment. In these cases, the court shall equally divide the omitted or unadjudicated community estate asset or liability, unless the court finds upon good cause shown that the interests of justice require an unequal division of the asset or liability.

In *Marriage of Huntley* (2017) 10 Cal.App.5th 1053, the court, in applying section 2556, stated as follows:

,

> [A] dissolution judgment does not affect the disposition of community property as to which the judgment is silent. 'Under California law, a spouse's entitlement to a share of the community property arises at the time that the property is acquired. [Citations.] That interest is not altered except by judicial decree or an agreement between the parties. Hence "under settled principles of California community property law, '**property which is not mentioned in the pleadings as community property is left unadjudicated by decree of**

> **divorce**, and is subject to future litigation, the parties being tenants in common meanwhile.'" ... [Citations.] This rule applies to partial divisions of community property as well as divorces unaccompanied by any property adjudication whatsoever.
>
> In providing courts with continuing jurisdiction, section 2556 imposes no time limit on former spouses to seek to adjudicate omitted or unadjudicated community property after a dissolution judgment was entered." …[T]here is no statute of limitations imposed by Family Code section 2556 on a former spouse who seeks adjudication of omitted or unadjudicated community property.

*Id.* at 1059-1060 (emphasis added).

G. Reversion rights: Brian should well be on his way to obtaining back his copyrights. We understand that Mike Love has already obtained reversions to at least some of the separate property songs co-created with Brian. We are sure Brian would not be ignoring these valuable rights. Please advise forthwith regarding the status for the community songs and/or the plan for the reversions.

Very truly yours,

HERSH MANNIS LLP

Joseph Mannis
Of The Firm

KLEINBERG LANGE CUDDY & CARLO LLP

Candace Carlo
Of the Firm

JM:cp

# EXHIBIT C

0.0

**Subject:** RE: Marilyn Wilson Rutherford/Brian Wilson
**Date:** Monday, November 29, 2021 at 3:42:26 PM Pacific Standard Time
**From:** Custer, Eric
**To:** Cindy Payton, Candace Carlo, Joseph Mannis
**CC:** James M. Simon, John Branca
**Priority:** High

Joe and Candace, this is in response to your joint letter to me dated November 18, 2021. Some of the items raised therein may require further research and a more detailed response. However, in view of timelines on the proposed UMPG transaction, we did want to provide an initial response based on the information we had available. We would suggest a call tomorrow or the day after (the two of you, me and John Branca) once you have had a chance to digest this response. As a formality, this is a confidential settlement communication pursuant to California Evidence Code § 1152, Federal Rule of Evidence 408 and similar laws to that effect.
Writer Share Sale:
With respect to items A and B from your letter, to the extent we have brought you the opportunity to participate in the sale to UMPG of the UMPG/BMI writer royalty interests, we would of course waive that right of first refusal to enable such sale to be completed. While the intent is to sell the entire interest (including Marilyn's share) to UMPG, and though Brian has the power to do so pursuant to the terms of the Judgment, if your client is simply strongly philosophically opposed to the concept of her interest being sold, then provided all other issues between our clients are resolved, we are willing to consider excluding her interest from the sale (and using our current leverage to secure a contractual commitment from UMPG to directly account to Marilyn for her share of royalties going forward).
However, on that front I would caution that a strong desire not to sell is indeed the reason. We are aware that Marilyn was approached last year by a prospective buyer, but bear in mind that dollar amounts tossed around in that context are meaningless since it will always come down to a multiple applied to the verifiable historical earnings. Also, our sense was that the prospective buyer was Primary Wave, and note that UMPG is actually joining forces with Primary Wave to co-fund this acquisition, so it's not really the case that Primary Wave would be a likely separate possible independent buyer here. We are confident that the market right now is not going to yield a better offer than what we have from UMPG (we know that from direct competitive offers from other buyers who pay top multiples, which, to our surprise, UMPG matched and then exceeded to take this one off the table).
If your client truly does not want to sell, we understand that. But if there is some notion that she is going to turn around and do her own sale now or in the near future, there are some complicating factors you need to be aware of that make it near impossible to sell to anyone other than UMPG, irrespective of whether Brian waives his last refusal right. As part of this process, we pulled the original underlying songwriter agreements through which UMPG has chain of title (the agreements from the 1960s between Brian and Sea of Tunes, which were later assigned to Rondor, which was acquired by UMPG). We discovered that those agreements have express language prohibiting Brian from assigning his rights to a third party without UMPG's consent (which would impact Marilyn in the same fashion). As such, when presented with these underlying agreements in diligence, pretty much any third party buyer would require that you deliver a consent to assignment executed by UMPG. UMPG is well aware of these anti-assignment prohibitions and no such consent will be forthcoming from them. Further, UMPG would have an argument that any such attempted assignment to a third party would be interference with their agreements and they could simply ignore payment letters of direction, which is likely to scare most buyers away (and I don't foresee Primary Wave being willing to proceed on a separate Marilyn only sale in the face of all of the above).
With respect to items C and D, the process is simple and does not require that you rely on us to come up with some discretionary amount. Indeed, the community assets that would be sold are (i) the contractual songwriter royalties that UMPG pays under the original Sea Of Tunes agreements covering the community compositions and (ii) the BMI writer royalties that are payable on those same community songs. In addition, there are some

separate property songs that are also owned by UMPG pursuant to similar Sea of Tunes agreements (basically those before 1965), which Brian is selling as well, and Marilyn would not share in.

As such, the allocation is simple. The offer is a 30X multiple (unheard of for a passive royalty interest like this) on the UMPG and BMI writer royalties payable in respect of the Sea Of Tunes songs and the ultimate price will be that multiple applied to the verified annual average earnings in respect of same. We have per song data culled from source statements (which UMPG is verifying to confirm the final valuation) that will show the average earnings of each such song. To determine the allocation, we simply apply the 30X multiple to the annual average earnings on the community songs, which amount would be paid 50% to Brian and 50% to Marilyn (and then the 30X multiple is also applied to the annual average earnings on the separate property songs, which goes to Brian 100%). These are the objective figures on which the UMPG offer is based, not discretionary figures that we made up. We will provide the per song earnings data and the underlying UMPG and BMI source statements from which they are derived so that you can verify these figures as well.

Based on past accountings rendered to Marilyn, we anticipate that Marilyn's total share would be approximately between 30% and 35% of the overall purchase price attributable to the sale of the songwriter royalties (this is less than 50% because a number of major songs were before the marriage and thus separate property as reflected on the Judgement, and in which Marilyn does not share). Based on the earnings history and the 30X multiple, the expected purchase price for the songwriter royalties is $35,200,000. Assuming that UMPG verifies such earnings history, that the per song earnings track our rough 30% to 35% Marilyn historical projection, and the deduction of the 5% off the top, Marilyn would be looking at receiving between $10MM to $11.7MM in respect of her share of the purchase price for just these assets.

<u>Other Issues</u>:

While items E through G may warrant further research and a more detailed response, we did want to quickly respond to a number of these items based on the information available to us.

First, we have rendered accountings in the same format for well over a decade (usually on a monthly basis). As a general matter, historically we have not provided underlying UMPG and BMI statements since (i) they include confidential information as to non-community songs and (ii) given modern per track accounting, those are voluminous (hundreds and in some cases thousands of pages) and not particularly decipherable for someone other than an experienced music business accountant. That said, from time to time Marilyn has requested further detail, and my understanding is that we have provided same when asked (and further that Marilyn actually conducted an audit a few years ago). As noted above, given the impending sale, we are fine now providing access to the same UMPG and BMI statements UMPG is basing their offer on so you can be assured of the earnings that support the purchase price.

Second, as we have previously advised, though Brian did take advances from BMI from time to time, those had no impact on Marilyn. She has been paid her ongoing share of BMI royalties as accrued on statements irrespective of Brian's BMI recoupment status. We can provide whatever you need to verify that's the case, but the basic proof is that the statements issued to Marilyn have always included BMI earnings without interruption, which would not have been the case had she been standing behind Brian advances.

Third, certain items under item E (Neighbouring rights and SoundExchange) are not interests/monies derived from "musical compositions" (in which Marilyn shares), but rather derive from performances on "sound recordings". This same issue is also raised more broadly in item F. However, the Judgment is clear that Marilyn does not share in monies Brian receives in respect of Beach Boys recordings (i.e., producer royalties are not monies derived from musical compositions). For example, subparagraph 4(D) of the Judgment indicates that Brian was awarded as his separate property "all of the community's right, title and interest in Brother Records, Inc." (the source of the Beach Boys sound recording income in which Brian shares, including any producer royalties, which the parties clearly understood based on other provisions of the Judgment). Similarly, subparagraph 4(E) of the Judgment indicates that Brian was awarded as his separate property "any interest in the musical group 'The Beach Boys".

That is in contrast to certain minor Beach Boys related music publishing entities (Brother Publishing and Wilojarston, which owned lesser catalogs of musical compositions), where the Judgment provided Marilyn would be entitled to an ongoing 50% interest. The parties clearly understood how to express a shared interest in an entity and the monies it generated, and did not do so with respect to Brother Records, Inc.

Indeed, it seems pretty clear there was some horse trading going on where Brian got as his separate property certain community items and Marilyn got as her separate property certain other community items, and your citation to case law and general principles of community property law ignores the express language of the Judgement.

Nor can it be said that the drafters of the Judgment simply missed or forgot to deal with the issue of sound recording royalties (as opposed to musical composition royalties). In fact, language tacked on to the end of the Judgment underscores that the parties clearly understood Brother Records, Inc. was the source of sound recording royalties, which was awarded to Brian alone.

Paragraph 59 of the Judgment indicates that in connection with an "audit of Warner Brothers Records . . . being conducted by Brother Records, Inc., with regard to record royalties for the period January 1, 1976 through December 31, 1978, the value of the community's interest in the stock of Brother Records, Inc. will be revalued at the time Brother Records liquidates its' claim against Warner Brothers Records, so that said value of Brother Records, Inc. will be deemed to increase in the sum of twenty (20%) percent of any amount in excess of THREE HUNDRED THOUSAND ($300,000.00) DOLLARS received by Brother, net of audit costs, including legal fees and accounting expenses."

Paragraph 60 then goes on to provide that "said increase in the value of the stock of Brother Records, Inc., if any, shall be, divided, equally, one-half (1/2) to [Brian] and one-half (1/2) to [Marilyn] by offset in distribution from the 38 Trust Account." And paragraph 61 further provided that "the payments made pursuant to [paragraph 60] to [Marilyn] by [Brian], will not be taxable to [Brian]."

Paragraph 62 is the coda on this issue, expressly providing that "[Marilyn] shall have no other rights in any other records or other audit conducted by Brother Records, Inc., nor in any other asset of Brother Records, Inc., or in the name or group known as "The Beach Boys", except as otherwise provided in this Judgment."

It is clear the parties understood Brother Records, Inc. was the source of sound recording royalties and awarded all such interests to Brian as his separate property with no further obligation to Marilyn in respect of same, save only for a one time obligation to make a further cash payment to Marilyn in the event the referenced audit of Warner Brothers Records (for the period 1976 through 1978, i.e., royalties earned during the marriage), was settled by Brother Records for more than $300,000. Any such audit settlement would have happened no later than a year or so after the Judgment and the parties presumably addressed that matter no later than 1983. The bottom line is that these express provisions make clear Marilyn has no interest in sound recording royalties.

On top of that, we know that since at least the 1990s (when accountings were handled by Arnie Glassberg, later taken over by LeeAnn Hard in the 2000s), no monies were ever accounted to Marilyn in respect of sound recordings earnings, which we understood followed prior accounting practice from inception of the Judgment (i.e., that Marilyn never shared in such non-publishing earnings as per the express terms of the Judgement).

And in the forty years that the Judgment has been in effect, audits have been conducted by Marilyn and in 1997 Marilyn even initiated a dispute proceeding in the family court (involving costs and possible proceeds from third party litigation relating to the community compositions), and yet this issue was never raised, further supporting that the Judgment and clear intent of the parties was that she had no interest in same.

Finally, with respect to item F, Brian has indeed served termination notices on the Sea Of Tunes/UMPG songs as they have become eligible. As you may know, the earliest possible termination dates under Section 304(c) of the Copyright Act run 56 years from the date of the copyright. As such, until this year, only songs from 1964 and before (separate property songs) had technically reverted, and then over the course of this past year reversions on songs from 1965 would have become effective (all of which we had left open pending what we decided to do with UMPG). Of course, terminations only recover rights in the United States and essentially enabled Brian to claim from UMPG going forward the other 50% of US earnings that UMPG was retaining the past 60 years, which Brian did not own previously.

In the spirit of transparency, in addition to the sale of the writer royalties described above, Brian is considering the sale to UMPG of these reversion interests for a separate purchase price (note that the multiple on the sale of writer royalties is actually higher). Inasmuch as these additional rights were not owned by Brian during the marriage (from inception they were owned by UMPG or their predecessors) and were only acquired by Brian under federal copyright law by virtue of his surviving to the effective dates over the past few years (i.e., had he not, those interests would have been owned directly, under copyright law, by Brian's wife and children), Marilyn

has no interest in and is not entitled to a share of any purchase price for such interests.

While there has been some litigation in the past between authors and their ex-spouses (e.g., a case in Los Angeles in recent years between Smokey Robinson and his ex-wife to the effect that copyright terminations can even operate to cut off the prior songwriter royalty interest), provided we can resolve all other issues between our clients, it is not our current intent to take that position. Rather, we view the appropriate resolution as Marilyn sharing in the purchase price payable for the share of songwriter royalties that she has historically received, but that she not share in any purchase price for these termination/reversionary interests that did not exist during the marriage, were never owned by the community, and which only became a vested property right of Brian under the United States Copyright Act in the last few years (decades after the marriage ended).

Of course, feel free to contact me if you have any questions (and again, we suggest a call tomorrow or the day after to go over any questions). In the meantime, as a formality, this is not intended as a complete recitation of all facts or legal theories pertaining to this matter, or of a waiver of any rights or remedies in connection therewith, all of which are specifically reserved.

Best regards,

Eric

**Eric Custer**
Partner

**Manatt, Phelps & Phillips,** LLP
2049 Century Park East
Suite 1700
Los Angeles, CA 90067
**D** (310) 312-4219 **F** (310) 914-5846
ecuster@manatt.com
**manatt.com**

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it, may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this message is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify us by reply email and destroy the original transmission and its attachments without reading them or saving them to disk. Thank you.

---

**From:** Cindy Payton <CPayton@HershMannis.com>
**Sent:** Friday, November 19, 2021 2:45 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** Candace Carlo <ccarlo@kleinberglange.com>; James M. Simon <JSimon@HershMannis.com>; Joseph Mannis <JMannis@HershMannis.com>
**Subject:** Marilyn Wilson Rutherford

Dear Mr. Custer,

Attached for your attention please see Candace Carlo's and Joseph Mannis' joint letter dated November 18, 2021.

Cordially,

Cindy Payton
Legal Assistant to Joseph Mannis
Hersh Mannis, LLP
9150 Wilshire Blvd., Suite 209
Beverly Hills, CA 90212
Phone: (310) 786-1910
Fax: (310) 786-1917
cpayton@hershmannis.com

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a

leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT D

| | |
|---|---|
| **Subject:** | Marilyn Wilson Rutherford |
| **Date:** | Tuesday, November 30, 2021 at 12:13:40 PM Pacific Standard Time |
| **From:** | Joseph Mannis |
| **To:** | Custer, Eric |
| **CC:** | Candace Carlo |
| **Attachments:** | image001.jpg, formprotectiveorder1confidential_1(1377933.1).pdf |

Dear Eric,

In addition to my letter of November 18 emailed to you, I am now informed that Brother Records was sold some time in the recent past. Per the Judgment, that company was Brian's separate property. However, Brother Publishing was and is community property belonging ½ to each party. Please advise whether or not any portion of Brother Publishing or any of its assets were part of the sale of Brother Records.

Candace has advised that she believes that various publishing rights may have also been sold. Please provide a copy of the sales agreement itself so that we can make our own determination of whether Marilyn's rights were affected by the sale. If you are concerned about confidentiality, we are willing to sign the Court's form protective agreement. I have attached same, from the Court website, for your review. Thank you in advance.

This email was prepared prior to receiving your email of yesterday afternoon, which I will respond to in the near future.

Very truly yours,

JOSEPH MANNIS
Founding Partner
HM HERSH MANNIS
HERSH MANNIS LLP
9150 Wilshire Blvd., Suite 209
Beverly Hills, CA 90212
Phone: 310-786-1910
Fax: 310-786-1917
jmannis@hershmannis.com

*This e-mail message is intended to be a confidential attorney client communication and/or contain confidential work product intended solely for the use of the addressee(s) named above. Email between the attorneys and clients of this firm are intended to be confidential. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please promptly notify the sender by return e-mail.*

*Rules governing our practice before the Internal Revenue Service require that we advise you that any tax advice in this communication (and any attachments) (i) is intended only for the addressee and (ii) is not written with the intent that it be used, and in fact it cannot be used, to avoid penalties imposed under the Internal Revenue Code or to promote, market, or recommend to another person any tax-related idea.*

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

Where the Parties wish to have a confidentiality stipulation and protective order the parties in all civil cases, other than products liability cases, are encouraged to use this Stipulated Confidentiality Order Form as an initial working draft to save time.

Where this Stipulated Confidentiality Order Form is used, then any proposed stipulated confidentiality order submitted to the Court MUST be accompanied by a "redlined' or "compare" version of this Form, so that the Court may readily see ALL MODIFICATIONS that were made to this Form. This procedure is intended to save you and the Court time, and promote faster processing of these proposed orders.

This model form confidentiality stipulation and protective order (the "Stipulated Confidentiality Order Form") does not address, and may not be used in, products liability cases.

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

| | |
|---|---|
| Plaintiffs,<br><br>vs.<br><br>Defendants. | Case No.<br><br>LOS ANGELES MODEL<br><br>STIPULATION AND PROTECTIVE ORDER – CONFIDENTIAL DESIGNATION ONLY |

**IT IS HEREBY STIPULATED** by and between the Parties to Plaintiffs v. Defendants, (*list names of Plaintiffs and Defendants*), by and through their respective counsel of record, that in order to facilitate the exchange of information and documents which may be subject to confidentiality limitations on disclosure due to federal laws, state laws, and privacy rights, the Parties stipulate as follows:

1. In this Stipulation and Protective Order, the words set forth below shall have the following meanings:

a. "Proceeding" means the above-entitled proceeding (*specify case number*).

b. "Court" means the Hon. (*list name of judge*), or any other judge to which this Proceeding may be assigned, including Court staff participating in such proceedings.

c. "Confidential" means any information which is in the possession of a Designating Party who believes in good faith that such information is entitled to confidential treatment under applicable law.

d. "Confidential Materials" means any Documents, Testimony or Information as defined below designated as "Confidential" pursuant to the provisions of this Stipulation and Protective Order.

e. "Designating Party" means the Party that designates Materials as "Confidential."

f. "Disclose" or "Disclosed" or "Disclosure" means to reveal, divulge, give, or make available Materials, or any part thereof, or any information contained therein.

g. "Documents" means (i) any "Writing," "Original," and "Duplicate" as those terms are defined by California Evidence Code Sections 250, 255, and 260, which have been produced in discovery in this Proceeding by any person, and (ii) any copies, reproductions, or summaries of all or any part of the foregoing.

h. "Information" means the content of Documents or Testimony.

i. "Testimony" means all depositions, declarations or other testimony taken or used in this Proceeding.

2. The Designating Party shall have the right to designate as "Confidential" any Documents, Testimony or Information that the Designating Party in good faith believes to contain non-public information that is entitled to confidential treatment under applicable law.

3. The entry of this Stipulation and Protective Order does not alter, waive, modify, or abridge any right, privilege or protection otherwise available to any Party with respect to the discovery of matters, including but not limited to any Party's right to assert the attorney-client

privilege, the attorney work product doctrine, or other privileges, or any Party's right to contest any such assertion.

4. Any Documents, Testimony or Information to be designated as "Confidential" must be clearly so designated before the Document, Testimony or Information is Disclosed or produced. The parties may agree that the case name and number are to be part of the "Confidential" designation. The "Confidential" designation should not obscure or interfere with the legibility of the designated Information.

a. For Documents (apart from transcripts of depositions or other pretrial or trial proceedings), the Designating Party must affix the legend "Confidential" on each page of any Document containing such designated Confidential Material.

b. For Testimony given in depositions the Designating Party may either:

i. identify on the record, before the close of the deposition, all "Confidential" Testimony, by specifying all portions of the Testimony that qualify as "Confidential;" or

ii. designate the entirety of the Testimony at the deposition as "Confidential" (before the deposition is concluded) with the right to identify more specific portions of the Testimony as to which protection is sought within 30 days following receipt of the deposition transcript. In circumstances where portions of the deposition Testimony are designated for protection, the transcript pages containing "Confidential" Information may be separately bound by the court reporter, who must affix to the top of each page the legend "Confidential," as instructed by the Designating Party.

c. For Information produced in some form other than Documents, and for any other tangible items, including, without limitation, compact discs or DVDs, the Designating Party must affix in a prominent place on the exterior of the container or containers in which the Information or item is stored the legend "Confidential." If only portions of the Information or item warrant protection, the Designating Party, to the extent practicable, shall identify the "Confidential" portions.

5. The inadvertent production by any of the undersigned Parties or non-Parties to the Proceedings of any Document, Testimony or Information during discovery in this Proceeding without a "Confidential" designation, shall be without prejudice to any claim that such item is "Confidential" and such Party shall not be held to have waived any rights by such inadvertent production. In the event that any Document, Testimony or Information that is subject to a "Confidential" designation is inadvertently produced without such designation, the Party that inadvertently produced the document shall give written notice of such inadvertent production within twenty (20) days of discovery of the inadvertent production, together with a further copy of the subject Document, Testimony or Information designated as "Confidential" (the "Inadvertent Production Notice"). Upon receipt of such Inadvertent Production Notice, the Party that received the inadvertently produced Document, Testimony or Information shall promptly destroy the inadvertently produced Document, Testimony or Information and all copies thereof, or, at the expense of the producing Party, return such together with all copies of such Document, Testimony or Information to counsel for the producing Party and shall retain only the "Confidential" designated Materials. Should the receiving Party choose to destroy such inadvertently produced Document, Testimony or Information, the receiving Party shall notify the producing Party in writing of such destruction within ten (10) days of receipt of written notice of the inadvertent production. This provision is not intended to apply to any inadvertent production of any Information protected by attorney-client or work product privileges. In the event that this provision conflicts with any applicable law regarding waiver of confidentiality through the inadvertent production of Documents, Testimony or Information, such law shall govern.

6. In the event that counsel for a Party receiving Documents, Testimony or Information in discovery designated as "Confidential" objects to such designation with respect to any or all of such items, said counsel shall advise counsel for the Designating Party, in writing, of such objections, the specific Documents, Testimony or Information to which each objection pertains, and the specific reasons and support for such objections (the "Designation Objections"). Counsel for the Designating Party shall have thirty (30) days from receipt of the written Designation Objections to either (a) agree in writing to de-designate Documents, Testimony or Information pursuant to any or

all of the Designation Objections and/or (b) file a motion with the Court seeking to uphold any or all designations on Documents, Testimony or Information addressed by the Designation Objections (the "Designation Motion"). Pending a resolution of the Designation Motion by the Court, any and all existing designations on the Documents, Testimony or Information at issue in such Motion shall remain in place. The Designating Party shall have the burden on any Designation Motion of establishing the applicability of its "Confidential" designation. In the event that the Designation Objections are neither timely agreed to nor timely addressed in the Designation Motion, then such Documents, Testimony or Information shall be de-designated in accordance with the Designation Objection applicable to such material.

7. Access to and/or Disclosure of Confidential Materials designated as "Confidential" shall be permitted only to the following persons:

a. the Court;

b. (1) Attorneys of record in the Proceedings and their affiliated attorneys, paralegals, clerical and secretarial staff employed by such attorneys who are actively involved in the Proceedings and are not employees of any Party. (2) In-house counsel to the undersigned Parties and the paralegal, clerical and secretarial staff employed by such counsel. Provided, however, that each non-lawyer given access to Confidential Materials shall be advised that such Materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

c. those officers, directors, partners, members, employees and agents of all non-designating Parties that counsel for such Parties deems necessary to aid counsel in the prosecution and defense of this Proceeding; provided, however, that prior to the Disclosure of Confidential Materials to any such officer, director, partner, member, employee or agent, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A;

d. court reporters in this Proceeding (whether at depositions, hearings, or any other proceeding);

e. any deposition, trial or hearing witness in the Proceeding who previously has had access to the Confidential Materials, or who is currently or was previously an officer, director, partner, member, employee or agent of an entity that has had access to the Confidential Materials;

f. any deposition or non-trial hearing witness in the Proceeding who previously did not have access to the Confidential Materials; provided, however, that each such witness given access to Confidential Materials shall be advised that such Materials are being Disclosed pursuant to, and are subject to, the terms of this Stipulation and Protective Order and that they may not be Disclosed other than pursuant to its terms;

g. mock jury participants, provided, however, that prior to the Disclosure of Confidential Materials to any such mock jury participant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain that such person is bound to follow the terms of such Order, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A.

h. outside experts or expert consultants consulted by the undersigned Parties or their counsel in connection with the Proceeding, whether or not retained to testify at any oral hearing; provided, however, that prior to the Disclosure of Confidential Materials to any such expert or expert consultant, counsel for the Party making the Disclosure shall deliver a copy of this Stipulation and Protective Order to such person, shall explain its terms to such person, and shall secure the signature of such person on a statement in the form attached hereto as Exhibit A. It shall be the obligation of counsel, upon learning of any breach or threatened breach of this Stipulation and Protective Order by any such expert or expert consultant, to promptly notify counsel for the Designating Party of such breach or threatened breach; and

i. any other person that the Designating Party agrees to in writing.

8. Confidential Materials shall be used by the persons receiving them only for the purposes of preparing for, conducting, participating in the conduct of, and/or prosecuting and/or defending the Proceeding, and not for any business or other purpose whatsoever.

9. Any Party to the Proceeding (or other person subject to the terms of this Stipulation and Protective Order) may ask the Court, after appropriate notice to the other Parties to the Proceeding, to modify or grant relief from any provision of this Stipulation and Protective Order.

10. Entering into, agreeing to, and/or complying with the terms of this Stipulation and Protective Order shall not:

a. operate as an admission by any person that any particular Document, Testimony or Information marked "Confidential" contains or reflects trade secrets, proprietary, confidential or competitively sensitive business, commercial, financial or personal information; or

b. prejudice in any way the right of any Party (or any other person subject to the terms of this Stipulation and Protective Order):

i. to seek a determination by the Court of whether any particular Confidential Material should be subject to protection as "Confidential" under the terms of this Stipulation and Protective Order; or

ii. to seek relief from the Court on appropriate notice to all other Parties to the Proceeding from any provision(s) of this Stipulation and Protective Order, either generally or as to any particular Document, Material or Information.

11. Any Party to the Proceeding who has not executed this Stipulation and Protective Order as of the time it is presented to the Court for signature may thereafter become a Party to this Stipulation and Protective Order by its counsel's signing and dating a copy thereof and filing the same with the Court, and serving copies of such signed and dated copy upon the other Parties to this Stipulation and Protective Order.

12. Any Information that may be produced by a non-Party witness in discovery in the Proceeding pursuant to subpoena or otherwise may be designated by such non-Party as "Confidential" under the terms of this Stipulation and Protective Order, and any such designation by a non-Party shall have the same force and effect, and create the same duties and obligations, as if made by one of the undersigned Parties hereto. Any such designation shall also function as a consent by such producing Party to the authority of the Court in the Proceeding to resolve and

conclusively determine any motion or other application made by any person or Party with respect to such designation, or any other matter otherwise arising under this Stipulation and Protective Order.

13. If any person subject to this Stipulation and Protective Order who has custody of any Confidential Materials receives a subpoena or other process ("Subpoena") from any government or other person or entity demanding production of Confidential Materials, the recipient of the Subpoena shall promptly give notice of the same by electronic mail transmission, followed by either express mail or overnight delivery to counsel of record for the Designating Party, and shall furnish such counsel with a copy of the Subpoena. Upon receipt of this notice, the Designating Party may, in its sole discretion and at its own cost, move to quash or limit the Subpoena, otherwise oppose production of the Confidential Materials, and/or seek to obtain confidential treatment of such Confidential Materials from the subpoenaing person or entity to the fullest extent available under law. The recipient of the Subpoena may not produce any Documents, Testimony or Information pursuant to the Subpoena prior to the date specified for production on the Subpoena.

14. Nothing in this Stipulation and Protective Order shall be construed to preclude either Party from asserting in good faith that certain Confidential Materials require additional protection. The Parties shall meet and confer to agree upon the terms of such additional protection.

15. If, after execution of this Stipulation and Protective Order, any Confidential Materials submitted by a Designating Party under the terms of this Stipulation and Protective Order is Disclosed by a non-Designating Party to any person other than in the manner authorized by this Stipulation and Protective Order, the non-Designating Party responsible for the Disclosure shall bring all pertinent facts relating to the Disclosure of such Confidential Materials to the immediate attention of the Designating Party.

16. This Stipulation and Protective Order is entered into without prejudice to the right of any Party to knowingly waive the applicability of this Stipulation and Protective Order to any Confidential Materials designated by that Party. If the Designating Party uses Confidential Materials in a non-Confidential manner, then the Designating Party shall advise that the designation no longer applies.

17. Where any Confidential Materials, or Information derived from Confidential Materials, is included in any motion or other proceeding governed by California Rules of Court, Rules 2.550 and 2.551, the party shall follow those rules. With respect to discovery motions or other proceedings not governed by California Rules of Court, Rules 2.550 and 2.551, the following shall apply: If Confidential Materials or Information derived from Confidential Materials are submitted to or otherwise disclosed to the Court in connection with discovery motions and proceedings, the same shall be separately filed under seal with the clerk of the Court in an envelope marked: "CONFIDENTIAL – FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER AND WITHOUT ANY FURTHER SEALING ORDER REQUIRED."

18. The Parties shall meet and confer regarding the procedures for use of Confidential Materials at trial and shall move the Court for entry of an appropriate order.

19. Nothing in this Stipulation and Protective Order shall affect the admissibility into evidence of Confidential Materials, or abridge the rights of any person to seek judicial review or to pursue other appropriate judicial action with respect to any ruling made by the Court concerning the issue of the status of Protected Material.

20. This Stipulation and Protective Order shall continue to be binding after the conclusion of this Proceeding and all subsequent proceedings arising from this Proceeding, except that a Party may seek the written permission of the Designating Party or may move the Court for relief from the provisions of this Stipulation and Protective Order. To the extent permitted by law, the Court shall retain jurisdiction to enforce, modify, or reconsider this Stipulation and Protective Order, even after the Proceeding is terminated.

21. Upon written request made within thirty (30) days after the settlement or other termination of the Proceeding, the undersigned Parties shall have thirty (30) days to either (a) promptly return to counsel for each Designating Party all Confidential Materials and all copies thereof (except that counsel for each Party may maintain in its files, in continuing compliance with the terms of this Stipulation and Protective Order, all work product, and one copy of each pleading filed with the Court [and one copy of each deposition together with the exhibits marked at the deposition)]*, (b) agree with counsel for the Designating Party upon appropriate methods and

certification of destruction or other disposition of such Confidential Materials, or (c) as to any Documents, Testimony or other Information not addressed by sub-paragraphs (a) and (b), file a motion seeking a Court order regarding proper preservation of such Materials. To the extent permitted by law the Court shall retain continuing jurisdiction to review and rule upon the motion referred to in sub-paragraph (c) herein. *[The bracketed portion of this provision shall be subject to agreement between counsel for the Parties in each case.]

22. After this Stipulation and Protective Order has been signed by counsel for all Parties, it shall be presented to the Court for entry. Counsel agree to be bound by the terms set forth herein with regard to any Confidential Materials that have been produced before the Court signs this Stipulation and Protective Order.

23. The Parties and all signatories to the Certification attached hereto as Exhibit A agree to be bound by this Stipulation and Protective Order pending its approval and entry by the Court. In the event that the Court modifies this Stipulation and Protective Order, or in the event that the Court enters a different Protective Order, the Parties agree to be bound by this Stipulation and Protective Order until such time as the Court may enter such a different Order. It is the Parties' intent to be bound by the terms of this Stipulation and Protective Order pending its entry so as to allow for immediate production of Confidential Materials under the terms herein.

This Stipulation and Protective Order may be executed in counterparts.

Dated:

By:______________________________

Attorneys for Plaintiffs

Dated:

By:______________________________

Attorneys for Defendants

**ORDER**

**GOOD CAUSE APPEARING**, the Court hereby approves this Stipulation and Protective Order.

**IT IS SO ORDERED.**

Dated: ________________________ ________________________________________

THE HONORABLE ________________

# EXHIBIT A

## CERTIFICATION RE CONFIDENTIAL DISCOVERY MATERIALS

I hereby acknowledge that I, ________________________________[NAME], ____________________________________________ [POSITION AND EMPLOYER], am about to receive Confidential Materials supplied in connection with the Proceeding, **(INSERT CASE NO.)**. I certify that I understand that the Confidential Materials are provided to me subject to the terms and restrictions of the Stipulation and Protective Order filed in this Proceeding. I have been given a copy of the Stipulation and Protective Order; I have read it, and I agree to be bound by its terms.

I understand that Confidential Materials, as defined in the Stipulation and Protective Order, including any notes or other records that may be made regarding any such materials, shall not be Disclosed to anyone except as expressly permitted by the Stipulation and Protective Order. I will not copy or use, except solely for the purposes of this Proceeding, any Confidential Materials obtained pursuant to this Protective Order, except as provided therein or otherwise ordered by the Court in the Proceeding.

I further understand that I am to retain all copies of all Confidential Materials provided to me in the Proceeding in a secure manner, and that all copies of such Materials are to remain in my personal custody until termination of my participation in this Proceeding, whereupon the copies of such Materials will be returned to counsel who provided me with such Materials.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed this _____ day of ______, 20__, at __________________.

DATED:_________________________ BY: ________________________________

Signature

________________________________

Title

________________________________

Address

________________________________

City, State, Zip

________________________________

Telephone Number

# EXHIBIT E

[redacted]

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Tuesday, November 30, 2021 7:50 PM
**To:** Joseph Mannis <JMannis@HershMannis.com>
**Cc:** Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** RE: Marilyn Wilson Rutherford
**Importance:** High

Hi Joe, yea, as the folks on your side presumably read in the press months ago (and which I think we discussed in passing earlier this year as well), the Beach Boys sold to Iconic (Irving Azoff's company) a 51% interest in all of the group's assets (as opposed to individual assets of the members thereof, e.g., Brian's writer royalties and owned publishing, which is the subject of our other emails, were excluded, as were his solo projects). In general, that sale covered things which did not involve Marilyn (i.e., Brother Records, Inc. Beach Boys assets such as recordings, the trademark, group publicity rights, income from the foregoing, etc.).

However, you are correct that the Iconic sale also includes certain minor publishing assets that involve Marilyn, to wit the sale by Brother Publishing and Wilojarston of the musical composition copyrights owned by those entities. Those are lesser known catalogs (basically songs written from about 1970 to the early 1980s) and not all written by Brian. For your convenience, attached are the catalog lists for Brother Publishing (249 songs, many not written by Brian) and Wilojarston (31 songs, the vast majority not written by Brian). If you peruse those catalog lists, you will see that these are not the major songs (I think the biggest songs in there are "Sail On Sailor" and "Darlin").

That sale was only 51% of the ownership interest/copyright of Brother Publishing and Wilojarston (and 100% of the administration rights) in these musical compositions, the other 49% being retained by those entities (Iconic to account to those entities for that retained share going forward). As part of that, going forward Iconic also assumed the obligation to account and pay writer royalties, which includes writer royalties due to Brian on those of the compositions that he wrote or co-wrote.

As such, the Iconic sale will not impact the writer royalties (generally 50% of 100% of earnings on such compositions) that Brian receives in respect of those of the Brother Publishing and Wilojarston compositions that he wrote. In turn, Brian will continue to account to Marilyn for her 50% share of such songwriter royalties, as has been done in the past, though these songs don't generate that much in royalties per year.

In terms of the share of purchase price attributable to the sale of these Brother Publishing and Wilojarston

musical composition interests, economically what Iconic acquired was the entitlement to retain the 51% of net revenues (after deduction of writer royalties) on such musical compositions. As with the other transaction we have been discussing, for such valuation you look at the net share of earnings acquired by the buyer for such asset applied against the multiple applicable for such assets. The Brother accountants and related representatives came up with the allocations for the various assets sold, in consultation with independent outside tax counsel, the representatives of the shareholders and Iconic, and based on customary multiples applicable to assets of that type (in order to pass muster with the IRS as to treatment of the various asset classes/allocations).

While the Iconic sale closed some time ago, Brother/Wilojarston had not distributed to the shareholders the purchase price proceeds attributable to these publishing assets, despite our protestations that they be released much earlier. The Brother business manager had been reserving against possible tax consequences, and potential impact of certain possible third party interests, which could have affected the net distributions to the shareholders. He finally relented on this issue and was ordered by the shareholders to issue that distribution in late October. As a result, before I got your email, LeeAnn Hard was already in the process of preparing the next statement to Marilyn covering her share of those monies, which will be about $70,000 (i.e., half of the approximately $140,000 distributed to Brian by Brother/Wilojarston in respect of same). That statement and payment will go out this week. Again, those monies represent the value of Marilyn's 50% interest of Brian's ¼ shareholder interest in the 51% interest acquired by Iconic in Brother/Wilojarston's 50% publisher interest in these lesser earning songs.

That's a lot of fractions of fractions, but the basic point is that what was sold is a small piece of minor Beach Boys publishing assets (and not Brian's writer royalties in those songs), when compared against the deal we have on the table with UMPG.

We can provide further detail/documentation to help connect the dots on this valuation and the share of the purchase price attributable to such assets, and the resulting portion distributed to Brian by Brother/Wilojarston. In that regard, we can discuss what makes sense with respect to an NDA (and I will review what you sent) so that we can be as transparent as possible (bearing in mind that such transaction primarily covered assets not relevant to Marilyn and involves the interests of third parties, e.g., Iconic, the other Beach Boys and their entities, and so I have to double check the limits on what we can provide there or who I may need consent from re same). That overall APA is long and convoluted and primarily deals with things other than the Brother Publishing/Wilojarston publishing interests. So I am going to try and see whether there is something that can be carved out that more easily connects the dots for you on the items at issue (I do recall there was a separate assignment exhibit which reflects the publishing interests being transferred, and will look back for that initially).

As before, let us know if you have any questions; we think it makes sense to set a call to discuss the UMPG issues in the next couple of days, so would appreciate if you can advise as to your availability re same.

Best,
Eric

---

**From:** Joseph Mannis <JMannis@HershMannis.com>
**Sent:** Tuesday, November 30, 2021 12:14 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** Marilyn Wilson Rutherford

Dear Eric,

In addition to my letter of November 18 emailed to you, I am now informed that Brother Records was sold some time in the recent past. Per the Judgment, that company was Brian's separate property. However, Brother Publishing was and is community property belonging ½ to each party. Please advise whether or not any portion of Brother Publishing or any of its assets were part of the sale of Brother Records.

Candace has advised that she believes that various publishing rights may have also been sold. Please provide a copy of the sales agreement itself so that we can make our own determination of whether Marilyn's rights were affected by the sale. If you are concerned about confidentiality, we are willing to sign the Court's form protective agreement. I have attached same, from the Court website, for your review. Thank you in advance.

This email was prepared prior to receiving your email of yesterday afternoon, which I will respond to in the near future.

Very truly yours,
JOSEPH MANNIS
Founding Partner
HM HERSH MANNIS

HERSH MANNIS LLP
9150 Wilshire Blvd., Suite 209
Beverly Hills, CA 90212
Phone: 310-786-1910
Fax: 310-786-1917
jmannis@hershmannis.com

*This e-mail message is intended to be a confidential attorney client communication and/or contain confidential work product intended solely for the use of the addressee(s) named above. Email between the attorneys and clients of this firm are intended to be confidential. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please promptly notify the sender by return e-mail.*

*Rules governing our practice before the Internal Revenue Service require that we advise you that any tax advice in this communication (and any attachments) (i) is intended only for the addressee and (ii) is not written with the intent that it be used, and in fact it cannot be used, to avoid penalties imposed under the Internal Revenue Code or to promote, market, or recommend to another person any tax-related idea.*

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

# EXHIBIT F

0.0

[redacted]

**From:** Joseph Mannis
**Sent:** Wednesday, December 15, 2021 3:40 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** James M. Simon <JSimon@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** RE: Brian/Marilyn

Eric,

Given the time crunch, I do not have wire instructions for Marilyn. At present, Universal's check in the amount of $11,022,937 should be made payable to Marilyn S. Wilson-Rutherford (Social Security No. [redacted]) c/o Hersh Mannis LLP, Attention Joseph Mannis, 9150 Wilshire Blvd., Suite 209, Beverly Hills, CA 90212.

Of course, pursuant to previous correspondence, I reserve Marilyn's rights. She is considering your settlement offer of an additional $3,352,439.82, which would bring her total up to $14,375,376.78. We will be back to you hopefully in the near future regarding a settlement of this matter.

Please send us the finalized Universal/PW Acquisition Agreement. I have skimmed the draft Agreement you provided and will read it in more depth tonight. My poor other clients. Again, thanks for your promptly providing me and Candace with the draft agreement.

Very truly yours,
JOSEPH MANNIS
Founding Partner
HM HERSH MANNIS
HERSH MANNIS LLP

9150 Wilshire Blvd., Suite 209
Beverly Hills, CA 90212
Phone: 310-786-1910
Fax: 310-786-1917
jmannis@hershmannis.com

*This e-mail message is intended to be a confidential attorney client communication and/or contain confidential work product intended solely for the use of the addressee(s) named above. Email between the attorneys and clients of this firm are intended to be confidential. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please promptly notify the sender by return e-mail.*

*Rules governing our practice before the Internal Revenue Service require that we advise you that any tax advice in this communication (and any attachments) (i) is intended only for the addressee and (ii) is not written with the intent that it be used, and in fact it cannot be used, to avoid penalties imposed under the Internal Revenue Code or to promote, market, or recommend to another person any tax-related idea.*

---

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 1:35 PM
**To:** Joseph Mannis <JMannis@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** Brian/Marilyn
**Importance:** High

HI guys, so we have the final figures calculated from the underlying source statements (which you can review yourselves to tie out the math).

End result is that net to Marilyn on the writer share sale is: **$11,022,937**

That is arrived at based on gross price for the writer share sale (before the 5% commission) of $33,324,023.50 multiplied by the Marilyn pro rata share of 34.819% (that % is determined based on the pro rata earnings that the community Sea Of Tunes compositions contribute to the overall Sea of Tunes compositions, i.e., accounting for the fact that the first few years of songs were pre marriage and thus separate property as per the APA – that % is calculated in the attached spreadsheet based on data culled from the source BMI and UMPG statements).

After the 5% commission, the numbers are then $31,657,822 x 34.819% = $11,022,937 as noted above. That's the share to Marilyn for the sale of the writer share.

As for the reversions sale, for information purposes and in furtherance of our settlement discussions yesterday, total gross purchase price would be $20,269,293.40 for that interest, so after the 5% commission the net price would be $19,255,829. Again, our view is that per copyright law and the MSA, Marilyn does not share on that, but as we have indicated, to tie off all issues between our clients in regards to the subject of our recent letters (except to your ability to double check to verify that the math indeed connects to the underlying statements), and in view of impending tax increases and that UMPG closes this week, we would be willing to split the difference on the reversions, i.e., share half of the 34.819%, i.e., pay Marilyn 17.41% of the reversions price, to wit an additional $3,352,439.82 (with Brian to retain the balance of the reversions purchase price).

So under that scenario the total to be paid to Marilyn this year would be **$14,375,376.78**.

I realize all of this is short notice and to the extent too much to sort out in a day, we understand. We will be proceeding with sale this week in any event, and to the extent we cannot resolve the reversions on the above basis, then we understand everyone will reserve their arguments to make as to same, including from our side that Marilyn is not entitled to any of that. Given time deadline UMPG has imposed on us to be able to close this year, unless we hear back from you by 3PM today, we will assume this settlement proposal is not acceptable to Marilyn and proceed accordingly. If it is acceptable, we could put together a term sheet and document a more formal agreement next year without the time pressure.

As a formality, this is a confidential settlement communication pursuant to California Evidence Code § 1152, Federal Rule of Evidence 408 and similar laws to that effect. The foregoing is not intended as a complete recitation of all facts or legal theories pertaining to this matter, or of a waiver of any rights or remedies in connection therewith, all of which are specifically reserved. Of course, feel free to contact me if you have any questions.

Best,
Eric

---

**From:** Custer, Eric
**Sent:** Tuesday, December 14, 2021 1:59 PM
**To:** Joseph Mannis <JMannis@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:**

Thanks for the call, sorry had to be rushed as I understand these are consequential issues. If you guys have questions or want to discuss further, I am pretty open after 3:30. If its all a bridge too far with not enough time to deal with the non-writer share loose ends, totally understand that and we can work around it and take those other elements up next year.

Best,
Eric

EXHIBIT G1

**Subject:** Re: [EXTERNAL] Brian/Marilyn
**Date:** Wednesday, December 15, 2021 at 2:53:23 PM Pacific Standard Time
**From:** Custer, Eric
**To:** Joseph Mannis, Candace Carlo

If you guys need an extra few minutes to hour to connect with your client, should be ok, all driven by needing to tell UMPG what to put in re payment para and we have to tell them today.

---

**From:** Joseph Mannis <JMannis@HershMannis.com>
**Sent:** Wednesday, December 15, 2021 2:43:40 PM
**To:** Custer, Eric <ecuster@manatt.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** RE: [EXTERNAL] Brian/Marilyn

**[EXTERNAL] Please do not reply, click links, or open attachments unless you recognize the source of this message and know the content is safe.**

---

Thank you and I will of course treat the documentas confidential but reserve all use should there be any litigation.

---

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 1:47 PM
**To:** Candace Carlo <ccarlo@kleinberglange.com>
**Cc:** Joseph Mannis <JMannis@HershMannis.com>
**Subject:** RE: [EXTERNAL] Brian/Marilyn
Here you go, sent on the condition its treated as confidential information, technically this is not final final, but just a matter of picking nits to generate final, including payment timing, won't be any substantive changes form here as we are out of time.
Best,
Eric

---

**From:** Candace Carlo <ccarlo@kleinberglange.com>
**Sent:** Wednesday, December 15, 2021 1:37 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** 'Joseph Mannis' <JMannis@HershMannis.com>
**Subject:** RE: [EXTERNAL] Brian/Marilyn
Please forward the agreement also. Thank you!

---

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 1:35 PM
**To:** Joseph Mannis <JMannis@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** [EXTERNAL] Brian/Marilyn
**Importance:** High
HI guys, so we have the final figures calculated from the underlying source statements (which you can review yourselves to tie out the math).
End result is that net to Marilyn on the writer share sale is: **$11,022,937**
That is arrived at based on gross price for the writer share sale (before the 5% commission) of $33,324,023.50 multiplied by the Marilyn pro rata share of 34.819% (that % is determined based on the pro rata earnings that the community Sea Of Tunes compositions contribute to the overall Sea of Tunes compositions, i.e., accounting for the fact that the first few years of songs were pre marriage and thus separate property as per the APA – that % is calculated in the attached spreadsheet based on data culled from the source BMI and UMPG statements).

EXHIBIT G2

**Subject:** RE: [EXTERNAL] Brian/Marilyn
**Date:** Wednesday, December 15, 2021 at 1:47:07 PM Pacific Standard Time
**From:** Custer, Eric
**To:** Candace Carlo
**CC:** Joseph Mannis
**Attachments:** Brian Wilson - UMPG - Acquisition Agreement - v8 - REDLINE.pdf

Here you go, sent on the condition its treated as confidential information, technically this is not final final, but just a matter of picking nits to generate final, including payment timing, won't be any substantive changes form here as we are out of time.
Best,
Eric

---

**From:** Candace Carlo <ccarlo@kleinberglange.com>
**Sent:** Wednesday, December 15, 2021 1:37 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** 'Joseph Mannis' <JMannis@HershMannis.com>
**Subject:** RE: [EXTERNAL] Brian/Marilyn
Please forward the agreement also. Thank you!

---

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 1:35 PM
**To:** Joseph Mannis <JMannis@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** [EXTERNAL] Brian/Marilyn
**Importance:** High
HI guys, so we have the final figures calculated from the underlying source statements (which you can review yourselves to tie out the math).
End result is that net to Marilyn on the writer share sale is: **$11,022,937**
That is arrived at based on gross price for the writer share sale (before the 5% commission) of $33,324,023.50 multiplied by the Marilyn pro rata share of 34.819% (that % is determined based on the pro rata earnings that the community Sea Of Tunes compositions contribute to the overall Sea of Tunes compositions, i.e., accounting for the fact that the first few years of songs were pre marriage and thus separate property as per the APA – that % is calculated in the attached spreadsheet based on data culled from the source BMI and UMPG statements).
After the 5% commission, the numbers are then $31,657,822 x 34.819% = $11,022,937 as noted above. That's the share to Marilyn for the sale of the writer share.
As for the reversions sale, for information purposes and in furtherance of our settlement discussions yesterday, total gross purchase price would be $20,269,293.40 for that interest, so after the 5% commission the net price would be $19,255,829. Again, our view is that per copyright law and the MSA, Marilyn does not share on that, but as we have indicated, to tie off all issues between our clients in regards to the subject of our recent letters (except to your ability to double check to verify that the math indeed connects to the underlying statements), and in view of impending tax increases and that UMPG closes this week, we would be willing to split the difference on the reversions, i.e., share half of the 34.819%, i.e., pay Marilyn 17.41% of the reversions price, to wit an additional $3,352,439.82 (with Brian to retain the balance of the reversions purchase price).
So under that scenario the total to be paid to Marilyn this year would be **$14,375,376.78**.
I realize all of this is short notice and to the extent too much to sort out in a day, we understand. We will be proceeding with sale this week in any event, and to the extent we cannot resolve the reversions on the above basis, then we understand everyone will reserve their arguments to make as to same, including from our side that Marilyn is not entitled to any of that. Given time deadline UMPG has imposed on us to be able to close

EXHIBIT G3

**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
**Date:** Wednesday, December 15, 2021 at 5:34:11 PM Pacific Standard Time
**From:** Custer, Eric
**To:** Candace Carlo, Joseph Mannis
**CC:** James M. Simon
**Attachments:** image001.jpg

I see what you are referring to, they are not among the materials sent to me, but ultimately:
1. Ex A is an [redacted]. So yes we need it as it will be attached [redacted].

2. This is the [redacted] Not seeing it among what's been sent to me but your protection is that umpg vetted and you can verify yourself to source statements in due course re your checking our math exercise. We will send you the source statements and will get you this exhibit one I have it. Some of the same info I think is on the spreadsheet I sent you.

Best,
Eric

**From:** Candace Carlo <ccarlo@kleinberglange.com>
**Sent:** Wednesday, December 15, 2021 4:17 PM
**To:** Custer, Eric <ecuster@manatt.com>; 'Joseph Mannis' <JMannis@HershMannis.com>
**Cc:** 'James M. Simon' <JSimon@HershMannis.com>
**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
We would appreciate seeing Exhibits A and J in particular, if you have them. Thanks!

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 4:15 PM
**To:** Candace Carlo <ccarlo@kleinberglange.com>; 'Joseph Mannis' <JMannis@HershMannis.com>
**Cc:** 'James M. Simon' <JSimon@HershMannis.com>
**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
Will hunt for them but not sure I have them, though that should all be pro forma stuff (LODs, songs lists etc.), I only have what Branca has been sending to me and don't remember seeing that in the fusillade of emails, but will look.

**From:** Candace Carlo <ccarlo@kleinberglange.com>
**Sent:** Wednesday, December 15, 2021 4:13 PM
**To:** 'Joseph Mannis' <JMannis@HershMannis.com>; Custer, Eric <ecuster@manatt.com>
**Cc:** 'James M. Simon' <JSimon@HershMannis.com>
**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
Eric, please include the exhibits. Thanks!

**From:** Joseph Mannis <JMannis@HershMannis.com>
**Sent:** Wednesday, December 15, 2021 3:40 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** James M. Simon <JSimon@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** [EXTERNAL] RE: Brian/Marilyn
Eric,

Given the time crunch, I do not have wire instructions for Marilyn. At present, Universal's check in the amount of $11,022,937 should be made payable to Marilyn S. Wilson-Rutherford (Social Security No. [redacted]) c/o Hersh Mannis LLP, Attention Joseph Mannis, 9150 Wilshire Blvd., Suite 209, Beverly Hills, CA 90212. Of course, pursuant to previous correspondence, I reserve Marilyn's rights. She is considering your settlement offer of an additional $3,352,439.82, which would bring her total up to $14,375,376.78. We will be back to you hopefully in the near future regarding a settlement of this matter.

Please send us the finalized Universal/PW Acquisition Agreement. I have skimmed the draft Agreement you provided and will read it in more depth tonight. My poor other clients. Again, thanks for your promptly providing me and Candace with the draft agreement.

Very truly yours,

JOSEPH MANNIS
Founding Partner
HM HERSH MANNIS
HERSH MANNIS LLP
9150 Wilshire Blvd., Suite 209
Beverly Hills, CA 90212
Phone: 310-786-1910
Fax: 310-786-1917
jmannis@hershmannis.com

*This e-mail message is intended to be a confidential attorney client communication and/or contain confidential work product intended solely for the use of the addressee(s) named above. Email between the attorneys and clients of this firm are intended to be confidential. If you are not the intended recipient, or the person responsible to deliver it to the intended recipient, you are hereby advised that any dissemination, distribution or copying of this communication is prohibited. If you have received this e-mail in error, please promptly notify the sender by return e-mail.*

*Rules governing our practice before the Internal Revenue Service require that we advise you that any tax advice in this communication (and any attachments) (i) is intended only for the addressee and (ii) is not written with the intent that it be used, and in fact it cannot be used, to avoid penalties imposed under the Internal Revenue Code or to promote, market, or recommend to another person any tax-related idea.*

---

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 1:35 PM
**To:** Joseph Mannis <JMannis@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** Brian/Marilyn
**Importance:** High

HI guys, so we have the final figures calculated from the underlying source statements (which you can review yourselves to tie out the math).

End result is that net to Marilyn on the writer share sale is: **$11,022,937**

That is arrived at based on gross price for the writer share sale (before the 5% commission) of $33,324,023.50 multiplied by the Marilyn pro rata share of 34.819% (that % is determined based on the pro rata earnings that the community Sea Of Tunes compositions contribute to the overall Sea of Tunes compositions, i.e., accounting for the fact that the first few years of songs were pre marriage and thus separate property as per the APA – that % is calculated in the attached spreadsheet based on data culled from the source BMI and UMPG statements).

After the 5% commission, the numbers are then $31,657,822 x 34.819% = $11,022,937 as noted above. That's the share to Marilyn for the sale of the writer share.

As for the reversions sale, for information purposes and in furtherance of our settlement discussions yesterday, total gross purchase price would be $20,269,293.40 for that interest, so after the 5% commission the net price would be $19,255,829. Again, our view is that per copyright law and the MSA, Marilyn does not share on that, but as we have indicated, to tie off all issues between our clients in regards to the subject of our recent letters (except to your ability to double check to verify that the math indeed connects to the underlying statements), and in view of impending tax increases and that UMPG closes this week, we would

# EXHIBIT G4

**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
**Date:** Wednesday, December 15, 2021 at 4:18:21 PM Pacific Standard Time
**From:** Custer, Eric
**To:** Candace Carlo, Joseph Mannis
**CC:** James M. Simon
**Attachments:** image001.jpg

Checking.

---

**From:** Candace Carlo <ccarlo@kleinberglange.com>
**Sent:** Wednesday, December 15, 2021 4:17 PM
**To:** Custer, Eric <ecuster@manatt.com>; 'Joseph Mannis' <JMannis@HershMannis.com>
**Cc:** 'James M. Simon' <JSimon@HershMannis.com>
**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
We would appreciate seeing Exhibits A and J in particular, if you have them. Thanks!

---

**From:** Custer, Eric <ecuster@manatt.com>
**Sent:** Wednesday, December 15, 2021 4:15 PM
**To:** Candace Carlo <ccarlo@kleinberglange.com>; 'Joseph Mannis' <JMannis@HershMannis.com>
**Cc:** 'James M. Simon' <JSimon@HershMannis.com>
**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
Will hunt for them but not sure I have them, though that should all be pro forma stuff (LODs, songs lists etc.), I only have what Branca has been sending to me and don't remember seeing that in the fusillade of emails, but will look.

---

**From:** Candace Carlo <ccarlo@kleinberglange.com>
**Sent:** Wednesday, December 15, 2021 4:13 PM
**To:** 'Joseph Mannis' <JMannis@HershMannis.com>; Custer, Eric <ecuster@manatt.com>
**Cc:** 'James M. Simon' <JSimon@HershMannis.com>
**Subject:** RE: [EXTERNAL] RE: Brian/Marilyn
Eric, please include the exhibits. Thanks!

---

**From:** Joseph Mannis <JMannis@HershMannis.com>
**Sent:** Wednesday, December 15, 2021 3:40 PM
**To:** Custer, Eric <ecuster@manatt.com>
**Cc:** James M. Simon <JSimon@HershMannis.com>; Candace Carlo <ccarlo@kleinberglange.com>
**Subject:** [EXTERNAL] RE: Brian/Marilyn
Eric,
Given the time crunch, I do not have wire instructions for Marilyn. At present, Universal's check in the amount of $11,022,937 should be made payable to Marilyn S. Wilson-Rutherford (Social Security No. [redacted]) c/o Hersh Mannis LLP, Attention Joseph Mannis, 9150 Wilshire Blvd., Suite 209, Beverly Hills, CA 90212. Of course, pursuant to previous correspondence, I reserve Marilyn's rights. She is considering your settlement offer of an additional $3,352,439.82, which would bring her total up to $14,375,376.78. We will be back to you hopefully in the near future regarding a settlement of this matter.
Please send us the finalized Universal/PW Acquisition Agreement. I have skimmed the draft Agreement you provided and will read it in more depth tonight. My poor other clients. Again, thanks for your promptly providing me and Candace with the draft agreement.
Very truly yours,
JOSEPH MANNIS
Founding Partner
HM HERSH MANNIS

# EXHIBIT H

HM HERSH MANNIS

ATTORNEYS AT LAW

9150 Wilshire Boulevard Suite 209
Beverly Hills, CA 90212
www.hershmannis.com
310.786.1910

**PERSONAL & CONFIDENTIAL**

November 29, 2021
Invoice: 39844

MARILYN WILSON-RUTHERFORD
6236 ROYER AVE.
WOODLAND HILLS, CA 91364

**SERVICES RENDERED THROUGH NOVEMBER 24, 2021**

File Number: 2121-090 - WILSON-RUTHERFORD

| | |
|---|---|
| Total Fees | 5,480.00 |
| Total Fees and Costs Advanced this Period | 5,480.00 |
| Overhead Fee per Retainer | 274.00 |
| Net Charges This Period | 5,754.00 |

PAYMENTS RECEIVED AFTER INVOICE DATE WILL NOT BE REFLECTED ON THIS STATEMENT

HM HERSH MANNIS

Invoice Number 39844
Page 2

RE: 2121-090 - WILSON-RUTHERFORD

## PROFESSIONAL SERVICES

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| | **JOSEPH MANNIS** | | |
| 11/11/21 | Telephone call with John Branca; Correspondence | 0.20 | 180.00 |
| 11/12/21 | Telephone call with Candace Carlo | 0.50 | 450.00 |
| | Review | 0.30 | 270.00 |
| 11/15/21 | Review; Telephone calls with Marilyn (2) | 0.60 | 540.00 |
| 11/16/21 | Telephone call with [redacted] | 0.20 | 180.00 |
| | Review Judgment; Draft, review and revise letter to Eric | 1.60 | 1,440.00 |
| 11/17/21 | Telephone call with Jim Simon; Review and revise letter; Correspondence | 0.50 | 450.00 |
| 11/18/21 | Correspondence; Instructions to Cindy Payton | 0.20 | 180.00 |
| 11/19/21 | Instructions to Cindy Payton | 0.20 | 180.00 |
| 11/22/21 | Correspondence | 0.50 | 450.00 |
| | **TOTAL FOR JOSEPH MANNIS** | **4.80** | **$4,320.00** |
| | **JAMES M. SIMON** | | |
| 11/16/21 | Review and revise letter re [redacted] and email Mannis | 1.20 | 930.00 |
| | **TOTAL FOR JAMES M. SIMON** | **1.20** | **$930.00** |
| | **ANDREW M. STEIN** | | |
| | Telephone call from lawyer re [redacted]; Research and prepare insert [redacted] | 0.40 | 230.00 |
| | **TOTAL FOR ANDREW M. STEIN** | **0.40** | **$230.00** |

## STAFF SUBTOTALS

| | | | |
|---|---|---|---|
| Joseph Mannis | 4.8 hrs | @ 900.00 | 4,320.00 |
| James M. Simon | 1.2 hrs | @ 775.00 | 930.00 |
| Andrew M. Stein | 0.4 hrs | @ 575.00 | 230.00 |
| **TOTAL PROFESSIONAL SERVICES** | **6.40** | | **$5,480.00** |

**TOTAL NEW CHARGES** **$5,480.00**

OVERHEAD FEE PER RETAINER $274.00

**NET CHARGES THIS PERIOD** **$5,754.00**

**TOTAL BALANCE DUE **PLEASE PAY THIS AMOUNT**** **$5,754.00**

HERSH MANNIS

**Invoice Number** **39844**
**Page** **3**

RE: 2121-090 - WILSON-RUTHERFORD

PAYMENTS CAN BE MADE DIRECTLY THROUGH OUR WEBSITE: https://secure.lawpay.com/pages/hershmannis/operating

HERSH MANNIS

ATTORNEYS AT LAW

9150 Wilshire Boulevard Suite 209
Beverly Hills, CA 90212
www.hershmannis.com
310.786.1910

**PERSONAL & CONFIDENTIAL**

December 28, 2021
Invoice: 39958

MARILYN WILSON-RUTHERFORD
6236 ROYER AVE.
WOODLAND HILLS, CA 91364

**SERVICES RENDERED THROUGH DECEMBER 27, 2021**

File Number: 2121-090 - WILSON-RUTHERFORD

| | |
|---|---|
| Total Fees | 31,007.50 |
| Courtesy Discount | -7,000.00 |
| Total Fees and Costs Advanced this Period | 24,007.50 |
| Overhead Fee per Retainer | 1,200.38 |
| Net Charges This Period | 25,207.88 |
| Outstanding Balance from Prior Period | 5,754.00 |
| Payments Received | -1,000.00 |
| **Total Balance Due** | **29,961.88** |

PAYMENTS RECEIVED AFTER INVOICE DATE WILL NOT BE REFLECTED ON THIS STATEMENT

HM HERSH MANNIS



RE: 2121-090 - WILSON-RUTHERFORD

**PROFESSIONAL SERVICES**

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| | **JOSEPH MANNIS** | | |
| 11/29/21 | Correspondence; Instructions to Cindy | 0.40 | 360.00 |
| 11/30/21 | Correspondence; Review | 1.00 | 900.00 |
| 12/01/21 | Telephone call with Candace Carlo; Telephone call with Andrew Stein | 0.40 | 360.00 |
| 12/06/21 | Review; Instructions to Cindy Payton | 0.20 | 180.00 |
| 12/07/21 | Correspondence | 0.20 | 180.00 |
| | Correspondence; Telephone call with Marilyn | 0.60 | 540.00 |
| 12/08/21 | Dictate | 1.00 | 900.00 |
| 12/09/21 | Telephone call with Jim Simon | 0.30 | 270.00 |
| | Dictate; Review and revise; Telephone call with Jim Simon; Telephone call with John Branca; Telephone call with Marilyn | 0.80 | 720.00 |
| 12/10/21 | Telephone call with John Branca; Correspondence | 0.50 | 450.00 |
| 12/13/21 | Review and revise RFO for accounting | 0.60 | 540.00 |
| | Telephone call with Marilyn; Telephone call with Branca | 0.70 | 630.00 |
| | Correspondence | 0.40 | 360.00 |
| 12/14/21 | Telephone calls with Jim Simon (2); Telephone call with Andrew Stein | 0.40 | 360.00 |
| | Instructions to Cindy Payton | 0.20 | 180.00 |
| | Correspondence | 0.20 | 180.00 |
| | Conference with Cindy Payton, etc. | 0.20 | 180.00 |
| | Telephone call with Eric Custer and Candace Carlo; Telephone call with Marilyn Wilson | 1.00 | 900.00 |
| 12/15/21 | Prepare | 0.50 | 450.00 |
| | Telephone call with [redacted] | 1.10 | 990.00 |
| | Correspondence; Review [redacted]; Telephone call with Marilyn; Telephone call with Candace Carlo, etc. | 2.80 | 2,520.00 |
| | Telephone call with Candace Carlo | 0.30 | 270.00 |
| 12/16/21 | Correspondence; Telephone call with Jim Simon; Telephone call with John Branca | 1.00 | 900.00 |
| | Review [redacted] | 0.20 | 180.00 |
| 12/17/21 | Correspondence | 0.20 | 180.00 |
| 12/20/21 | Telephone call with Marilyn | 0.50 | 450.00 |
| 12/21/21 | Review; Telephone call with [redacted] | 0.30 | 270.00 |
| 12/22/21 | Correspondence | 0.20 | 180.00 |
| | Telephone call with Marilyn; Telephone call with [redacted] | 0.60 | 540.00 |
| 12/23/21 | Correspondence | 0.40 | 360.00 |
| | Telephone call with accountants re [redacted], [redacted] | 0.50 | 450.00 |
| | Correspondence | 0.20 | 180.00 |

HM HERSH MANNIS



RE: 2121-090 - WILSON-RUTHERFORD

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| 12/24/21 | Telephone calls with Marilyn (several) | 0.50 | 450.00 |
| 12/27/21 | Correspondence; Instructions to Cindy Payton | 0.30 | 270.00 |
| | **TOTAL FOR JOSEPH MANNIS** | **18.70** | **$16,830.00** |
| | **JAMES M. SIMON** | | |
| 12/08/21 | Email Mannis re [redacted] | 0.40 | 310.00 |
| | Review draft of RFO for an accounting | 0.50 | 387.50 |
| 12/09/21 | Telephone call with Mannis re [redacted] | 0.20 | 155.00 |
| 12/14/21 | Telephone call with Mannis and Payton re [redacted] | 0.20 | 155.00 |
| | Conference call Mannis and Stein re [redacted] | 0.20 | 155.00 |
| 12/15/21 | Conference call re [redacted] | 1.20 | 930.00 |
| 12/16/21 | Telephone call with Mannis re [redacted] | 0.40 | 310.00 |
| | Memo re [redacted] | 0.80 | 620.00 |
| | **TOTAL FOR JAMES M. SIMON** | **3.90** | **$3,022.50** |
| | **ANDREW M. STEIN** | | |
| 12/01/21 | Complete review of [redacted] | 2.30 | 1,322.50 |
| | Further time re [redacted] [NO CHARGE] | 0.20 | N/C |
| 12/02/21 | Review Prepare for call to Candance Carlo; Related E-mails and call [NO CHARGE] | 0.20 | N/C |
| | Leave voicemail for Candace; Brief return call from her re [redacted] | 0.20 | 115.00 |
| 12/03/21 | Work on accounting RFO (preparing of part of P's & A's re [redacted]) | 3.90 | 2,242.50 |
| | Further time re accounting RFO [NO CHARGE] | 0.40 | N/C |
| | Telephone call to Candace re [redacted] | 0.40 | 230.00 |
| 12/06/21 | Further work on accounting RFO, focusing on research re [redacted] | 2.60 | 1,495.00 |
| 12/07/21 | Further work on accounting RFO, through completion of rough draft of points and authorities | 4.20 | 2,415.00 |
| 12/08/21 | Complete draft of P's and A's and three declarations for accounting RFO; Revise | 3.30 | 1,897.50 |
| | Further work re RFO [NO CHARGE] | 0.20 | N/C |
| | Read Joe's draft E-mail and draft letter to Custer; Respond; Read [redacted] | 0.20 | 115.00 |
| | Telephone call from lawyer re [redacted] | 0.20 | 115.00 |
| 12/09/21 | Review revised letter re accounting; Comment | 0.20 | 115.00 |

HERSH MANNIS



RE: 2121-090 - WILSON-RUTHERFORD

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| 12/13/21 | Read and comment on proposed E-mail to Custer | 0.20 | 115.00 |
| 12/14/21 | Conference call with lawyers re [redacted] | 0.20 | 115.00 |
| 12/15/21 | Participate in Zoom call with client and lawyers re [redacted] | 1.10 | 632.50 |
| | Read Custer E-mails re proposed sale and re proposed deal with Marilyn | 0.20 | 115.00 |
| 12/16/21 | Read Jim's memo on [redacted] | 0.20 | 115.00 |
| | **TOTAL FOR ANDREW M. STEIN** | **20.40** | **$11,155.00** |

**STAFF SUBTOTALS**

| | | | | |
|---|---|---|---|---|
| Joseph Mannis | 18.7 hrs | @ | 900.00 | 16,830.00 |
| James M. Simon | 3.9 hrs | @ | 775.00 | 3,022.50 |
| Andrew M. Stein | 19.4 hrs | @ | 575.00 | 11,155.00 |
| Andrew M. Stein | 1 hrs | @ | 0.00 | N/C |
| **TOTAL PROFESSIONAL SERVICES** | **43.00** | | | **$31,007.50** |

| | |
|---|---|
| **TOTAL NEW CHARGES** | **$31,007.50** |
| COURTESY DISCOUNT | -$7,000.00 |
| OVERHEAD FEE PER RETAINER | $1,200.38 |
| **NET CHARGES THIS PERIOD** | **$25,207.88** |
| **BALANCE FORWARD** | **$5,754.00** |

**PAYMENTS & CREDITS**

| | | |
|---|---|---|
| 12/14/21 | Payment - Thank you, Check # 38123023 | -$1,000.00 |
| | **TOTAL PAYMENTS & CREDITS** | **-$1,000.00** |

| | |
|---|---|
| **UNPAID BALANCE FORWARD** | **$4,754.00** |
| **TOTAL BALANCE DUE **PLEASE PAY THIS AMOUNT**** | **$29,961.88** |

HERSH MANNIS

**Invoice Number** **39958**
**Page** **5**

RE: 2121-090 - WILSON-RUTHERFORD

PAYMENTS CAN BE MADE DIRECTLY THROUGH OUR WEBSITE: https://secure.lawpay.com/pages/hershmannis/operating

HM HERSH MANNIS

ATTORNEYS AT LAW

9150 Wilshire Boulevard Suite 209
Beverly Hills, CA 90212
www.hershmannis.com
310.786.1910

**PERSONAL & CONFIDENTIAL**

January 26, 2022
Invoice: 40073

MARILYN WILSON-RUTHERFORD
6236 ROYER AVE.
WOODLAND HILLS, CA 91364

**SERVICES RENDERED THROUGH JANUARY 25, 2022**

File Number: 2121-090 - WILSON-RUTHERFORD

| | |
|---|---|
| Total Fees | 21,393.00 |
| Courtesy Discount | -5,000.00 |
| Client Costs Advanced | 61.82 |
| Total Fees and Costs Advanced this Period | 16,454.82 |
| Overhead Fee per Retainer | 819.65 |
| Net Charges This Period | 17,274.47 |
| Outstanding Balance from Prior Period | 29,961.88 |
| Payments Received | -29,961.88 |
| Retainer Applied | -17,274.47 |
| **Total Balance Due** | **0.00** |

PAYMENTS RECEIVED AFTER INVOICE DATE WILL NOT BE REFLECTED ON THIS STATEMENT

**Retainer Account**

| Date | Transaction | Deposits | Payments | Balance |
|---|---|---|---|---|
| 01/06/2022 | Payment Received from: Marilyn Wilson-Rutherford Check #: XFER Wilson \| Balance of retainer for xfer to Retainer acct | $45,038.12 | $0.00 | $45,038.12 |
| 01/26/2022 | Retainer applied to Invoice #40073 | | $17,274.47 | $27,763.65 |

HM HERSH MANNIS

Invoice Number 40073
Page 2

RE: 2121-090 - WILSON-RUTHERFORD

## PROFESSIONAL SERVICES

| DATE | DESCRIPTION | HOURS | AMOUNT |
|---|---|---|---|
| | **JOSEPH MANNIS** | | |
| 12/28/21 | Telephone call with [redacted] re [redacted] | 1.00 | 900.00 |
| 12/30/21 | Telephone call with [redacted] Telephone call with Marilyn | 0.80 | 720.00 |
| 01/03/22 | Correspondence; Instructions to Cindy Payton | 0.20 | 185.00 |
| 01/04/22 | Review [redacted] | 1.00 | 925.00 |
| 01/05/22 | Telephone call with [redacted]; Correspondence | 0.60 | 555.00 |
| 01/06/22 | Telephone call with Andrew Stein; Correspondence | 0.40 | 370.00 |
| 01/07/22 | Review estate issues; Correspondence; Instructions to Cindy Payton | 1.00 | 925.00 |
| | Telephone call with Andrew Stein re [redacted] | 0.40 | 370.00 |
| 01/10/22 | Correspondence | 0.20 | 185.00 |
| 01/11/22 | Correspondence; Review | 0.50 | 462.50 |
| | Review Points and Authorities; Telephone call with Marilyn | 1.00 | 925.00 |
| 01/12/22 | Correspondence | 0.20 | 185.00 |
| 01/13/22 | Correspondence; Conference with Neal Hersh; Telephone call with [redacted]; Telephone call with client; Instructions to Andrew Stein | 1.20 | 1,110.00 |
| 01/17/22 | Review; Correspondence | 1.00 | 925.00 |
| 01/18/22 | Telephone calls with Marilyn (3) | 0.30 | 277.50 |
| | Review and revise Points and Authorities; Conference with Jim Simon; Telephone call with Andrew Stein; Review | 1.90 | 1,757.50 |
| 01/19/22 | Correspondence | 0.20 | 185.00 |
| 01/20/22 | Telephone call with Andrew Stein re [redacted]; Correspondence | 0.30 | 277.50 |
| | Telephone conference with [redacted] re [redacted] [NO CHARGE] | 1.00 | N/C |
| | Conference with Marilyn re [redacted] | 0.30 | 277.50 |
| | Telephone call with [redacted] | 0.20 | 185.00 |
| 01/21/22 | Telephone call with Merrill Lynch | 0.30 | 277.50 |
| | Telephone call with Marilyn re [redacted]; Correspondence [NO CHARGE] | 0.20 | N/C |
| 01/24/22 | Correspondence | 0.20 | 185.00 |
| 01/25/22 | Correspondence; Telephone call with [redacted] | 0.50 | 462.50 |
| | **TOTAL FOR JOSEPH MANNIS** | **14.90** | **$12,627.50** |
| | **JAMES M. SIMON** | | |
| 01/10/22 | Pull [redacted] | 0.30 | 232.50 |
| 01/18/22 | Review and revise email re [redacted] | 0.40 | 310.00 |
| | Conference with Mannis re [redacted] | 0.40 | 310.00 |
| 01/19/22 | Emails Mannis re [redacted] | 0.30 | 232.50 |

HERSH MANNIS

Invoice Number 40073
Page 3

RE: 2121-090 - WILSON-RUTHERFORD

| | | | | |
|---|---|---|---|---|
| | **TOTAL FOR JAMES M. SIMON** | | **1.40** | **$1,085.00** |
| | **ANDREW M. STEIN** | | | |
| 01/06/22 | Telephone call from lawyer re [redacted] | | 0.20 | 119.00 |
| | Update accounting RFO [redacted]; Revise [redacted] | | 1.40 | 833.00 |
| | Telephone call to secretary re [redacted] | | 0.30 | 178.50 |
| 01/07/22 | Telephone call from lawyer re [redacted] | | 0.20 | 119.00 |
| 01/10/22 | Telephone call from paralegal re [redacted] | | 0.20 | 119.00 |
| 01/10/22 | Revise RFO [redacted] and prepare Judicial Council forms | | 4.50 | 2,677.50 |
| 01/11/22 | Review and revise complete draft of accounting RFO [redacted] and [redacted] E-mail memo | | 0.40 | 238.00 |
| 01/13/22 | Telephone call from lawyer re [redacted]; Prepare E-mail and send documents | | 0.20 | 119.00 |
| 01/18/22 | Read draft E-mail to opposing counsel; Comment; Call from lawyer re [redacted] | | 0.20 | 119.00 |
| | Telephone call from lawyer re [redacted] | | 0.50 | 297.50 |
| | Update RFO based on instructions from lawyer; Related research and E-mail | | 1.60 | 952.00 |
| 01/19/22 | Follow-up re RFO re accounting and fees, including review of redline and preparing of E-mail memo | | 0.20 | 119.00 |
| 01/20/22 | Telephone call to lawyer re [redacted]; Related E-mail to [redacted] lawyer | | 0.20 | 119.00 |
| | Telephone call to [redacted] lawyer re [redacted]; Brief related research | | 0.30 | 178.50 |
| | Research re [redacted] and supplement P's & A's for RFO re accounting and fees; Revise P's & A's to fit within 15 pages; Prepare related E-mail memo | | 1.70 | 1,011.50 |
| | **TOTAL FOR ANDREW M. STEIN** | | **12.10** | **$7,199.50** |
| | **MAX E. GOOSSEN** | | | |
| 01/18/22 | Work on going through all of our files to find [redacted] | | 1.10 | 324.50 |
| 01/19/22 | Email attorney serve re [redacted] | | 0.20 | 59.00 |
| | **TOTAL FOR MAX E. GOOSSEN** | | **1.30** | **$383.50** |
| | **IRIS F. GOLDMAN** | | | |
| 01/10/22 | Review email from A. Stein; Redact statements from March 2021 to current; Telephone calls to A. Stein re same | | 0.50 | 97.50 |
| | **TOTAL FOR IRIS F. GOLDMAN** | | **0.50** | **$97.50** |

HERSH MANNIS



RE: 2121-090 - WILSON-RUTHERFORD

**STAFF SUBTOTALS**

| | | | | |
|---|---|---|---|---|
| Joseph Mannis | 11.9 hrs | @ | 925.00 | 11,007.50 |
| Joseph Mannis | 1.8 hrs | @ | 900.00 | 1,620.00 |
| Joseph Mannis | 1.2 hrs | @ | 0.00 | N/C |
| James M. Simon | 1.4 hrs | @ | 775.00 | 1,085.00 |
| Andrew M. Stein | 12.1 hrs | @ | 595.00 | 7,199.50 |
| Max E. Goossen | 1.3 hrs | @ | 295.00 | 383.50 |
| Iris F. Goldman | 0.5 hrs | @ | 195.00 | 97.50 |
| **TOTAL PROFESSIONAL SERVICES** | **30.20** | | | **$21,393.00** |

**COSTS ADVANCED**

| | | |
|---|---|---|
| 01/06/22 | Federal Express #[redacted] | 61.82 |
| | **TOTAL COSTS ADVANCED** | **$61.82** |

| | |
|---|---|
| **TOTAL NEW CHARGES** | **$21,454.82** |
| COURTESY DISCOUNT | -$5,000.00 |
| OVERHEAD FEE PER RETAINER | $819.65 |
| **NET CHARGES THIS PERIOD** | **$17,274.47** |
| **BALANCE FORWARD** | **$29,961.88** |

**PAYMENTS & CREDITS**

| | | |
|---|---|---|
| 01/05/22 | Payment - Thank you, Check # 1204 | -$29,961.88 |
| | **TOTAL PAYMENTS & CREDITS** | **-$29,961.88** |

| | | |
|---|---|---|
| 01/26/22 | Payment - Retainer Account | -$17,274.47 |
| **UNPAID BALANCE FORWARD** | | **$0.00** |

| | |
|---|---|
| **TOTAL BALANCE DUE **PLEASE PAY THIS AMOUNT**** | **$0.00** |

HERSH MANNIS



RE: 2121-090 - WILSON-RUTHERFORD

PAYMENTS CAN BE MADE DIRECTLY THROUGH OUR WEBSITE: https://secure.lawpay.com/pages/hershmannis/operating

# EXHIBIT I

# JOHN BRANCA

[illegible]

Brooklyn Dodgers and was a teammate and lifelong friend of Jackie Robinson.) John's mother, dancer/singer/actress Barbara Werle, whose credits include two Elvis Presley movies, had relocated to L.A. when John was four after she and John's father divorced. John joined his mother on the west coast when he turned 11.

He started his first band at 13, playing keyboards and guitar and writing songs. This was two years after arriving in L.A. from Mt. Vernon, N.Y., where he'd been living with his father and buying a 7-inch 45 rpm record every Saturday with his weekly allowance.

When he was 16, John's band scored a record deal – the act's profile had been raised by gigs opening for the Doors, including a show at the famed Whisky a Go Go. His studies suffered, however, and when the band failed to catch fire, his mother insisted he either commit to high school or get a job. He chose the former but later opted for a third route.

As recounted by Southern California Super Lawyers in 2006: "One day Branca marched into the principal's office and announced, 'I'm done.' And, amazingly, the principal let him go and let him graduate. 'It was perhaps an indication of early negotiating skills,' Branca says, 'since I accurately read the principal's capacity for aggravation (limited) and real motivation, for tuition."

The barrister-to-be then enrolled in Los Angeles City College, where he majored in music but determined that, as he put it, "I had inherited my mother's athletic ability and my father's musical skills." So he transferred to Occidental College, graduating cum laude and with honors, earning a degree in political science, then entered UCLA School of Law. He was editor-in-chief of one of the law reviews there and earned his J.D. in 1975.

Branca actually began his career in estate law, the legal field having become a viable career option after rock stardom didn't pan out. Estate planning (with the firm Kindel & Anderson) gave way to entertainment law after Branca experienced a lightbulb moment while reading an article in Time Magazine about Elton John that highlighted the star's representation in legal negotiations. (Branca would later represent John and, among other things, handle John's agreement to write music for "The Lion King.")

By the age of 27, Branca had joined the firm of Hardee Barovick Konecky and begun negotiating tours, with Bob Dylan, the Beach Boys, George Harrison and Neil Diamond among his first artist clients.

Touring would also be the setting for one of Branca's most notable innovations. When the Rolling Stones were preparing their 1989 "Steel Wheels" tour, Branca gave control of sponsorships, venues, ticket sales and merchandise to a single concert promoter, departing from the tradition of local promoters handling each city. This would make the tour significantly easier to organize, which meant venues could be determined earlier and tickets sold sooner. This scheme has since become the model for major concert tours.

In 1980, Branca found himself working on the Michael Jackson account. He and the artist had an immediate rapport, with Jackson even wondering if they'd met before.

Calling Branca one of his "closest and most valued advisors," Jackson recounts in "Moonwalk": "John had been working with me ever since the Off the Wall days; in fact, he even helped me out by donning many hats and functioning in several capacities when I had no manager after Thriller was released. He's one of those extremely talented, capable men who can do anything." When Branca married his first wife, Jackson was his best man. (Little Richard officiated; David Lee Roth threw the bachelor party.)

In 1981, Branca joined Ziffren Brittenham, where he continued his association with the King of Pop and maintained relationships with record labels, publishing companies and music executives. He made headlines when he sold Berry Gordy's Jobete music publishing company (the "Motown catalog") for a record breaking valuation multiple. He made further headlines when he sold the Leiber & Stoller catalog for yet another valuation record, and also the Rodgers & Hammerstein Organization. He likewise gained recognition for advising both Matsushita and Vivendi on the acquisition of Universal Music. He has advised numerous independent labels, including Death Row Records, Rhino Records, and the groundbreaking Interscope Records which he represented during its formation and subsequent very lucrative sale. In addition, he guided Carlos Santana to reunite with Clive Davis leading to the "Supernatural" album which sold in excess of 25 million copies worldwide, and is the only album along with "Thriller" to garner eight Grammy awards. During this period, Branca and his firm also represented such mega-selling acts as the Backstreet Boys, Celine Dion, TLC, and Usher, among others, and established a trend of mega artist deals for clients including Michael Jackson, Aerosmith, the Rolling Stones, ZZ Top, and Don Henley, among others.

Branca has represented notable music industry investors including Richard Branson, Ron Perelman (MacAndrews & Forbes), Apollo Advisors, Boston Ventures, Vivendi, Matsushita, JVC, Marvin Davis, Walt Disney, Inc, Dick Clark Productions, Safeguard Scientifics, Authentic Brands Groups, and others. Recently, Branca completed a record distribution deal for the Bee Gees catalog with Capitol, secured a publishing-administration deal for Barry Gibb and produced a prime-time special Grammy tribute to the Bee Gees. Additionally he has negotiated various signature agreements for Enrique Iglesias, Lil Pump and the Elvis Presley estate.

Branca's career has not been strictly about dealmaking, however. He is chairman emeritus of MusiCares, the Recording Academy charity whose mission is to provide "a safety net of critical assistance for music people in times of need." Billboard related in 2016: "Branca cites the organization's largest undertaking as the most inspiring: 'During Hurricane Katrina, musicians in New Orleans lost their instruments and the ability to make a living.' MusiCares immediately pledged $1 million in aid for Katrina and, as [Recording Academy president Neil] Portnow proudly notes, 'We were there before FEMA.'"

Branca has also been involved in MusiCares because it is a source of help and hope for musicians struggling with substance abuse. In 1992, he was instrumental in the formation of the Musicians' Assistance Program, which was acquired by MusiCares in 2004. He's on the Board of Trustees of Occidental College and the Board of the UCLA Law School Ziffren Center for Media, Entertainment, Technology and Sports Law, and he's acted as a fundraiser for UCLA Athletics. He recently joined the Board of the Jackie Robinson Foundation, the UCLA Herb Alpert School of Music and the Grammy Museum.

But Branca has served artists throughout his career primarily by making them money, in some cases as an expert on copyright law and royalty recovery – helping Don Henley regain ownership of his Eagles copyrights, John Fogerty attain a royalty on Creedence Clearwater Revival, and the Beach Boys and the Doors obtain increases on catalog royalties – but mostly, as legendary Motown Records founder Berry Gordy called him, "the Smokey Robinson of dealmaking."

Even so, as he told the L.A. Business Journal in 2017: "For somebody who is interested first and foremost in making money … you would probably go up to Silicon Valley. But for me, my motivation is that I love music … Growing up, if you had told me I could represent … Brian Wilson, Mick Jagger and Michael Jackson, I would have said, how much do I have to pay to do that? To even meet [them] would have been enough."

READ LESS -

## AREAS OF SPECIALTY

- Artist Representation
- Artist Re-Branding
- Asset Acquisitions and Sales
- Corporate Investment Strategies
- Estate Representation
- Live Performance and Touring
- Music Publishing
- Royalty Recovery and Copyright Law

## EDUCATION

- AA in Philosophy, Los Angeles City College 1970
- AB Political Science, Occidental College, Cum Laude with honors 1972
- JD UCLA School of Law, 1975

## AWARDS & ACCOLADES

(Partial List)

Martindale-Hubbell AV Preeminent Rating

Best Lawyers in America (every edition 1987-2018)

Lawyers.com Best Lawyers in America in the practice areas of Entertainment Law – Motion Pictures and Television and Entertainment Law- Music

Best Lawyers in the World

Billboard Magazine Top Lawyers List

Hollywood Reporter Power Lawyers List

Variety Magazine Power List

LA Business Journal Los Angeles 500: LA's Most Influential People

Alumnus of the Year UCLA Law School

Alumnus of the Year Occidental College

Alumnus of the Year Los Angeles City College

American Lawyer Magazine Lawyer of the Year

Billboard Magazine Lawyer of the Year

Grammy Foundation Entertainment Law Initiative Service Award

Musician's Assistant Program Honoree of the Year

Marquis Who's Who #1 Music Attorney in the World

Who's Who in America

Who's Who in the World

Who's Who in Business

Who's Who in Entertainment

Who's Who in Law

Billboard Magazine Touring, Conference & Awards Creative Content Award for Michael Jackson THE IMMORTAL World Tour

Albert Nelson Marquis Lifetime Achievement Award

Expert Guides List Leading Lawyers

Acquisition International List Leading Corporate Entertainment Lawyers

Southern California Super Lawyers List

Editor-in-Chief, UCLA – Alaska Law Review

American Jurisprudence Award (Estate Planning)

Lawdragon Hall of Fame – 500 Leading Lawyers in America

## COMMUNITY INVOLVEMENT

(Partial List)

Grammy Museum Board of Trustees

Occidental College Board of Trustees

Ziffren Center at UCLA Law School Advisory Board

Chair Emeritus of MusicCares and Chairman of the Capital Campaign

Occidental College Obama Scholars Advisory Council

Musicians Assistance Program founding member

UCLA/Pauley Pavilion Renovation Campaign Committee

Guest lecturer Stanford University, UCLA Law School, USC Law School, Occidental College, Los Angeles City College among others

Board of Directors, The Jackie Robinson Foundation

Board of Directors, UCLA Herb AlpertSchool of Music

**Charities Mr. Branca and His Firm Supports**

(Partial List)

ACLU

The Anti-Defamation League

Brady Center to Prevent Gun Violence

Campbell Hall School

Church of the Good Shepherd

City of Hope

Club 42 – an integrated youth baseball league

Conservation International

Environmental Defense Fulfillment Fund

Grammy Museum

Habitat for Humanity

HELP Group

Last Chance for Animals

Los Angeles City College

L.A. Free Clinic

Milagro Foundation

MusiCares

Musicians Assistance Program

The National Resources Defense Council

Neil Bogart Memorial Foundation

Occidental College

Professional Baseball Scouts Foundation

Rape Foundation

Semper Fi

Sierra Canyon

St. Catherine of Siena Catholic Church

TJ Martell Foundation

UCLA Foundation

UCLA Law School

UCLA Pauley Pavilion Renovation Campaign

UCLA Law School Ziffren Center

## CREATIVE AND PRODUCTION

Co-Manager of the Beach Boys 50th Anniversary Reunion Tour.

Executive Producer of *Michael Jackson's This is It*, the most successful concert film in history.

Executive Producer of Cirque Du Soleil's Michael Jackson IMMORTAL World Tour, the #1 grossing tour in North America, 2011-2012.

Executive Producer Michael Jackson ONE, a permanent show at Las Vegas' Mandalay Bay

Executive Producer Michael Jackson's Halloween, a CBS animated special

Executive Producer Michael Jackson's Journey from Motown to Off the Wall

Executive Producer Michael Jackson's BAD 25

President of Optimum Productions and producer of Thriller 3D, which premiered at the Venice and Toronto Film Festivals.

Producer, Michael Jackson Live at Wembley

Producer, The Making of Michael Jackson's Thriller

Producer, The Doors: When You're Strange

Producer, Michael Jackson: From Motown to Your Town

Producer, The Doors: Live at the Hollywood Bowl

Producer, The Doors: Dance on Fire

Producer, Metropolis (1984 restoration)

## PRESERVING THE LEGACY OF MICHAEL JACKSON

Following in Michael's footsteps, the co-executors of the Estate of Michael Jackson, John Branca and John McClain, continue to produce artistically exceptional and enormously successful ventures resulting in, as reported on 60 Minutes, "the most remarkable financial and image resurrection in pop-culture history."

Upon release, **Michael Jackson's This is It** became the highest grossing music documentary of all time. In 2010, Branca negotiated a Sony recording deal which is credited as the largest record deal in history, involving the release of 10 CDs over time, some of which will contain previously unreleased recordings as well as reissues. The agreement was extended in 2018 as The Estate and Sony find new and innovative ways to Make Michael's music available to future generations of fans.

A history making touring show produced in partnership with Cirque du Soleil, **Michael Jackson THE IMMORTAL World Tour**, played four continents, 157 cities, was seen by 3.7 million fans and became the #8 top grossing tour of all time. The second venture between the Estate and Cirque du Soleil, the critically acclaimed **Michael Jackson ONE**, a permanent show at Mandalay Bay Las Vegas, gave Cirque its biggest opening ever in Las Vegas and continues to be one of the top shows in the city.

In 2014, The Estate astounded the world with the technical wizardry of a 'virtual Michael Jackson' performance during the Billboard Music Awards, which gave the show its biggest ratings in years and became the topic of conversation worldwide. That same year, **Xscape**, the second posthumous release of previously unreleased music by Michael Jackson, was released and became one of the top selling albums of 2014. In 2015, **Thriller** became the first album in RIAA Gold & Platinum Program history to be certified 30X multi-Platinum for U.S. sales, continuing The King of Pop's reign as the biggest selling artist of all time with worldwide sales of over 103 million for Thriller and 1 billion overall.

In 2016, the Estate released the documentary **MICHAEL JACKSON's Journey From Motown To Off The Wall**, directed by Spike Lee. The documentary made its world premiere at the Sundance Film Festival on January 24, 2016, and its subsequent broadcast on SHOWTIME® became the channel's highest rated music documentary of all time and its second highest rated documentary ever. Last year the Estate premiered **Thriller 3D** at the Venice Film Festival and the Toronto Film Festival and in October its animated special **Michael Jackson's Halloween** made its debut on the CBS Television Network.

READ LESS -

## PERSONAL

John's mother was Barbara Werle, a Harvest Moon Ball winner who danced on the Ed Sullivan Show.

John's father, the Honorable John R Branca, served as the Mt. Vernon, NY Recreation Commissioner. He was a New York State Assemblyman from 1980-1984, and thereafter Chairman of the New York State Athletic Commission. A star pitcher for AB Davis High School in Mt. Vernon, he was undefeated during his high school varsity career and pitched two no-hitters. In his senior year, he was named the New York State Player of the Year, and lead AB Davis to the New York State Championship at Mt. Vernon Edison High School. As Recreation Commissioner, his recreation programs, and his programs specially designed for the handicapped, the disabled, and the elderly, were innovative and were cited by President Kennedy as a model for other communities. As New York State Athletic Commissioner, he brought championship boxing back to Madison Square Garden and instituted national reforms.

John's uncle, baseball great Ralph Branca, was a 3-time All Star starting pitcher for the Brooklyn dodgers and pitched in two World Series. He was a team mate and close friend of Jackie Robinson, and stood up for Robinson when he first joined the team. Branca appeared in the film "42" and serviced as an advisor.

John is the father of Jessica Branca, John Conor Branca and Dylan Gregory Branca. All share their father's love of music and sports.

John is married to Jenna Branca.





VIEW MORE +

## NEWS/ARTICLES

John Branca, King of Deals, Los Angeles Business Journal

JOHN BRANCA – UCLA ATHLETICS, ROCK & ROLL, AND BRANCA FAMILY FIELD

UCLA Athletics Introduces Plans for JRS Improvements

Variety: 'Neverland' Ethics Questioned as Michael Jackson Lawyers Speak at Documentaries Panel, UCLA School of Law

*Video 1 | Video 2*

Billboard: Michael Jackson Co-Executor John Branca Says He's Considering Suing 'Leaving Neverland' Director Dan Reed, Harvard

*Video 1 | Video 2 | Video 3 | Video 4*

John Branca Named #1 Music Attorney in the World by Marquis Who's Who

HITS Rainmakers: John Branca, The Closer

Michael Jackson is worth more than ever and the IRS wants a piece of it
*Bloomberg News*

King's Counsel: Lawyer Continues in Service of Pop Superstar as Estate Executor
*Los Angeles Business Journal*

VIEW ALL +

## CLIENTS

AEROSMITH**
ALAN PARSONS PROJECT
AMERICAN RECORDINGS (RICK RUBIN)
AMOS, TORI
ANKA, PAUL
ANTIN, ROBIN (PUSSYCAT DOLLS)
APOLLO ADVISORS
ATKINS, JEFFREY (P/K/A JA RULE)
AUTHENTIC BRANDS GROUP
AVEX D.D., INC.
BACH, SEBASTIAN (SKID ROW)
BACKSTREET BOYS, THE
BANDIER, MARTY / CHARLES KOPPELMAN
BEACH BOYS, THE**
BEATLES NORTHERN SONGS CATALOG**
BEE GEES, THE**
BLACK CROWES, THE
BLAINE, DAVID
BOCELLI, ANDREA
BOSTON VENTURES
BRANSON, RICHARD / VIRGIN RECORDS
BRUNEI, SULTAN OF
CANNELL, STEPHEN, PRODUCTIONS
CAREY, MARIAH
CAVALLO/RUFFALO MANAGEMENT
CETERA, PETER (CHICAGO)**
CHILD, DESMOND
COBAIN, KURT – THE END OF MUSIC, LLC (ESTATE OF KURT COBAIN)**
CONCEPCION, MIKE
COPPERFIELD, DAVID
CORNELL, CHRIS (SOUNDGARDEN, AUDIOSLAVE)
COWELL, SIMON / SYCO MUSIC
CROSBY, DAVID**
CROSBY, STILLS & NASH**
CULT, THE
D'ARBY, TERENCE TRENT
DAMN YANKEES
DEATH ROW RECORDS
DeBARGE
DELICIOUS VINYL
DENSMORE, JOHN**
DICK CLARK**
DIAMOND, NEIL**
DOORS, THE**
DR. DRE**
DURAN DURAN
DURST, FRED
DYLAN, BOB**
EAGLES, THE**
EARTH, WIND & FIRE**
EHRLICH, KEN (THE GRAMMYS)
ELO**
EMI MUSIC PUBLISHING – (SONY CORPORATION / MUBADALA)
EMUSIC.COM
EPITAPH RECORDS
FAGEN, DONALD**
FALTERMEYER, HAROLD
FIFIELD, JAMES (EMI)
FIRM, THE / JEFF KWATINETZ
FLEETWOOD MAC**
FLEETWOOD, MICK**
FOGELBERG, DAN
FOGERTY, JOHN / CREEDENCE CLEARWATER REVIVAL**
FORBES MAGAZINE
FORD, LITA
FUGEES, THE
FUJISANKEI
GABRIEL, PETER**
GENERAL MEDIA INC. (BOB GUCCIONE / PENTHOUSE MAGAZINE)
GIANT RECORDS / IRVING AZOFF
GIBB, BARRY**
GORDY, BERRY**
GUERINOT, JIM / REBEL WALTZ
HAM, BILL
HARRISON, GEORGE**
HENLEY, DON**
HIATT, JOHN
HILBURN, ROBERT
HILL, LAUREN
HINDER
HOFFS, SUSANNA (THE BANGLES)
HUTCHENCE, MICHAEL, ESTATE OF (INXS)
IGLESIAS, ENRIQUE
INCUBUS
INTERSCOPE RECORDS
ISLEY, RON**
ISAAK, CHRIS
JACK MACK & THE HEART ATTACK
JACKSON, MICHAEL**
JACKSON FIVE, THE**
JAGGER, MICK**
JEFF WALD ENTERTAINMENT
JOBETE MUSIC, INC. (MOTOWN CATALOGUE)
JOHN, ELTON**
JOHNSON, DON
JOPLIN, JANIS, ESTATE OF**
JVC
KALODNER, JOHN
KAT VON D
KAUFMAN, HOWARD / HK MANAGEMENT
KEYS, ALICIA
KHAYAT, NADIR (P/K/A REDONE)
KNIGHT, HOLLY
KOMURO, TETSUYA ("TK")
KORN
LEE, TOMMY
LEIBER/STOLLER SONGS, INC.**
LENNON, JULIAN
LIL PUMP
LIMP BIZKIT
LOPES, LISA
LOUD RECORDS / STEVE RIFKIN
LOVE, COURTNEY
LYNNE, JEFF**
MACANDREWS & FORBES HOLDINGS, INC. (RON PERELMAN)
MAINMAN/TONY DEFRIES
MANDALAY ENTERTANMENT
MATCHBOX 20
MATSHUSITA INC.
MCI
McCOO, MARILYN & BILLY DAVIS, JR.
McINTYRE, REBA
McKNIGHT, BRIAN
MEGADETH
MIGUEL, LUIS
MILLI VANILLI
MORISSETTE, ALANIS
MORODER, GIORGIO
MORRISON, VAN**
MOTOWN PRODUCTIONS
MP3.COM, INC.
MURDER, INC. / IRV GOTTI
MURPHY, EDDIE
MUSICARES
MUSICIANS ASSISTANCE PROGRAM
NEIL, VINCE (MOTLEY CRUE)
NICKELBACK
NICKS, STEVIE**
NIRVANA**
OCCIDENTAL COLLEGE
O'NEAL, SHAQUILLE OSEARY, GUY (MAVERICK RECORDS)
PASTORIUS, JACO
PET SHOP BOYS
PLAYBOY ENTERPRISES
POISON
PONY CANYON, INC.
PRESLEY, ELVIS, ESTATE OF**
PRESLEY, PRISCILLA
PRIMARY WAVE MUSIC PUBLISHING
PRUDENTIAL SECURITIES
PRYOR, RICHARD
REDDING, OTIS, ESTATE OF**
RHINO RECORDS
RICHARD RODGERS FAMILY TRUST, THE
ROBERTSON, ROBBIE / THE BAND**
ROBINSON, SMOKEY**
RODGERS AND HAMMERSTEIN ORGANIZATION, THE
ROLLING STONES, THE**
ROSA, ROBI
ROSSUM, EMMY
ROTH, DAVID LEE**
RUBIN, RICK
SABAN, HAIM
SAFEGUARD SCIENTIFICS
SANTANA, CARLOS**
SBK ENTERTAINMENT WORLD
SCHEFF, JASON (CHICAGO)
SCHUR, JORDAN / SURETONE RECORDS
SEAL
SEALS & CROFTS
SEDAKA, NEIL
SEX PISTOLS, THE**
SHAKIRA
SHAW, TOMMY (STYX)
SHORTER, WAYNE
SIR MIX-A-LOT
SLASH (GUNS N' ROSES, VELVET REVOLVER)**
SNAPCHAT, INC
SO SO DEF / JERMAINE DUPRI
SONY/ATV MUSIC PUBLISHING
SOUNDSTAGE / JOE THOMAS
STAIND
STEELY DAN**
STILLS, STEPHEN**
STRANG, CAMERON (WARNER MUSIC GROUP)
SULLIVAN, FRANKIE (SURVIVOR)
SWID, STEPHEN
SYLVERS JR., LEON
TAUPIN, BERNIE
TAYLOR, JAYCEON (P/K/A THE GAME)
THORN/EMI
TIMBERLAKE, JUSTIN
TLC
TONY! TONI! TONE!/RAPHAEL SAADIQ
TRAVELING WILBURYS
TYGA
TYLER, STEVEN (AEROSMITH)**
TYSON, MIKE
UCLA FOUNDATION
USHER
VIVENDI
VMI-VICTOR MUSICAL INDUSTRIES
WALT DISNEY, INC.
WEATHER REPORT
WEEZER
WHITE, MAURICE**
WILSON, BRIAN**
WATERS, MUDDY, ESTATE OF**
YAMAHA
YOAKAM, DWIGHT
YOSHIKI ("X")
ZAWINUL, JOE
ZEVON, WARREN
ZZ TOP**

READ LESS -

© 2022 John Branca - ZIFFREN BRITTENHAM LLP - All rights reserved.

Website by Funnel Sharks | Photo Credit: CLAUDIO ONORATI/EPA-EFE/REX/Shutterstock

# EXHIBIT J

# Eric Custer



## Partner

**Manatt Entertainment**

**Contact**

ecuster@manatt.com

Phone: 310.312.4219

Download vCard

Los Angeles

+ **Bar Admissions**

+ **Education**

**Services**

Cannabis and CBD

Intellectual Property Protection and Enforcement

**Industries**

Manatt Digital and Technology

Manatt Entertainment

Music

**Profile** Speaking Engagements Honors & Awards Memberships Publications

## Profile

Eric Custer's practice focuses on all aspects of the music industry, including the negotiation of a wide variety of music related contracts and advising clients as to intellectual property rights in the context of the music business.

Eric has provided these services for bands, recording artists, producers, songwriters, record companies, music publishing companies, film production companies, performing rights societies, music industry trade organizations, concert promoters, managers/talent agencies, brands/ad agencies, APP developers and various Internet and new media companies.

## Eric in the News

12.10.21

### Manatt Represents BMG Rights Management in Its Acquisition of Mötley …

This transaction makes it the largest single-catalog acquisition BMG has made since its formation.

10.19.21

### Manatt Represents Dundee Partners in $1.1B Acquisition of Kobalt …

A Manatt team led by Manatt Entertainment partner and leader Jordan Bromley, partner Eric Custer and associate Beau Stapleton …

04.08.21

### Nine Manatt Attorneys Recognized on Variety's 2021 Legal Impact Report

Leader of Manatt Entertainment Lindsay Conner, leader of the firm's entertainment transactions and finance practice Jordan Bromley, …

04.05.21

### Seven Manatt Attorneys Recognized Among Billboard's Top Music Lawyers

Leader of Manatt's entertainment transactions and finance practice Jordan Bromley, leader of the firm's entertainment litigation …

**Show More ›**



ATTORNEY ADVERTISING
pursuant to New York DR 2-101(f)
© 2022 Manatt, Phelps & Phillips, LLP.
All rights reserved

# EXHIBIT K

**JOSEPH MANNIS**
HERSH, MANNIS LLP
9150 Wilshire Blvd., Suite 209
Beverly Hills, California 90212
TEL: (310) 786-1910; FAX: (310) 786-1917

**1967 B.A. University of Southern California**

**1971 J.D. Loyola School of Law**

**1972 Admitted to the Bar: State of California**

## WORK HISTORY

1972 - 1995 Miscellaneous partnerships

1995 Partner: Mannis & Phillips

2000 Partner: Hersh Mannis & Bogen

2016 Present: Founding Partner: Hersh Mannis LLP

## BAR MEMBERSHIP

Member, California Bar Association
Member, Los Angeles County Bar Association, Family Law Executive Committee Member, Family Law Section American Bar Association. Member, Family Law Section Beverly Hills Bar Association
Volunteer Mediator Los Angeles Superior Court, Central District

## BIOGRAPHY, SPEAKING ENGAGEMENTS AND NOTABLE AWARDS

Mr. Mannis has practiced law since 1972. He graduated in the top 6% from Loyola Law School. For over 35 years, Mr. Mannis' practice has been almost exclusively devoted to family law. Currently, Mr. Mannis is the senior partner at Hersh Mannis LLP a firm with eleven attorneys and one of-counsel lawyers with approximately 95% of our business being in family law matters. Mr. Mannis has handled scores of cases involving significant assets, some with assets of hundreds of millions of dollars, and regularly reviews and analyzes tax returns and financial statements. He has served as lead counsel in some of the most significant child support cases in California including at least two cases with monthly child support being $100,000 or more per month. He regularly is lead counsel on significant family law matters and has represented dozens of celebrities, musicians and athletes in all areas of family law. Mr. Mannis has tried to conclusion dozens of family law cases and has serve as lead attorney in thousands of settled family law cases.  Prominent cases have included Mr. Mannis being lead

counsel for the Chairman of the Board and Chief Executive Officer of a major motion picture studio and in another, President of a major studio.

Mr. Mannis is often called upon to participate in industry discussions on relevant family law issues. In 2019, Mr. Mannis spoke on the topic of “Hollywood Divorces: An Insider's Perspective on Navigating A Divorce When Representing Clients in the Entertainment Industry” for the Beverly Hills Bar Association. The panel of experts also focused on cross over issues that family law attorneys should be apprised of when representing clients working in the entertainment industry. In 2016, Mr. Mannis was honored as a legend in Family Law by the Beverly Hills Bar Association, along with Dennis Wasser and Daniel Jaffe.

Mr. Mannis has also offered his expertise to certified public accountants and attorneys on a broad range of topics ranging from “High Wage Earners, Celebrity Goodwill”, Beverly Hills Bar Association, “Support on Support”, 48th Annual Family Law Symposium, Los Angeles County Bar Association, “Private Judges”, Beverly Hills Bar Association, “Spousal Support,” Orange County Bar Association, Family Law Section, The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005: The Impact on Family Law”, 31st Annual Family Law Symposium, “Professional Practice.

Mr. Mannis’ notable print and broadcast credits include: “Before You Say I DO” Los Angeles Daily Journal – California Law Business E! Entertainment Television (Divorce Hollywood Style), The Hollywood Divorce (MG Network, France De Quel Droit) and other entertainment ventures. Mr. Mannis produced two motion pictures (executive producer): “Cheech & Chong’s Still Smokin” and “Cheech & Chong’s Corsican Brothers.” Since 1982, a large percentage of Mr. Mannis’ practice has involved family law. Since 1988, virtually his entire practice has been family law.

Mr. Mannis has also produced or co-produced over 40 rock concerts including a sold out, all-day festival at Anaheim Stadium.

## FAMILY LAW EXPERIENCE

Mr. Mannis has practiced law since 1972. From 1972 to approximately 1976, his practice consisted of civil litigation with an emphasis on construction litigation. Beginning in 1976 through the mid to late 1980s, his practice was substantially family law. From the mid to late 1980s to the present, his practice has been almost exclusively family law. On several occasions, Mr. Mannis has qualified as an expert witness in the Los Angeles Superior Court system in family law matters. He regularly served as a family law mediator in the Los Angeles Superior Court, Central District. Mr. Mannis firm has been AV rated by Martindale-Hubbell virtually since its inception in 1990. Prior to 1990, his previous firms were also AV rated for many years. Mr. Mannis has handled dozens of cases involving significant assets, some with a value of over $750 million. He regularly reviews and analyzes tax returns and financial statements.

Mr. Mannis was named a Super Lawyer by Los Angeles Magazine’s Southern California’s Super Lawyers for 2004 to 2020. He was named a Top 100 Super Lawyer

in Southern California by Los Angeles Magazine in 2006, 2007, 2009, 2010, and 2011. Mr. Mannis' firm has been AV rated by Martindale-Hubbell virtually since its inception in 1990. Prior to 1990, his previous firms were also AV rated for many years.